IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | 19-cv-3192 |
| BUTCHIE LONG | : | |
|     Petitioner, | : | |
|   v. | : | HON. WENDY BEETLESTONE |
| | : | UNITED STATES DISTRICT JUDGE |
| THOMAS McGINLEY, et al., | : | |
|     Respondents. | : | HON. LYNNE A. SITARSKI |
| | : | UNITED STATES MAGISTRATE JUDGE |
| | : | |
| _____ | | |

## PETITIONER'S BRIEF IN SUPPORT OF HIS
## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. §2254

Karl Schwartz
Katherine Ernst
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 360-3988
schwartz@wisemanschwartz.com

Counsel for Petitioner
Butchie Long

Dated: October 13, 2021
Philadelphia, PA

# Table of Contents

Introduction ...................................................................................... 1

Preliminary Statement ...................................................................... 2

Procedural History ........................................................................... 3

Statement of the Case ....................................................................... 6

Standard of Review ........................................................................ 31

Standards Governing a Defendant's Due Process Rights ............................ 35

Standards Governing Claims of Ineffective Assistance of Counsel ............. 40

The Weakness of the Commonwealth's Case ............................................ 42

Claims for Relief ........................................................................... 46

Claim I – The Commonwealth violated Petitioner's
right to due process under the Fourteenth Amendment,
and the principles of *Napue* and *Brady*, by suppressing,
and by affirmatively misrepresenting, the nature of the
immunity offered to Rashan Gaffney ........................................... 46

Claim II – Trial counsel was ineffective under the Sixth
Amendment to the United States Constitution for failing
to request that the jury be given an interested witness/
corrupt source charge regarding the witness Rashan Gaffney ..................... 62

Claim III – Trial counsel was ineffective under the Sixth
Amendment to the United States Constitution for failing
to investigate, interview and call Delisa Griffin as an
alibi witness at trial ......................................................... 69

Claim IV – Trial counsel was ineffective under the Sixth
Amendment to the United States Constitution for failing to
investigate, interview and call Eric Green as a witness;
Green would have testified that he witnessed the shooting

and that Petitioner was not the shooter ......................................................... 90

<u>Claim V</u> – The Commonwealth violated Petitioner's
right to Due Process under the Fourteenth Amendment
as explained in *Brady v. Maryland*, by failing to reveal
Eric Green's exculpatory statement ........................................................... 105

<u>Claim VI</u> – Petitioner is entitled to relief because of the
Cumulative prejudicial effect of the errors in this case ............................. 106

Conclusion ................................................................................................ 109

## INTRODUCTION

Petitioner Butchie Long's first-degree murder conviction rested on the testimony of one identification witness: Rashan Gaffney. Gaffney identified Petitioner as the shooter in a statement to the police and at a preliminary hearing but disavowed his identification at trial. What no one knew, other than trial prosecutor Bridget Kirn and other representatives of the Commonwealth, was that Gaffney had been given transactional immunity in exchange for his testimony. These blatant *Brady* and *Napue* violations were only recently uncovered when the District Attorney's Office permitted undersigned counsel to review its trial file.

Petitioner was ultimately convicted by a jury in a trial rife with constitutional error, including those *Brady/Napue* violations, as well as multiple instances of trial counsel's ineffectiveness. By trial counsel's own admission, he did no investigation even though Petitioner consistently maintained his innocence. Because of trial counsel's utter inaction, he failed to present two critical witnesses: an alibi witness that the PCRA court found to be believable and a witness to the shooting who testified at a post-conviction hearing that Petitioner was not the shooter.

No defendant in a murder case, no matter his innocence, could survive such an onslaught of constitutional errors.

## PRELIMINARY STATEMENT

Citations to the transcripts from the state court will appear as "date," followed by "Tr.", followed by transcript page. Although most of the cited material in his brief can be found in the state court record, certain cited documents in the record, as well as any cited extra-record documents, are attached as an Appendix.

There is one PCRA court opinion of relevance to the issues addressed in this memorandum: the opinion denying Mr. Long's PCRA claims, *Commonwealth v. Long*, CP-51-CR-0003619-2012 (Pa. Com. Pleas Ct. January 27, 2017); A1[1]. This will be cited as PCRA Opinion followed by the page number cited. There is one Superior Court opinion of relevance to the issues addressed in this memorandum: the opinion on appeal of the relevant PCRA denial, *Commonwealth v. Long*, No. 3691 EDA 2016, 2018 WL 3015330 (Pa. Super. Ct. June 18, 2018).

Some of the claims involve application of identical legal standards: due process claims relating to *Brady v. Maryland*, 373 U.S. 83 (1963) and claims raising ineffective assistance of counsel. For that reason, there are fairly extensive introductory sections addressing relevant legal standards. These sections are presented to avoid the repetition of reasserting the relevant general standards in the sections addressing each claim.

---

[1] A citations refer to the Appendix filed along with this memorandum.

Finally, all of the claims involve some type of prejudice analysis (e.g., *Strickland* prejudice, *Brady* materiality, etc.). Those analyses are claim specific; however, almost all of them implicate, what Petitioner contends is, the weakness of the Commonwealth's case, founded as it was on the disavowed-at-trial statement of a comprised and secretly immunized Commonwealth Witness. To avoid repetition, Petitioner includes an introductory section titled "The Weakness of the Commonwealth's Case." Where appropriate, during discussion of materiality and prejudice, Petitioner cites to and incorporates this section.

## PROCEDURAL HISTORY

On May 17, 2013, following a jury trial before the Honorable Barbara A. McDermott, Petitioner was found guilty of first-degree murder, firearms not to be carried without a license, and possession of an instrument of crime, under CP-51-CR-0003619-2012. At that trial, Petitioner was represented by Eugene P. Tinari ("trial counsel") and the Commonwealth was represented by Bridget L. Kirn ("Ms. Kirn"). On that same date, the trial court imposed the mandatory sentence of life without the possibility of parole for first-degree murder, and concurrent sentences on the other two charges.

Petitioner appealed and on July 9, 2014, the Superior Court affirmed the judgment of sentence. *See Commonwealth v. Long*, 105 A.3d 785 (Pa.Super. 2014).

On January 26, 2105, the Pennsylvania Supreme Court denied allowance of appeal. *Commonwealth v. Long*, 108 A.3d 34 (Pa. 2015).

On December 1, 2015, Petitioner filed a counseled, timely PCRA petition. On November 21, 2016, after an evidentiary hearing, the PCRA court dismissed the petition. Petitioner appealed that dismissal and on June 18, 2018, the Superior Court affirmed the PCRA court's dismissal. *Commonwealth v. Long*, 193 A.3d 1085 (Pa.Super. 2018). On March 21, 2019, the Supreme Court of Pennsylvania denied Long's petition for allowance of appeal. *Commonwealth v. Long*, 202 A.3d 686 (Pa. 2019).

On March 22, 2019, Petitioner filed a *pro se* petition for writ of habeas corpus with the state court, which the PCRA court treated as a second, subsequent PCRA petition. On June 25, 2019, appointed PCRA counsel filed an amended petition.

On July 22, 2019, Petitioner filed a *pro se* petition for writ of habeas corpus with this Court. ECF #1. On July 31, 2019, Petitioner filed a *pro se* "motion for stay-and-abeyance," asking this Court to stay his federal habeas petition while he exhausted his state remedies in his second PCRA Petition. ECF #4. On December 3, 2019, the Honorable Wendy Beetlestone adopted Magistrate Judge Lynne A. Sitarski's Report and Recommendation that this matter be stayed and held in abeyance while Petitioner litigated his PCRA petition in the state court. ECF #14.

The State PCRA court found the Second PCRA Petition to be properly filed and addressed the merits of the petition. However, on September 24, 2019, after an evidentiary hearing, the PCRA court dismissed Petitioner's second PCRA petition.

On October 11, 2020, Karl Schwartz, Esq. entered his appearance on behalf of Petitioner before this Court. ECF #15.

Petitioner appealed the dismissal of his second PCRA petition. On July 28, 2020, the Superior Court agreed with the PCRA court that the second PCRA petition was properly filed and  affirmed the PCRA court's merits dismissal. *Commonwealth v. Long*, 239 A.3d 105, 2020 WL 4332930 (Pa.Super. 2020). On November 19, 2020, the Supreme Court of Pennsylvania denied Petitioner's petition for allowance of appeal (153 ET 2020).

On March 4, 2021, Katherine Ernst, Esq. entered her appearance on behalf of Petitioner before this Court. ECF #18.

Based upon his recent discovery of previously suppressed *Brady* material (*see* Claim 1 below), Petitioner asked for leave to amend his Petition, which was granted on March 8, 2021. ECF #23. After a number of extensions, this Brief in Support follows.

## STATEMENT OF THE CASE

### The Shooting Death of Ercel Butts-Sterns

On November 10, 2011, at approximately 6:30 p.m., Ercel Butts-Sterns was shot near the intersection of 57th and Willows Streets in Philadelphia. 5/14/13 Tr. 40-41. On January 19, 2012, Petitioner was charged with Butts-Stern's murder.

### Petitioner's Trial

Petitioner was tried by jury between May 14 and May 17, 2013.

### Introduction

The shooter's identity was the central issue at trial. The Commonwealth's theory hinged around a dispute that occurred at the MJ Mini Market twenty minutes before the shooting. 5/14/13 Tr. 23.

One hour before this dispute occurred, Petitioner went to the same mini market. In the mini market's surveillance video, Petitioner is seen greeting a man in a red hoodie for less than a minute outside the store. 5/16/13 Tr. 89-90. Minutes later, Petitioner left the store's property and is not seen on the video again. *Id.*

An hour after Petitioner left the mini market, Butts-Sterns, Rashan Gaffney, and two other friends[2] went to this same mini market. 5/14/13 Tr. 146. A man in a red hoodie, who was never identified by anyone, got into an altercation with Rashan

---

[2] These friends were Benderick Sterns and Lidell Brightman. 5/14/13 Tr. 146. Neither man testified at trial, however, so for the ease of the reader they will be referred to generically as friends.

Gaffney outside the store. 5/14/13 Tr. 151. During this altercation, Gaffney pulled out an illegal gun and fired it twice. *Id.* at 151-152. This can all be seen on the surveillance video.

Butts-Sterns, Gaffney, and their friends started walking home. 5/14/13 Tr. 153. Thereafter, two men began following them, eventually culminating in the shooting and killing of Butts-Sterns. 5/14/13 Tr. 154. The shooter was identified by two independent witnesses as wearing a black hoodie with a white stripe. 5/14/13 Tr. 40-41; 5/15/13 Tr. 12-13.

Gaffney identified Petitioner as the shooter in a statement to the police. As discussed below (*see* "Evidence Discovered in the Commonwealth's File, *infra* at 16), in light of Gaffney's implication of Petitioner, the Commonwealth affirmatively decided to overlook Gaffney's criminal conduct, a fact never disclosed to trial counsel, and no other witness identified Petitioner as the shooter. Indeed, during the trial, Gaffney himself disavowed his former identification and explained that he only chose Petitioner out of the photo array because police had shown him pictures of Petitioner from the earlier surveillance video. 5/14/13 Tr. 171.

The Commonwealth argued that because Petitioner was wearing a black hoodie with a white stripe in the surveillance video, he must have been the shooter. 5/16/13 Tr. 85-86. Even though Petitioner had left the mini market more than an hour prior to the confrontation between Gaffney and the man in the red hoodie, the

7

Commonwealth theorized, with no evidence, that Petitioner must have been standing nearby, off camera all that time. *Id.* at 102-103.

Petitioner has consistently maintained that he had nothing to do with this shooting, and that he was not at the mini market when the dispute occurred, twenty minutes before Butts-Stearns was shot. 11/21/16 Tr. 42.

### The Commonwealth's Case

The Commonwealth presented surveillance video from the convenience store, four fact witnesses (including Gaffney), and numerous police witnesses during its case against Petitioner. No forensic evidence connected Petitioner to the shooting. Thus, the Commonwealth's case rose or fell on the strength of prior inconsistent statements of the single alleged eyewitness, who disavowed those statements at trial and whose immunity deal was kept from the jury. Below, Petitioner summarizes the relevant evidence.

**The Surveillance Video.** Petitioner entered the MJ Mini Market convenience store at 5:03 p.m. (17:55:02 camera time).[3] 5/15/13 Tr. 139; *see also* C-71 (surveillance footage). In the video, Petitioner was wearing a dark hoodie with a white stripe. 5/15/13 Tr. 129-130. Petitioner was also wearing dark track pants with

---

[3] The stamp on the video footage is 17:55:02, but Det. Thorsten Lucke testified that the time on the video is off by approximately 52 minutes from the real time. 05/15/2013 Tr. 122-123. Thus, one takes the time stamped on the camera (camera time) and subtracts 52 minutes to get the accurate or real time. *Id.* at 122-123.

a prominent white stripe running down the side of each leg. 5/14/13 Tr. 223-224. Petitioner greeted a man in a red hoodie outside of the mini market and interacted with him for less than a minute. *Id.*

The man in the red hoodie entered the mini market at approximately 5:04 (17:55:52 camera time). *Id.* The man in the red hoodie exited the mini market at 5:04 (17:56:23 camera time) and walked east on Walnut Street. *Id.*

Petitioner also exited the mini market at approximately 5:04 (17:56:28 camera time), but he walked west on Walnut Street. Petitioner is not seen on the video again. *Id.*

Over an hour later, at 6:09 (19:01:22 camera time), Ercel Butts-Sterns, Rashan Gaffney and two other friends entered the mini market. *Id.* Less than a minute later at 6:09 (19:01:52 camera time), all four exited the mini market and walked west on Walnut Street toward the corner of Walnut and 56th Streets. *Id.*

At 6:10 (19:02:00 camera time), the man in the red hoodie came around the corner of 56th Street and Walnut Street and walked toward Butts-Sterns, Gaffney and friends. *Id.* The man in the red hoodie exchanged words with Gaffney. *Id.* Seconds later, the man in the red hoodie took a swing at Gaffney. *Id.* Gaffney pulled his gun and fired shots at the man's feet. *Id.* Gaffney then ran north on 56th Street with Butts-Sterns and their two other friends.

Twenty minutes later, at 6:39 p.m., officers responded to a radio call regarding Ercel Butts-Sterns' shooting near 57th Street and Willows Avenue. 5/15/13 Tr. 20.

**Hazel Matthias** was driving her car in Philadelphia with her sister Tracie Hunter in the passenger seat on November 10, 2011 around 6:30 p.m. 5/14/13 Tr. 40-41. She saw a group of 4-5 men running in front of her car west toward Willows Street. *Id.* at 41. She heard a sound like a firecracker as the men ran. *Id.* at 42. One of the men fell to the ground, and another man stood over the fallen man with something in his hand. *Id.* at 43. She then heard another shot. *Id.*

The shooter had on a blue or black hoodie with a white stripe. *Id.* at 44. The shooter had the hood up, so she could not tell his race. *Id.* at 47. The shooter ran by her car, approximately 12 feet away from her, but in the dark (the sun had already set) she could not see his face. *Id.* at 55-57. She did not notice what pants the shooter was wearing. *Id.* at 67.

**Tracie Hunter**. On November 10, 2011, at approximately 6:30 p.m., Tracie Hunter was a passenger in the car driven by her sister Hazel Matthias. 5/15/13 Tr. 7. When they got onto 57th Street, she saw some young men running toward Willows Street. *Id.* at 8. Two to three men were chasing another man, one of the pursuers pointing something at the back of the man they chased. *Id.* Hunter heard a pop, and the man being chased fell to the ground in the street. *Id.* The man with the gun walked over to the fallen man and shot him again. *Id.* The shooter ran past the car Hunter

10

was in, right by her passenger window, but she did not see his face. *Id.* at 10-11. The shooter was wearing a dark hoodie with a white stripe on it. *Id.* at 12-13. Hunter did not notice anything in particular about the shooter's pants. *Id.*

**Ebony Mitchell.** On November 10, 2011, Ebony Mitchell lived near the corner where the shooting occurred. 5/14/13 Tr. 99-100. At 6:30 p.m. she was home with her children, their father having left to play basketball a few minutes earlier. *Id.* at 101. At 6:30 she heard gunshots. *Id.* Worried that her boyfriend might have been hit, she walked out on her steps to see if he was okay. *Id.* at 101, 103. She saw three people. *Id.* at 102. One man was African American and heavyset; he had braids and a bright track jacket on. *Id.* at 109-110. The second man was African American and wearing a red shirt and dark pants. *Id.* at 110. The third man was African American and had on all dark clothes. *Id.* at 112. Mitchell never testified to a dark hoodie with a white stripe, nor did she notice pants with bright white stripes. She was also not able to identify any of these individuals. *Id.* at 125. Mitchell watched these three men for a couple minutes. *Id.* at 103.

Mitchell then went back inside to put on shoes and a different shirt. *Id.* at 104. While she was putting on her shoes, she heard another gunshot or two. *Id.* at 104. She went back outside. *Id.* The three men she had seen were gone, and by then neighbors were gathering around. *Id.* at 104.

**Rashan Gaffney** knew the victim, Ercel Butts-Sterns, his whole life; they were friends. 5/14/13 Tr. 146. On November 10, 2011, Gaffney, Butts-Sterns, and two other friends went shopping downtown. *Id.* at 147. They took the bus to their friend "E"'s house ("E" is Eric Green). *Id.* at 147; *see also* Gaffney Statement at 1-2; A22. Green was not home, so they went to the nearby convenience store, the MJ Mini Market, to get change for the bus. *Id.* at 148. This store was approximately 10 blocks from where the group lived. *Id.* at 149. Gaffney went into the store, came out, and when he went to turn the corner, a man asked him what was going on. *Id.* at 150. Gaffney said, "What do you mean?" and the man swung at him. *Id.* at 150-151. The punch missed, and Gaffney pulled out a gun. *Id.* at 151. Gaffney knew that it was illegal for him to possess this gun. *Id.* at 214. Gaffney shot the gun toward the ground. *Id.* at 152. This can all be seen on the surveillance video.

Gaffney, Butts-Sterns, and their two friends started walking back toward where they lived. *Id.* at 154. Some people started following them, but those people were too far back for Gaffney to make out who they were. *Id.* at 154. Gaffney and his friends walked down a few more streets, and then met up with their friend, Eric Green, just before more shooting started. *Id.* at 155.

Shots came from behind them. *Id.* at 156. Gaffney looked back and saw two black men chasing them. *Id.* After the shooting started, Gaffney and his friends, now including Green, ran down Frazier Street. Butts-Sterns got shot while they were

running. *Id.* at 158. Gaffney grabbed Butts-Sterns' arm and told him to come on. *Id.* at 159. By this point, all of their other friends (including Green) had run away. *Id.* at 159. Gaffney ultimately left Butts-Sterns and ran under a truck. *Id.* at 160. Gaffney saw a man in a black hoodie with a white stripe stand over Butts-Sterns. *Id.* at 161. The type of hoodie the shooter was wearing was very common. Gaffney testified that he, himself, had a hoodie just like it, and that in fact, "[t]he whole city wear[s] that jacket." *Id.* at 236.

The shooter did not have a large white stripe down the side of his pants. *Id.* at 249. Gaffney never saw the face of the shooter; all he saw was the black and white hoodie. *Id.* at 164. After the shooting, he waited a bit where he was hiding, then he got out from under the truck and ran to a friend's house. *Id.* at 163.

On December 30, 2011, Gaffney gave a statement to homicide detectives. *Id.* at 165. Because the surveillance video showed him shooting an illegal gun, he was given *Miranda* warnings prior to giving a statement. *Id.* at 165. During his statement, Gaffney was shown a photo array and circled Petitioner's picture. *Id.* at 171. He testified at trial that the only reason he circled Petitioner was because detectives had shown him a surveillance photo of Petitioner from the convenience store, so he circled the man who was wearing the black and white hoodie in that surveillance photo. *Id.* at 171.

13

Gaffney's written statement to the police indicated that he arrived at Homicide at 1:10 p.m. and his statement was taken five hours later at 5:54 p.m. *Id.* at 216. However, Gaffney testified that, in fact, he was held by homicide detectives for a day and a half before he gave the statement. *Id.* at 250-251. He was not free to leave prior to his giving the statement. *Id.* at 218. Indeed, Detective Tracey Byard, who took his statement, acknowledged that they only "cut him loose" after he finally gave his statement. 05/15/2013 Tr. 83.

Gaffney had also previously testified on March 21, 2012, at Petitioner's preliminary hearing. 5/14/13 Tr. 204. During the preliminary hearing, he identified Petitioner as the shooter. *Id.* at 197. However, at the preliminary hearing, Gaffney also testified that the men who followed him and his friends (and ultimately shot Butts-Sterns) were the same men who they got into an altercation with at the mini market, and Gaffney acknowledged during his trial testimony—as proven by the video—that he never saw or encountered Petitioner at the mini market. *Id.* at 245-47.

### Gaffney's Immunity

The defense emphasized in the opening that Gaffney had been given immunity in exchange for his testimony in this case.

> I want you to pay careful attention to Rashan [Gaffney]'s testimony either sometime today or tomorrow, and when you listen to him testify, you're going to hear one thing that the Commonwealth hasn't already

14

told you. He has been given immunity in this case to testify against this man, immunity.

5/14/13 Tr. 36-37.

During the trial, however, the Commonwealth emphasized to the court *and the jury* that Gaffney was only given use immunity for his testimony—not transactional immunity. *See id.* at 242-43 (trial prosecutor corrects trial court, after trial court announces that Gaffney would not be prosecuted and advises the trial court and jury that the immunity is just for Gaffney's testimony). Given, that Gaffney had been caught on video committing his crimes, use immunity did nothing to shield him from future charges. Thus, the Commonwealth represented to the Court and the jury that the immunity Gaffney was given would not insulate him from prosecution for his discharge of the illegal firearm. *Id.* Following that representation, trial counsel did not mention immunity again in his closing argument.

### The Defense Case

Trial counsel, Eugene Tinari, called no witnesses and presented no evidence during the trial.

### The Jury's Verdict

During deliberations, the jury asked seven questions, including asking to see the photograph of Petitioner in the mini market, the photo array Gaffney viewed, and Gaffney's statement. 5/17/13 Tr. 2; *see also* Jury Question Sheets; A31-A33. Ultimately the jury found Petitioner guilty of all charges. *Id.* at 3.

15

## Evidence Discovered in the Commonwealth's File

On March 2, 2021, the Commonwealth permitted undersigned counsel to inspect its trial file in this case. During that inspection, an email from Assistant District Attorney Edward Cameron, of the Homicide Unit, to Homicide Prosecutor Bridget Kirn and others in the District Attorney's Office, was discovered. A34. The email, dated January 25, 2012, stated in full:

> Please assign this case to Bridget Kirn. Bridget, this case has a history that is a little complicated. You will need to immuniuze (sic) witness Rashan Gaffney. He had a gun earlier on in this incident and either fired it at a person or at the ground. **We needed him as a witness, so I did not approve an arrest. That position may change if he gives you a hard time.** There is a related murder wherein a relative of the decedent, Ben Stern[s] killed someone in retaliation for this case.

A34 (emphasis added).

Thus, the District Attorney's Office by January 25, 2012, had agreed that Gaffney would not be arrested or charged for possessing and firing an illegal weapon as long as he did not "give [Ms. Kirn] a hard time." *Id.* Indeed, Gaffney never was charged with the possession of that illegal weapon, or crimes related to shooting it, notwithstanding the fact that he was caught shooting it on video. The statute of limitations regarding those crimes is now expired. 42 Pa.C.S. §5552.

On April 9, 2021, Eugene Tinari executed a declaration pursuant to 28 U.S.C. §1746 and 18 Pa.C.S. §4904 in which he declared that the prosecution had

16

represented that Gaffney only received use immunity and that no deal for transactional immunity had ever been disclosed to him. Tinari declared:

> In the absence of the evidence that Gaffney was getting off "scot-free," the prosecutor was able to credit Gaffney's motives in identifying Long as pure. She did so in her closing. Her argument would have been infinitely weaker, and mine infinitely stronger, had the jury known that from the very outset, the decision was made not to prosecute Gaffney if he cooperated. This is because Gaffney's incentive to lie at the preliminary hearing to avoid charges, was far more than a question of *hope*. He had a guarantee, that only the Commonwealth knew about. My argument would have been stronger because it would have been based on fact, rather than speculation. I could have pointed to the deal for transactional immunity and argued that there had to be reasonable doubt when the Commonwealth was seeking a murder conviction based upon the disavowed identification of a man incentivized before the preliminary hearing by the knowledge that he would not be prosecuted for his serious crimes.

A36-A37 (emphasis in original).

### **The First State Post-Conviction (PCRA) Proceeding**

The initial PCRA hearing was held on November 18 and 21, 2016. Petitioner presented three witnesses during his case-in-chief: Eric Green, Petitioner, and Delisa Griffin. The Commonwealth called trial counsel, Eugene Tinari. In rebuttal, Petitioner called Jazmine Cobb. The witnesses' testimony related to three issues relevant to this petition: (1) whether trial counsel was ineffective for failing to investigate and call Delisa Griffin as an alibi witness, (2) whether trial counsel was ineffective for failing to investigate and call Eric Green as an eyewitness, and (3)

17

whether the Commonwealth violate its *Brady* obligations by not disclosing to the defense that Green told police that Petitioner was not the shooter.

### Petitioner's Evidence-in-Chief at the PCRA Hearing

**Statement of Rashan Gaffney.** Petitioner submitted the statement of Rashan Gaffney taken by Detectives Byard and Kane December 30, 2011. *See* Gaffney Statement at 2; A22. In this statement, Gaffney related, as he did in his trial testimony above, that he and his friends met up with "E" or Eric Green immediately prior to when the shooting began, and also that once the shooting began, the friends scattered, ultimately leaving Gaffney as the only one present hiding under a truck when the shooter finally stood over Butts-Sterns and shot him as he lay on the ground. *Id.* at 1-2.

**Eric Green** testified that on November 10, 2011, he went to school, came home and then fell asleep. 11/18/16 Tr. 30. His phone rang and it was Benderick Sterns. *Id.* at 30-31. Green asked his mom to drive him to his old neighborhood to meet up with his friends. *Id.* at 31. While Green was on the way, Benderick Sterns called him again and told him that he and others had "got into it" with somebody in West Philly. *Id.* at 31. Sterns said that two people were following him and his friends, so Green stayed on the phone with him. *Id.* at 31. Sterns said the two guys turned off and were not following them anymore and he said to meet them at 56th Street; Green agreed and they hung up. *Id.* at 32. Green met them at 56th and Malcolm; the group

consisted of Benderick Sterns, Rashan Gaffney, Ercel Butts-Stern, Lidell Brightman and now Green.

The group started walking toward a convenience store (not the MJ Mini Market), when Gaffney said, "who's this behind us?" *Id.* at 33. Green looked behind them and saw a guy running on the other side of the street coming toward them with a gun. *Id.*

"And by the time he got towards us, he came between the cars and he was pointing a gun at us and shots went off." *Id*. Green ran to 57th and Pentridge. *Id.*

Green was able to see the gunman's face. *Id.* at 34. The gunman was not Petitioner. *Id.* Green knew it was not Petitioner because he knew Petitioner from school at Delaware Valley High School. *Id.* at 34. Green described the shooter as wearing a hoodie, older and with a beard. *Id.* at 35.

After the shooting, Green was brought to Homicide to speak to detectives. *Id.* at 35. They asked him what happened, and he told them the above narrative. *Id.* Detectives showed Green a picture of Petitioner, and Green told detectives that he knew Petitioner was not the shooter because he went to school with Petitioner and that was not the man he saw. *Id.* Green never told detectives that he was not present for the shooting or that he did not see the shooting. *Id.* at 36. Green reaffirmed that he specifically told detectives that Petitioner was not the gunman. *Id.*

After Green found out that Petitioner had been arrested for the Butts-Sterns killing, and before Petitioner's trial, Green told Petitioner that he knew he had not shot Butts-Sterns, and he volunteered to speak to Petitioner's lawyer about it. *Id.* at 43-44.

**Activity Sheet Dated 12-31-11.** Petitioner submitted an activity sheet prepared by Detective Thorsten Lucke dated December 31, 2011 that stated in relevant part:

> On Saturday, December 30, 2011, Det. Lucke spoke with Eric Green, who had been brought to the Homicide Unit in an unrelated matter. Green stated that he was not present during the decedent's murder and had no information pertaining to it and no formal statement was taken.

*See* Activity Sheet; A40.

**Petitioner (**Butchie Long) testified that on November 10, 2011, he went to his grandmother's house and washed up, and then called Delisa Griffin to find out what time he could come over to her house. 11/21/16 Tr. 7. Griffin told him to come over around 5:30 because it was her mother's birthday, so her mother was leaving the house around 5:00. *Id*

Around 5:00, he went to the store across the street from his house, the MJ Mini Market. *Id.* at 7-8. He went in and out of the convenience store and then he went around the corner to Sayre High School to watch basketball until it was time

to go to Griffin's house. *Id.* 8, 10. He got to Griffin's house at 5:30. *Id.* at 14.[4] They did not leave the apartment all night, and he left the next morning. *Id.* at 14-15.

Petitioner had nothing to do with Butts-Sterns' killing *Id.* at 15.

Petitioner retained his trial attorney, Eugene Tinari, two months before trial. *Id.* at 16. Petitioner only saw trial counsel twice: the day he introduced himself when Petitioner agreed to retain him, and about thirty seconds before entering the courtroom for trial. *Id.* at 19-20.

At their first meeting, trial counsel had not yet received the discovery. *Id.* at 19-20; *see also id.* at 17 (PCRA judge noting that trial counsel sent a letter to the court on March 5 saying that he needed the discovery). At this meeting, Petitioner told trial counsel that he did not commit the killing. *Id.* at 19-20. He told trial counsel that he was with a friend that night. *Id.* Trial counsel told Petitioner that he thought he could successfully defend his case, so Petitioner retained him for $10,000. *Id.* at 20. At this meeting, Petitioner told trial counsel about Delisa Griffin. *Id.* at 20. He wrote down her name and telephone number. *Id.* at 20. Trial counsel told Petitioner that he would interview Griffin. *Id.* at 26.

After this initial meeting, trial counsel never visited Petitioner again. Moreover, trial counsel never set up any private legal calls with Petitioner at the jail so that they could discuss his case. *Id.* at 21. Petitioner wrote trial counsel many

---

[4] The killing occurred at approximately 6:30 p.m. 05/14/13 Tr. 40-41.

letters, but trial counsel never once wrote him back. *Id.* at 22-23. The only mail Petitioner ever received from trial counsel were receipts when Petitioner made payments. *Id.* at 23. Before trial, trial counsel never discussed trial strategy with him. *Id.* at 23. They spoke on the phone two or three times, but they did not talk trial strategy on those calls because they were calls placed by Petitioner from the prison, and thus they were monitored and recorded. *Id.* at 23. The only way to have a confidential call with an attorney from jail is for the attorney to set up that call, but trial counsel never did. *Id.* at 25. Thus, when Petitioner called trial counsel, he would ask his lawyer if he had received Petitioner's letters and would ask him to write back; trial counsel would say he would, but he never did. *Id.* at 25.

Eric Green ended up briefly being Petitioner's cellmate in the county jail. *Id.* at 27. Green said that he knew Petitioner had not committed this murder and so Green was willing to come to court to testify to that. *Id.* at 28. Petitioner wrote to trial counsel about Green's willingness to be a witness. *Id.* at 27.

When Petitioner was brought to court for his trial, he asked trial counsel if he had interviewed Green and other witnesses; trial counsel said no and that it was now too late. *Id.* at 29. Petitioner saw Delisa Griffin in the courtroom every day of the trial, so he assumed trial counsel would call her. *Id.* at 32.

The PCRA court asked Petitioner why he did not tell the court that he objected when his attorney informed the court that he was not going to call any witnesses. *Id.*

at 38-39. Petitioner responded: "I was following Tinari's lead, Your Honor. That's what I hired him for. That's – this is his profession. I don't know about the law. This is his profession. This is what I hired him for." *Id.* at 39.

**Delisa Griffin** testified that on the morning of November 10, 2011, she spoke to Petitioner. 11/21/16 Tr. 81. She made arrangements with him to come over around 5:00 or 5:30 because her older sister was coming to get her mom to take her mom out for her birthday. *Id.* at 84. Griffin testified repeatedly that she was confident of the date because November 10 is her mother's birthday. *Id.* at 81, 84, 85.

Around 5:00, Griffin's mom left and shortly thereafter Petitioner came over. *Id.* at 82. He got to her house between 5:15 and 5:45. *Id.* at 85. He stayed all night and left the next morning. *Id.*

Griffin spoke to Petitioner's attorney before the trial. *Id.* at 87. When she spoke to the attorney, Griffin was in a car with Jazmine Cobb. *Id.* at 87. It was Jazmine Cobb who called trial counsel while Griffin was in the car, and he picked up. *Id.* Griffin then got on the phone and trial counsel indicated that he already knew who she was. *Id.* Trial counsel asked for her phone number. *Id.* Griffin told trial counsel that Petitioner was with her the night of the murder, but their conversation was brief—only about three minutes. *Id.*

After that conversation, trial counsel never contacted Griffin before the trial. *Id.* at 88. Griffin attended the trial. *Id.* During the trial she approached trial counsel

in the hallway. *Id.* at 89. She asked if she was still going to be used as a witness, and he said he was not sure but that she should stick around. *Id.* 89. She attended every day of the trial so she could be a witness for Petitioner, but she was never called. *Id.*

### Commonwealth's Evidence

The only witness the Commonwealth presented was Eugene Tinari. Notwithstanding Eric Green's testimony that he told detectives that he witnessed the shooting, and that Petitioner was not the shooter, the Commonwealth did not call Detective Thorsten Lucke, the detective who, according to the Commonwealth's Activity Sheet Dated 12-31-11, interviewed Green. The Commonwealth did not call the Detective even though he was the lead detective on the case, and the hearing was held on two separate days across two weeks.

**Eugene Tinari** was retained two months prior to Petitioner's murder trial. 11/21/16 Tr. 164. He testified that he believed this was a sufficient amount of time to prepare, even though he accepted the case before even reading the discovery. *Id.*

#### *Direct examination*

Trial counsel testified that he did not "recall any information about an alibi defense." *Id.* at 114. He testified that he did not recall Petitioner giving him any information about any potential witnesses. *Id.* at 114. Trial counsel also initially testified that the only girlfriend he knew about was Jazmine Cobb, and that he did not remember Delisa Griffin. *Id.* at 114.

24

In fact, trial counsel did not recall having any conversations with Petitioner about the possibility of witnesses of any sort, either conversations initiated by Petitioner or conversations initiated by trial counsel. *Id.* at 115-116. Trial counsel testified that he only ever considered the strategy of impeaching Commonwealth witnesses during cross-examination and never considered developing independent defense evidence. *Id.*

As to Eric Green, trial counsel said that all he remembered was "[s]omething along the line he was interviewed and he didn't make an ID." *Id.* at 121-122. Trial counsel testified that he did not recall Petitioner telling him that Green had information helpful to the defense. *Id.* at 124.

Trial counsel could provide no examples of any due diligence he performed to learn about or develop Petitioner's version of the events. *Id.* at 125-126.

When asked about the letters Petitioner sent to him, trial counsel said that he handed over his entire file with all pretrial letters to appellate counsel, so he no longer had them. *Id.* at 126. He could only find one letter from Petitioner that he had saved electronically, but it was from after the trial. *Id.*

### *Cross-examination*

On cross-examination, trial counsel did not remember when he first spoke to Petitioner, including whether he had received the discovery at that point, and he did not recall anything about their first meeting. *Id.* at 133-134.

Trial counsel testified that it was his standard practice to take notes at meetings, but there were no notes from any meetings in Petitioner's file. *Id.* 136. To explain the absence of any notes in the file, trial counsel suggested that maybe he pulled all the "work product" from Petitioner's file before sending it to appellate counsel. *Id.* at 136. PCRA counsel asked trial counsel if he was in possession of any work product from this case, and trial counsel responded, "I don't have it with me here, no." *Id.* at 136.

After their first meeting, trial counsel "couldn't tell you how often [he] communicated with" Petitioner. *Id.* at 139. When asked if he visited Petitioner a second time at the county jail, trial counsel said, "I can't tell you for sure." *Id.* at 140. Trial counsel testified that he did speak to Petitioner after this first visit. *Id.* at 147. When asked where those conversations occurred, he said, "[t]hey would have occurred at the prison or if he called me on the phone." *Id.*

When asked if he has a standard interview sheet, trial counsel said he does have a client intake form, but that he does not always use it, and his secretary usually scans the forms to put them in the electronic folder, but sometimes she forgets. *Id.* at 141-142, 145.

When asked what Petitioner said in his pretrial letters, trial counsel said he did not recall. *Id.* at 148. When asked if he replied to any of Petitioner's pretrial letters trial counsel said, "Again, I don't recall if I did or not." *Id.* at 150.

26

Trial counsel claimed that he gave the entire paper file to the attorney handling the case on direct review before the Supreme Court, Mr. Lowenberg, but he could not say whether he removed the letters before giving the file to that attorney. *Id.* at 153.

The PCRA court asked trial counsel to call his office to find out whether he had any documents, paper or electronic, with regard to Petitioner's case. *Id.* at 154. After a recess, trial counsel testified that he had given the entire paper file to Mr. Lowenberg and the only thing in his electronic file was a single post-trial letter from Petitioner. *Id.* at 154.

PCRA counsel asked trial counsel whether he would have saved a copy of any letter he had written to Petitioner on the hard drive of his computer. *Id.* at 158.

THE WITNESS: Yeah. What I have is on here. So there are no letters on the hard drive.

MR. COOLEY: Does that mean you didn't write any letters?

A. Pretrial?

Q. Pretrial.

Does that mean you did not write any letters?

A. I—I don't know the answer to that, sir. I'd have to –

Q. Okay.

A. Again, I don't know.

*Id.* at 161-162 (cleaned up).

27

Trial counsel acknowledged that Petitioner had told him that he was innocent of the charges. *Id.* at 146. When asked if he ever specifically asked Petitioner about an alibi, trial counsel said, "I don't recall." *Id.* at 167.

When asked what the most damaging evidence against Petitioner was, trial counsel answered that it was the video and eyewitness statements, especially Gaffney's statement. *Id.* at 166. Nonetheless, trial counsel did not try to interview any of the eyewitnesses prior to trial, including Gaffney. *Id.* at 169. Trial counsel was asked whether he believed it was important to interview eyewitnesses in an eyewitness case and he said, "Sometimes. Not always." *Id.* at 171-172.

Trial counsel never tried to interview Eric Green. *Id.* at 181. PCRA Counsel asked if it raised any red flags for him that Rashawn Gaffney's statement said that Green was present at the shooting, but the Detective's activity sheet said otherwise. Trial counsel answered, "No." *Id.* at 177. Trial counsel claimed that he interpreted Gaffney's statement to indicate that Green was not present during the shooting, even though the statement says: "**We met up with Eric Green** on Malcolm and Frazier St and the two guys were about two or three houses from us on Malcolm Street. I seen them and I said to them, Yo, who are those two boys following us? They like where, and I like here and when they saw them **we started running and they started chasing us and we ran down Frazier to Hadfield and they was shooting at us the whole time**." *Id.* at 178-179; 180 (emphasis added) (PCRA counsel read

this portion of the statement to trial counsel); *see also* Gaffney Statement at 3; A25.

Trial counsel could not explain how his interpretation made sense given the words

of the statement itself. *Id.*

    The cross-examination turned to alibi witness Delisa Griffin. PCRA counsel

asked:

> Q. Hypothetically speaking, if Delisa Griffin came in here and testified that she had a conversation with you, that's not true?
>
> A. I don't know. I don't recall having a conversation with her.
>
> Q. So you're saying it's possible you had a phone conversation with Delisa Griffin?
>
> A. It could be. I don't know who she is or when the conversation was that you're talking about.

*Id.* at 182.

    PCRA counsel continued to ask trial counsel about his conversations with

Griffin, and trial counsel said that the questions refreshed his recollection. *Id.* at 184.

    Trial counsel then testified that he *did* remember something about there being

a love "triangle." *Id.* at 185. He remembered Petitioner speaking to him about

another girl that Petitioner had been seeing during his relationship with Jazmine

Cobb. *Id.* ("I remember him [Petitioner] saying I'm going through it with Jazzy or

something…"). He also remembered speaking to Griffin ("this other girl called

me"). *Id*. He did not remember the specifics of their conversation, however, or

critically whether he spoke to Griffin before or after trial. *Id.* at 185.

Moving to trial counsel's overall trial preparation, when trial counsel was asked what he did to prepare for trial he said that he read the discovery and got ready for cross-examination; he did not interview witnesses or develop the defense case in any other way. *Id.* at 189.

> Q. Did you interview any witnesses?

> A. I don't—of the Commonwealth witnesses, I don't recall interviewing them before trial.

> Q. Did you interview any defense witnesses?

> A. We didn't have any defense witnesses.

> Q. So [Petitioner] just sat there, never said—never gave you—identified any one person to interview is that your testimony?

> A. (No response.)

> Q. He wrote you, like I'm innocent, I'm innocent. So for the eight weeks you represented him, he didn't mention one witness?

> A. Well, if you have a letter, show it to me. I don't recall.

*Id.* at 189-190.

Trial counsel reiterated that when he said that he did not recall a discussion with Petitioner about an alibi witness prior to trial, he could not say that the event did not occur; he simply did not remember. *Id.* at 190.

### Petitioner's Rebuttal

**Jazmine Cobb** testified that she and Delisa Griffin were in her car, on their way to a religious service. 11/21/16 Tr. 212. Cobb called trial counsel to find out

30

what was going on with Petitioner's case. *Id.* at 213. Trial counsel often did not answer the phone when she called, but he did on this occasion. *Id.* at 211-212. She handed the phone over to Griffin and had trial counsel speak to Griffin. *Id.* at 213. Cobb heard Griffin give trial counsel her name, phone number and address. *Id.*

## STANDARD OF REVIEW

This case is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §2254. Under AEDPA, a federal habeas court cannot grant relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

### Section 2254(d)(1)

Under § 2254(d)(1), "clearly established federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A state court's decision is "contrary to" clearly established federal law if the state court (1) "applies a rule that contradicts the governing law" set forth in Supreme Court precedent, or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from that reached

by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06. A state court decision is an "unreasonable application of federal law" if the state court "identifies the correct governing legal principle," but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A rule's unreasonable application corresponds to the specificity of the rule itself: "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### Section 2254(d)(2) Generally

Under 28 U.S.C. §2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Determinations of factual issues made by state courts are presumed to be correct. *Miller-El*, 537 U.S. at 340. However, "[d]eference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable...." *Id.* at 340.

### When the State Court Misstates or Misapprehends the Record

Where the state court plainly misstates or misapprehends the record in making its factual findings, and the misapprehension goes to a material factual issue, the misapprehension can fatally undermine the fact-finding process, rendering the state

court's determination of the facts "unreasonable" under §2254(d)(2). *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (where state court based its conclusion, in part, on a clear factual error, "[t]his partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision"); *Hall v. Director of Corrections*, 343 F.3d 976, 983 (9th Cir. 2003) (*per curiam*) (rejecting state court's finding as unreasonable where court "proceeded from an incorrect premise"); *Alexander v. Cockrell*, 294 F.3d 626, 631 (5th Cir. 2002) (*per curiam*) (state trial court's finding was unreasonable where it "erred in reading" affidavit of counsel); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (when state court misapprehends a material fact central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process requiring relief under §2254(d)(2)); *Canaan v. McBride*, 395 F.3d 376, 383 (7th Cir. 2005) (state court not entitled to deference when its factual finding was "flatly contradicted" by the record); *Bui v. Haley*, 321 F.3d 1304, 1314-16 (11th Cir. 2003) (state factual findings unreasonable when there were insufficient evidence of record to support the factual inference); *Miller v. Dormire*, 310 F.3d 600, 603-604 (8th Cir. 2002) (same).

**When State Court Ignores Critical Evidence in the Record**

When the state court has before it, yet apparently ignores, evidence that is highly probative and central to the petitioner's claim, this can undermine the fact-finding process. *See, e.g., Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005) ("The

33

state trial court's omission, without explanation, of findings on evidence crucial to Guidry's habeas claim, where the witnesses are apparently credible, brought into question whether, under subpart (d)(2), its 'decision…was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'"). While state courts are not required to address every "jot and tittle" of proof suggested to them, in making factual findings "a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings." *Taylor v. Maddox*, 366 F.3d 992, 1001, 1007 (9th Cir. 2004). The "failure to consider key aspects of the record is a defect in the fact-finding process," and if the omitted evidence was "very significant," the state court's factual determination will be deemed unreasonable and not entitled to deference. *Id.* at 1000-1001.

### Standard of Review for Alternative Grounds When State Ruling Erroneous

When the state court ruling "is based on a reasoned, but erroneous, analysis, federal habeas courts are empowered to engage in an alternate ground analysis—relying on any ground properly presented—but, in such a case, the federal court owes no deference to the state court." *Dennis v. Sec'y, Pa Dep't of Corr.*, 834 F.3d 263, 283 (3d Cir. 2016) (citing *Lafler v. Cooper*, 566 U.S. 156 (2012)). Federal courts "will not gap-fill when the state court has articulated its own clear reasoning.

34

Instead, we will evaluate the state court's analysis and review *de novo* any properly presented alternative ground(s) supporting its judgment." *Id.* at 284.

If the state court does not examine all prongs of a legal test because it wrongfully concludes relief is foreclosed by one of the prongs, then the federal court should examine the entirety of the legal test *de novo*. *See Boyd v. Waymart*, 579 F.3d 330, 337 (3d Cir. 2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (examining the prejudice prong of a *Strickland* claim *de novo* because the state courts, having unreasonably found counsel's performance adequate, never reached that issue)); *Breakiron v. Horn*, 642 F.3d 126, 137 (3d Cir. 2011) (reviewing the issue of trial counsel's performance under *Strickland de novo* because the state court had wrongly rejected the claim solely on the ground of prejudice).

Thus, if this Court were to determine that the state court's factual findings were unreasonable under (d)(2) or that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law under (d)(1), then this Court "must review the claim *de novo* to determine whether [Petitioner] is entitled to relief." *Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011).

## STANDARDS GOVERNING A DEFENDANT'S DUE PROCESS RIGHTS

Because multiple claims pled herein are grounded in part in allegations of prosecutorial misconduct—violations of *Brady v. Maryland*, 373 U.S. 83 (1963),

35

*Napue v. Illinois*, 360 U.S. 264, 269 (1959), and their progeny—Petitioner sets forth the general standards governing such claims. Petitioner includes this section to avoid repetition. This argument is incorporated in toto in the due process sections that follow.

Due process requires the prosecution to disclose evidence favorable to the defense. *Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *Brady*, 373 U.S. at 87. There are two components to a *Brady* claim: (1) the government suppressed favorable evidence, either intentionally or inadvertently; and (2) the suppressed evidence was material to the outcome of the trial. *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004). Favorable evidence includes impeachment evidence and exculpatory evidence. *Bagley*, 473 U.S. at 676.

A prosecutor's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. *Kyles*, 514 U.S. at 432 (quoting *Brady*, 373 U.S. at 87); *see also Banks*, 540 U.S. at 675-76. The prosecution's disclosure duty is not limited to information actually known to the trial prosecutor but, instead, includes all information in the possession of the prosecutor's office, police, and others responsible for or acting on behalf of the prosecutor's office. *Id.* at 437, 482 ("prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in this case, including the police";

"prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf"); *Giglio*, 405 U.S. at 154 ("prosecutor's office is an entity"; knowledge of anyone in office attributed to the trial prosecutor). This is an important consideration for this case because the *Brady* violation in Claim V implicates the police.

A "showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, the "touchstone of materiality is a '*reasonable probability*' of a different result," which is "shown when the government's evidentiary suppression '*undermines confidence* in the outcome of the trial.'" *Id.*; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (the "undermines confidence" standard "is not a stringent one. It is less demanding than the preponderance standard."). It is "not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial…." *Kyles*, 514 U.S. at 434.

Due process is also violated when the state knowingly presents false evidence. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Such deliberate deception is incompatible "with the rudimentary demands of justice." *Id.* That, however, is not the extent of the state's obligation. The prosecution also violates due process when, "although not soliciting false evidence, allows it to go uncorrected when it appears."

37

*Napue*, 360 U.S. at 269. The state may not knowingly rely on false evidence even where such evidence goes only to the credibility of a witness, because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors...that a defendant's life or liberty may depend." *Id*.; *see also Banks*, 540 U.S. at 694 ("It has long been established that the prosecution's 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'").

Thus, in *Napue v. Illinois*, where a key witness denied having received any promise of lenient treatment, the prosecutor's failure to correct that testimony, which he knew to be false, resulted in a denial of due process. *Napue*, 360 U.S. at 270-71. *See also United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010) ("A *Giglio* violation usually occurs when a cooperating witness denies having a pela agreement and the prosecutor fails to correct the misstatement.'"); *Jenkins v. Artuz*, 294 F.3d 284, 292-93 (2d Cir. 2002) (holding prosecution's knowing use of false testimony by witness, consisting of witness's statement that he had not entered a plea agreement with the state, could reasonably have affected the outcome, and state therefore violated *Napue* and *Giglio*); *Ouimette v. Moran*, 942 F.2d 1, 9-12 (1st Cir. 1991) (holding defendant's due process rights were violated by state's failure to disclose witness's criminal record, as well as existence and nature of deals between

witness and state); *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979) (holding defendant's due process rights violated by prosecutor's failure to correct false testimony concerning promises of lenience made to government witnesses, which prosecutor knew to be false).

The materiality threshold imposed when the prosecution knowingly presents false testimony is lower than the "reasonable probability" bar a petitioner must clear for a successful *Brady* claim. It is sufficient for a *Napue*/*Giglio* claim that there is "any reasonable likelihood that the false testimony *could* have affected the jury's verdict." *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) (emphasis added). This standard is equivalent to the harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967) (requiring the beneficiary—the prosecution—of a constitutional error to demonstrate that it was harmless beyond a reasonable doubt), *see Bagley*, 473 U.S. at 680 n. 9. This is the only prejudice showing that must be made, even on federal habeas review. *See Haskell v. Superintendent Green SCI*, 866 F.3d 139, 152 (3d Cir. 2017) (holding that even on habeas review, when there is false evidence claim, no additional "actual prejudice" showing under *Brecht* need be shown).

This standard is equally applicable where the prosecutor makes false statements to the jury. *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995). This is because "the reason the lower materiality burden applies where there is

knowing use of perjured testimony is that such a situation involves prosecutorial misconduct and a corruption of the truth-seeking function of the trial. *United States v. Bagley*, 473 U.S. 667, 680 (1985)]; *Agurs*, 427 U.S. at 104, 96 S. Ct. at 2397. [A prosecutor's false representation] involves prosecutorial misconduct and a corruption of the truth-seeking function as well, albeit through somewhat different means." *Id.*

## STANDARDS GOVERNING CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Because some of the claims pled herein are partially grounded in allegations of ineffective assistance of counsel in violation of the Sixth Amendment, Petitioner sets froth the following general principles and incorporates them into all ineffectiveness claims below.

Ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments are evaluated under the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, to prevail, Petitioner must show: (1) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (2) prejudice, i.e., that confidence in the result of the original proceeding is undermined as a result of counsel's deficiencies. *Id.* at 694; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005).

Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. This can be done only if counsel actually investigates the facts and circumstances surrounding the charges against his client. *See id.* at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). This national standard was cited in *Strickland* as a guide to determining what constitutes reasonable performance. *Strickland*, 466 U.S. at 688-89.

Moreover, a reasonably competent attorney under *Strickland* knows the relevant law or "performs basic research" to learn the relevant law. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

Prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995);[5] *see also*

---

[5] Although Kyles addressed a *Brady v. Maryland*, 373 U.S. 83 (1963) due process violation, *Brady* materiality and *Strickland* prejudice are coextensive.  *Marshall v. Hendricks*, 307 F.3d 36, 53, 85, n.9 (3d Cir. 2002).

*Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case").

Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *id.* at 694, the *Strickland* prejudice standard is not "stringent" – it is, in fact, "less demanding than the preponderance standard." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Barker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered.").

## THE WEAKNESS OF THE COMMONWEALTH'S CASE

The prejudice and materiality analyses that follow are claim-specific. Nevertheless, a portion of each analysis addresses the weakness of the Commonwealth's case because any determination of prejudice is inextricably bound to the strength or weakness of the Commonwealth's case. *See, e.g., Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) (tying quantum of evidence to prejudice determination); *see also Atkins v. Attorney General of Alabama*, 932 F.2d 1430, 1433 (11th Cir. 1991) (where "evidence of guilt not overwhelming" trial counsel's deficiency—there, permitting evidence of a prior arrest—was likely to have prejudiced petitioner). To avoid repetition, Petitioner addresses the weakness of the

Commonwealth's case here and incorporates this section by reference into each claim below.

The evidence against Petitioner was plainly not overwhelming. The Commonwealth's evidence included a surveillance video of Petitioner hours before the shooting wearing a common, black hoodie with white stripes. 05/14/2013 Tr. 236 ("The whole city wear[s] that jacket.").

The shooter was later described by two disinterested eyewitnesses as also wearing a black hoodie with white stripes. 5/14/13 Tr. 44 (Hazel Mathias); 5/15/13 Tr. 12-13 (Tracie Hunter). A third disinterested eyewitness, however, did not describe a black hoodie with white stripes—she only described someone wearing black clothing generally. 5/14/13 Tr. 112. None of the witnesses described the shooter as wearing sweatpants with large white stripes down the side, even though that is the most noticeable thing about Petitioner's attire in the surveillance video from that day. 5/16/13 Tr. 37-38.

Moreover, there was no forensic evidence, including DNA, fingerprint analysis, or ballistics that connected Petitioner to the crime.

Without the testimony of Rashan Gaffney, the Commonwealth's case was that (1) Petitioner was wearing a similar jacket to the shooter's on the day of the shooting, an extremely common jacket, and (2) he had been at a convenience store more than an hour prior to a dispute that led to the later shooting.

Therefore, the case rose or fell on the testimony of Rashan Gaffney, the only alleged identification witness at trial. 5/14/13 Tr. 171. In his direct testimony, while acknowledging he was present at the incident, Gaffney insisted that he could not identify the shooter. 5/14/13 Tr. 164. In light of Gaffney's trial testimony, the Commonwealth introduced Gaffney's preliminary hearing testimony, during which he identified Petitioner as the shooter, and reaffirmed his earlier identification in his police statement. 5/14/13 Tr. 182-87. The Commonwealth did so under Pennsylvania precedent that permits prior inconsistent testimony to be considered substantively, *Commonwealth v. Brady*, 507 A.2d 66 (Pa. 1986) and *Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992). Thus, the only "testimony" at Petitioner's trial identifying Petitioner as the shooter was a reading of Gaffney's preliminary hearing testimony.

Gaffney had—by his own admission—pulled out a gun and shot it twice during the course of the incident that led to Petitioner's arrest. 5/14/13 Tr. 149-153. In fact, Gaffney was captured on surveillance video doing so. *Id.* at 229. Gaffney was unlicensed to carry a gun, let alone fire one. Thus, Gaffney was caught on video committing serious felony firearms charges, reckless endangerment, and quite possibly aggravated assault.

Therefore, even before considering the impact of revealing to the jury that the cooperator was given a "free pass" on a shooting caught on video, Gaffney was a

compromised witness who admitted that he circled Petitioner's picture at the police station just so he would be released. 5/14/13 Tr. 218; *accord* 5/15/13 Tr. 83 (Detective Tracey Byard testified that they only "cut him loose" after Gaffney gave his statement).

In short, the Commonwealth's case was weak, the paramount concern in any materiality or prejudice analysis, because it relied on a single, compromised "identification" witness who disavowed that identification at trial.

## CLAIMS FOR RELIEF

**<u>CLAIM I</u> – THE COMMONWEALTH VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, AND THE PRINCIPLES OF *NAPUE* AND *BRADY*, BY SUPPRESSING, AND BY AFFIRMATIVELY MISREPRESENTING, THE NATURE OF THE IMMUNITY OFFERED TO RASHAN GAFFNEY**

Rashan Gaffney was the only alleged identification witness, and thus his testimony was not just important to, but a necessary component of, Petitioner's conviction. *See* The Weakness of the Commonwealth's Case, *supra.* Because of this, trial counsel emphasized in his opening statement that Gaffney should not be trusted because he had been given immunity in exchange for his testimony. 5/14/13 Tr. 36-37.

During the trial, however, the Commonwealth represented to the court and the jury that Gaffney's immunity was limited to the use of his testimony. The Commonwealth indicated that in light of Gaffney's criminal discharge of a firearm during the incident, the Commonwealth had granted him use immunity in advance of the preliminary hearing. A34. The immunity agreement, introduced into evidence at the trial, explicitly cabined Gaffney's protection to "use" immunity. *Id.* Indeed, during Gaffney's testimony—likely in response to trial counsel's opening statement that Gaffney could not be trusted due to the immunity he received—the prosecutor took great pains to make clear to the jury that Gaffney's immunity protected him only against the use of his in-court testimony. 5/14/13 Tr. 242-43.

46

This occurred when the trial judge announced to the jury that the Commonwealth "couldn't prosecute [Gaffney] for *his behavior*." *Id.* (emphasis added). The prosecutor immediately corrected the trial judge, declaring that the immunity "was just for testimony." *Id.* Having been corrected, the trial judge then clarified and confirmed for the jury that the immunity "was just for testimony[, i]t was *just* use immunity." *Id.* (emphasis added). The prosecutor said "yes," and the trial judge then reconfirmed the point. *See id.* ("It was just for his testimony."). Thus, the jury was instructed no less than four times that Gaffney was only protected from the use of his testimony but could still be prosecuted for his behavior. Trial counsel, therefore, understandably did not discuss immunity in his closing argument since the use immunity everyone (except the prosecutor) believed Gaffney was given was meaningless, since as he had been caught on video firing a gun during an altercation.

### Long-Suppressed Evidence that the Commonwealth Gave Rashan Gaffney Transactional Immunity

The written immunity agreement presented to the jury, and the prosecutor's representations regarding its terms, were both false. What no one, other than the Commonwealth, knew, was that Gaffney's immunity was not limited to the use of his testimony. He had, in fact, received transactional immunity. The Commonwealth had decided, well before this matter went to trial, that Gaffney would not be arrested for this incident as long as he cooperated. Moreover, the assigned prosecutor, Bridget Kirn, also knew this well before trial.

47

On March 2, 2021, undersigned counsel reviewed the prosecutor's trial file. Within that file was a copy of an email from the Edward Cameron, Assistant Chief of the Homicide Unit, to Bridget Kirn, the trial prosecutor.[6] The email is dated January 25, 2012, two months before the preliminary hearing. In the email, Mr. Cameron states in pertinent part:

> Bridget, [y]ou will need to immuniuze (sic) witness Rashan Gaffney. He had a gun earlier on in the incident and either fired it at a person or at the ground. We need him as a witness, so I did not approve an arrest. That position may change if he gives you a hard time.

A34.

That is, the District Attorney's Office had agreed that Gaffney would not be arrested or charged for possessing and firing an illegal weapon as long as he did not "give [Ms. Kirn] a hard time." *Id.* Indeed, Gaffney never was charged with any crime connected to this incident even though the video proved him guilty of felony firearms charges, reckless endangerment and quite possibility aggravated assault. Tinari Declaration ¶ 9; A36. The statute of limitations regarding any of those crimes has long since expired. 42 Pa.C.S. §5552.

Trial counsel had no idea that this grant of transactional immunity existed. Tinari Declaration ¶ 5; A35. Had trial counsel known of this deal, it would have

---

[6] The *Habeas Petition* identifies the sender of the email as the Chief of the Homicide Unit. This was an error.

dramatically changed his closing argument. Tinari Declaration ¶¶13-14; A36-A37 (*see also*, Prejudice section *infra*).

**Bridget Kirn Has a Pattern or Practice of Misleading Judges and Juries**

This is not the first case in which Bridget Kirn made false or misleading statements to a court or a jury in an effort to obtain a conviction.

On August 30, 2018, a complaint against Ms. Kirn was made by the Innocence Project alleging that she knowingly presented false evidence at the retrial of Anthony Wright, a man who was ultimately exonerated. Complaint against Bridget Kirn at 1; A127.

Anthony Wright had originally been tried and convicted for the rape and murder of Louise Talley in 1993. *Id.* at 2; A128. During his original trial, the Commonwealth primarily relied upon then-Detective Manuel Santiago's claim that Wright had given a detailed voluntary confession to the crime. *Id.* at 3; A129. The other pillar of the Commonwealth's 1993 prosecution of Wright was the testimony of then-Detective Frank Jastrzembski. *Id.* Det. Jastrzembski testified that a few hours after the confession was given, "he discovered and seized a blood-stained sweatshirt, jeans, and sneakers from Mr. Wright's bedroom." *Id.* These items, the Commonwealth claimed, matched the exact three items Wright had allegedly "confessed" to wearing during the rape-murder. *Id.*

Wright refused to plead guilty to the murder to avoid the death penalty and instead testified in his own defense at trial (as he did again at his 2016 retrial). *Id*. He told the jury that he never "confessed" to the crime and only signed the police-authored statement under duress, "after being threatened with extreme violence by the detectives while he was handcuffed in the interrogation room." *Id*. He also insisted the clothing Det. Jastrzembski claimed to have found at his house was not his, and his mother, who was present when the search warrant was executed, corroborated that testimony. *Id*.

No DNA evidence connected Wright to the crime. Nonetheless—with Wright's defense resting on the challenging contention that multiple Philadelphia Police Detectives had essentially framed him for murder—he was convicted on all charges. *Id.* at 4; A130.

More than two decades later, however, advanced DNA technology provided objective evidence that corroborated Wright's longstanding protestations of innocence. *Id*. The new DNA evidence excluded Wright as the lone perpetrator whose semen was found inside the elderly victim and identified the actual source: a recently deceased felon named Ronnie Byrd. *Id*. Thus, the DNA test results provided powerful, objective evidence that Wright's "confession" (which made no mention of another assailant, let alone any reference to Ronnie Byrd) was a fabrication. *Id*.

The DNA testing "also provided stunning new evidence about the disputed source of the clothing and shoes that Det. Jastrzembski had sworn to the 1993 jury were recovered from Mr. Wright's bedroom." *Id.* The testing revealed that the victim herself—not Wright—was the major or lone donor of the DNA on the clothing. *Id.*

Wright was represented by the Innocence Project and a *pro bono* team of lawyers who filed his initial PCRA petition in March 2013. Wright's conviction was ultimately vacated in September 2014.

Notwithstanding "this profoundly exculpatory DNA evidence, then-District-Attorney Seth Williams elected to put Mr. Wright on trial yet again." *Id.*

At the August 2016 retrial, Ms. Kirn appeared as lead counsel on behalf of the Commonwealth. *Id.* "She presented both opening and closing arguments and argued that notwithstanding the defense's new DNA evidence excluding Mr. Wright and identifying Ronnie Byrd, the jury should continue to credit the detectives' twenty-five-year-old claims as to the voluntary and truthful nature of Mr. Wright's 'confession' and the seizure of the bloody clothing and shoes from his home." *Id.*

Thus, the former detectives' credibility was "critical to what little chance Ms. Kirn had of securing a conviction in the face of the new DNA evidence." *Id.* Knowing this, "Ms. Kirn stood mute" while both officers "made factual statements to the jury that went directly to their veracity, and which she knew were false." *Id*.

Based upon these ethical violations, the Innocence Project's Senior Staff Attorney, Nina Morrison, Esquire, filed a complaint against Ms. Kirn with the Disciplinary Board of the Supreme Court of Pennsylvania. On information and belief, no determination has yet been made regarding that complaint.

But that is not the only time that Ms. Kirn misled a court or a jury to secure a conviction.

Theophalis Wilson and Christopher Williams were both convicted of murdering three men who were found shot in the head in Philadelphia on the same day in 1989. *See* Overturning Convictions—and an Era: Philadelphia CIU, January 2008-June 2021 at 24; A64; *see also Commonwealth's Answer to Petition for Post-Conviction Relief*, Commonwealth v. Theophalis Wilson, CP-51-CR-0417522-1992 at 5; A92. "The cases against Wilson and Williams hinged on the testimony of two men: James White and David Lee." *Id.* White and Lee testified that the three victims

> were lured to Philadelphia with the promise of being sold a pair of AK-47 assault rifles, in an attempt to rob them. The victims were unable to produce as much money as their robbers desired and were forced into a van. The men were allegedly driven around Philadelphia until Williams shot them, one by one, with a 9mm pistol. The bodies were then thrown from the moving van.

*Id.*

Lee testified that he had purchased a 9mm pistol for Williams, and this was the exact pistol police had taken from Williams during his arrest. *Id.* "Lee assured the jury that, although he knew that purchasing the guns had been illegal, **he had**

52

**not been offered any leniency** from law enforcement and—aside from purchasing the guns—had no criminal record." *Id.* (emphasis added).

In 2011, White recanted his testimony against Williams and Wilson, and an expert concluded that based on the blood evidence available and the conditions of the bodies, the three men had been killed where they were found, not thrown from a moving van. *Id.* at 24-25; A64-A65.

Wilson and Williams applied to the Philadelphia District Attorney's Office's Conviction Integrity Unit for a review of their cases. Pursuant to that review, "Wilson and Williams were provided open file discovery." Wilson Answer ¶ 5; A90. When Wilson and Williams were able to review the District Attorney's file, "a plethora of *Brady* information (material, exculpatory evidence)" was for the first time revealed to the defense. *Id.* at ¶ 4; A90.

Based upon that discovery, "[s]everal of the violations [of *Brady*] in this case appear purposeful at worst or reckless at best." *Id.* at ¶ 85; A112.

Even though Lee had testified that he had not received any leniency and that he had never before cooperated with the police, the original trial prosecutor knew of Lee's prior cooperation with the Alfie Coats prosecutions because "he, himself, prosecuted Coats for the murder of Troy Brown—a murder for which Lee provided numerous statements to the police detailing the crime and detailing his substantial role in its commission." *Id.* at ¶ 86; A113.

Bridget Kirn was instrumental in continuing the suppression of Lee's prior cooperation after Williams' convictions were vacated. *Id.* at ¶ 87; A113. During pretrial discovery in Williams' retrial, "ADA Bridget Kirn mischaracterized Lee's role in the Brown investigation as a simple 'eyewitness' without disclosing his possible participation in the murder." *Id.* "ADA Kirn also falsely informed the Court and Williams' counsel that 'David Lee was not involved in the investigation into the murder of David Rice.'" *Id.*

During a motion's hearing on the discovery dispute related to the Alfie Coats prosecutions, the Commonwealth reiterated ADA Kirn's position that the defense was not entitled to the Alfie Coats discovery because he had only ever been a 'witness.'" *Id.* at ¶ 90; A114. The Commonwealth represented that Ms. Kirn (and others) had thoroughly reviewed all the files and that was the basis on which the Commonwealth made its representations. *See id.* at ¶ 89; A113 (ADA on Motion: "I also spoke with Ms. Kirn, who had previously twice gone through all of the boxes.").

"The repeated failure to provide the Lee information despite either personal involvement in the Coats prosecution or assurances that the material had been thoroughly reviewed cannot easily be attributed to ignorance." *Id.* at ¶ 92; A114 [ADA Kirn and others] none of whom remains employed by the Philadelphia District Attorney's Office—appear to have acted in bad faith." *Id.* at ¶ 93; A114. The Commonwealth also agreed that the suppressed evidence was material. *Id.* at ¶94; A114. "If the Commonwealth had disclosed the evidence described above, it is likely that Wilson would have been acquitted." *Id*. In December 2019 and January 2020, Williams and Wilson (respectively) were exonerated and ultimately released. Overturning Convictions—and an Era: Philadelphia CIU,

54

January 2008-June 2021 at 25; A65; *see also* A 'Perfect Storm' of Injustice: Philly Man Freed After 28 Years as DA Condemns 'Decades' of Misconduct, Philadelphia Inquirer, January 21, 2020, https://www.inquirer.com/news/philadelphia-da-larry-krasner-conviction-integrity-unit-exoneration-theophalis-wilson-christopher-williams-20200121.html.

Thus, Petitioner's case is not the first time that Ms. Kirn has sought to conceal the extent of a witness's cooperation with the Commonwealth in an effort to obtain a (wrongful) conviction. As in Wilson and Williams' cases, Ms. Kirn's misrepresentations only came to light years later after the Commonwealth permitted open file review.

### Petitioner Establishes a Due Process Violation

The Commonwealth violated Petitioner's right to due process under the Fourteenth Amendment, and the principles of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959), by suppressing and then affirmatively misrepresenting the nature of the immunity given to Rashan Gaffney.

The Commonwealth never disclosed any agreement with Gaffney for transactional immunity. Tinari Declaration ¶ 5; A35. This violated *Brady*. *See U.S. v. Bagley*, 473 U.S. 667, 676 (impeachment evidence, as well as exculpatory evidence, falls within *Brady*'s ambit). That Gaffney appeared at Petitioner's trial, uncharged for the crime he had committed eighteen (18) months earlier, and that subsequent to his testimony, no charge was forthcoming, was nothing more than the

Commonwealth following through on Mr. Cameron's representation. Of course, the Commonwealth was free to make such a decision. But such a decision brings with it the obligation to inform counsel of its extent. Withholding that information violated due process.  Gaffney's incentive to have testified favorably for the Commonwealth at the preliminary hearing, testimony that became the lynchpin of the Commonwealth case, was powerful impeachment suppressed in violation of Petitioner's constitutional rights.

It is of no moment that there may not have been any signed contract memorializing the enormous benefit received by Gaffney. The failure to disclose *any* agreement—written, oral or implied—is a *Brady* violation under both Pennsylvania law and the United States Constitution.

With *Brady* claims involving agreements with the Commonwealth, the Pennsylvania Supreme Court has "observed that 'due process requires the jury to be informed of any promise or understanding that the government would extend leniency in exchange for a witness's testimony.'" *Commonwealth v. Bagnall*, 235 A.3d 1075, 1086 (Pa. 2020) (quoting *Commonwealth v. Chmiel*, 30 A.3d 1111, 1131 (Pa. 2011). Indeed, "[a]ny **implication**, **promise or understanding** that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility.'" *Bagnall*, 235 A.3d at 1086 (quoting *Commonwealth v. Strong,* 761 A.2d 1167, 1171 (Pa. 2000) (emphasis added)). The "understanding

between the prosecution and its testifying witness need not be in the form of a signed contract or a completed, ironclad agreement in order to qualify as *Brady* material." *Bagnall*, 235 A.3d at 1086 (quoting *Chmiel*, 30 A.3d at 1131). That is because impeachment evidence relating to "the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness." *Bagnall*, 235 A.3d at 1086 (quoting *Strong*, 761 A.2d at 1175).

In *Strong*, no final deal had been struck between the testifying witness and the Commonwealth. *Strong*, 761 A.2d at 1174. However, sufficient "circumstantial evidence" existed of an "understanding" between the witness and the Commonwealth that the Commonwealth might reward the witness for testifying favorably. *Id.* This was sufficient to impose a *Brady* obligation on the Commonwealth to reveal this "understanding" to defense counsel. *Id.*

"The absence of an ironclad, signed, sealed contract does not conclusively establish that no other information affected the credibility of the witness exists." *Id.* at 1175 (citing *Giglio* at 155). "To the contrary, the fact that there was no binding agreement…but rather only a contingency dependent upon the Commonwealth's satisfaction with the end result, only strengthens [the witness's] motive to testify favorably for the Commonwealth." *Id.* (citing *Bagley*, 473 U.S. at 683).

This is exactly what the Commonwealth did in this case—it indicated that Gaffney would not be arrested, but only if prosecutors were satisfied that he had not given them a "hard time." He followed through at the preliminary hearing, and the Commonwealth followed through and never arrested him – although his guilt would have been sealed via incontrovertible video evidence. Such an understanding is *Brady* material that needed to be disclosed to the defense, but instead Ms. Kirn affirmatively misled the judge and jury about the immunity that Gaffney received.

Thus, Petitioner has established a due process violation under both *Brady* and *Napue*.

**Materiality**

Ms. Kirn violated *Napue* by affirmatively misrepresenting the consideration conferred upon Gaffney. Thus, this Court must reverse unless the Commonwealth can establish beyond a reasonable doubt that the due process violation was harmless. *Bagley*, 473 U.S. at 680 n. 9. The materiality threshold under *Brady*—which does not require any bad faith on Ms. Kirn's part—is whether there is a "reasonable probability" of a different result had Gaffney's understanding with the Commonwealth been disclosed to the defense. *Kyles*, 514 U.S. at 434.

Either standard is easily met in this case.

Gaffney was the sole identification witness. When a witness is the sole eyewitness and his immunity agreement is even inadvertently withheld by the state,

such evidence is material and requires a new trial. *See Commonwealth v. Bagnall*, 235 A.3d 1075, 1087 (Pa. 2020) (Commonwealth agreement for a lessened sentence with sole eyewitness inadvertently withheld, reversal required); *Commonwealth v. Strong*, 761 A.2d 1167, 1175 (Pa. 2000) ("James Alexander is the key witness who puts the gun in appellant's hand at the moment of the murder, his credibility was decisive to the jury's finding as to appellant's guilt," failure to disclose "understanding" with Alexander required reversal).

Gaffney had—by his own admission—pulled a gun and shot it twice on a public street during the course of the incident that led to Petitioner's arrest. 5/14/13 Tr. 149-153. In fact, Gaffney was captured doing so on a surveillance video. 5/14/13 Tr. 229. Thus, there was ample evidence without Gaffney's testimony to prove him guilty of felony firearms charges, reckless endangerment and quite possibly aggravated assault.[7]

Given that Gaffney was caught on video shooting this gun, use immunity did nothing to help him since the Commonwealth had more than enough evidence for a conviction even without his testimony. Thus, when the jurors were told—four times—that Gaffney was only receiving use immunity, they had no reason to doubt

---

[7] Mr. Cameron certainly entertained the possibility that Gaffney had been shooting at someone. A34.

that he would be prosecuted irrespective of that use immunity. And yet, as we know, Gaffney was never prosecuted for any crime.

"[U]nlike transactional immunity, use immunity does not improve the legal position of the holder of the privilege; it leaves his legal rights precisely as they were before he testified." *United States v. Turkish*, 623 F.2d 769, 775 (2d Cir. 1980). Because use immunity does not improve the legal position of the holder of the privilege, a prosecutor's failure to correct a witness who testified that he only had use immunity when he was actually given transactional immunity violates due process. *United States v. Anderson*, 2018 WL 4898579, at *6-7 (D. Mont. Oct. 9, 2018). "[A]n immunity agreement holding a witness harmless for what he says to an agent or a jury is not the same thing as *rewarding* a witness for what he says to an agent or jury. Non-prosecution agreements, which provide transactional immunity and sentence reductions, are the two highest-value benefits a prosecutor can deliver to a witness." *Id.*

Ms. Kirn's words on the record regarding what sort of immunity extended to Gaffney are clear. In fact, the prosecutor's misrepresentation to the jury was particularly prejudicial since it came in response to, and flatly refuted, the trial court's suggestion that Gaffney's immunity meant that the Commonwealth "couldn't prosecute him for his behavior." 5/14/13 Tr. 242-43. In this way, the issue

was spotlighted for the jury, a jury that knew there was ample evidence without the "use" immunity to prosecute and convict Gaffney.

Moreover, trial counsel certainly understood the distinction between use and transactional immunity. During closing argument trial counsel "urged the jury to find that Gaffney had an incentive to lie previously, and pin the blame on Long, because he was *hoping* to avoid being prosecuted." Tinari Declaration ¶ 12; A36. Had trial counsel understood the true nature of the understanding between Gaffney and the Commonwealth, his closing "argument would have been stronger because it would have been based on fact, rather than speculation. [He] could have pointed to the deal for transactional immunity and argued that there had to be reasonable doubt when the Commonwealth was seeking a murder conviction based upon the disavowed identification of a man incentivized before the preliminary hearing by the knowledge that he would not be prosecuted for his serious crimes." *Id.* ¶ 13; A36.

Thus, the writ should issue.

**Exhaustion**

This claim was not exhausted in state court. It was not discovered until March 2, 2021, and this delay in discovery was due completely to the Commonwealth's suppression of the true agreement or understanding with Gaffney, and all prior counsel's understandable reliance on the prosecutor's representation that the immunity was not "transactional," notwithstanding the fact that it was.

The Commonwealth is currently considering whether to waive exhaustion. It should. The *Brady/Napue* violation was patent, committed by a known violator, and was material. However, if the Commonwealth decides otherwise, Petitioner avers that there is a state court avenue to raise this claim, 42 Pa.C.S. § 9545(b)(1)(i), and thus he is prepared to request that this Court stay the habeas proceeding so that he may exhaust the claim in state court.

### CLAIM II – TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION FOR FAILING TO REQUEST THAT THE JURY BE GIVEN AN INTERESTED WITNESS/CORRUPT SOURCE CHARGE REGARDING THE WITNESS RASHAN GAFFNEY

As described in Claim I, the Commonwealth suppressed the fact that Rashan Gaffney had a deal with the Commonwealth for transactional immunity. However, even without knowing such fact, trial counsel was well aware that Gaffney participated in the criminal incident and was caught on video committing serious felony gun crimes, reckless endangerment, and possibly aggravated assault.

The court instructed the jury on general credibility factors (5/16/13 Tr. 124-27) and gave a modified *Kloiber* charge based upon Gaffney's recantation of his prior statement (*id.* at 131-136). The Court did not, however, instruct the jury that Gaffney's testimony should be received with caution due to his own criminal exposure. *See* CERTAIN TESTIMONY SUBJECT TO SPECIAL SCRUTINY, Pa. SSJI (Crim) §4.06.

In short, the prosecution in this case cannot have it both ways. If, as the evidence developed in habeas demonstrates, Gaffney faced no exposure, then Petitioner *and his jury,* were entitled to know this. On the other hand, if the Commonwealth asks this Court to disregard the memorandum from its Assistant Homicide Chief – notwithstanding that his representation that Gaffney would not be prosecuted proved correct – and find that Gaffney faced exposure when he testified, then Petitioner was entitled to the instruction.

### Trial Counsel Was Ineffective For Failing To Request an Interested Witness/Corrupt Source Charge Related to Rashan Gaffney

### Deficient Performance

Trial counsel failed to perform as the reasonably effective advocate guaranteed by the federal constitution, when he failed to ask for an instruction which would have warned the jury to consider Gaffney's legal jeopardy and take his testimony with caution. Such an instruction exists, and it was there for the asking. *See* SSJI § 4.06; A125:

> You should examine closely and carefully and receive with caution the testimony of [name of witness] [any witness] if you find that he or she [was previously hypnotized] [admitted that he or she committed perjury at another trial] [give specific situation].

A 4.06 instruction is to be provided when "an informer testifies who has a penal or pecuniary interest in testifying favorably [for] the Commonwealth." *Id.*, *Subcommittee Notes.* Here, the court failed to give the instruction because counsel

failed to request it. Even though trial counsel did not know about the deal for transactional immunity, trial counsel did know that Gaffney was an informer, and certainly had an interest in testifying favorably for the Commonwealth. *See* 5/16/13 Tr. 35-36 (arguing that Gaffney lied about Petitioner's involvement in the crime because he could be "possibly accused of carrying a firearm on the street, shooting it, looking at God knows how long in jail based on the video").

In light of trial counsel's argument in closing that Gaffney lied to avoid his own criminal exposure, there can be no strategic basis for failing to ask that the Court instruct the jury to this effect. Such an instruction would have given counsel's argument the imprimatur of authority and was there for the asking.  Where case-specific factual circumstances present issues of legal significance, it is the lawyer's responsibility to ensure that the significance of those issues are explained to the jury. *See, e.g., Freeman v. Class*, 95 F.3d 639, 642 (8th Cir. 1996) (granting habeas on ineffective assistance grounds due to counsel's failure to request cautionary instructions on accomplice testimony). The case-specific facts here, the informant's penal interest, had legal significance on which the jury should have been instructed.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), counsel's failure to object to request a proper instruction constitutes deficient because counsel is required by the Sixth Amendment to be familiar with the relevant law. *See e.g.*, *Williams*, 529 U.S. at 395 (counsel ineffective because he made a decision "not

because of any strategic calculation but because" he misunderstood state law); *Hinton*, 571 U.S. 263, 274. Indeed, counsel have been held ineffective in habeas proceedings for the very type of deficiency alleged here. *See Bey v. Superintendent Greene SCI,* 856 F.3d 230, 244 (3d Cir. 2017) (failure to object to defective *Kloiber* instruction); *Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) (counsel ineffective for failing to object to a jury charge not requiring the Commonwealth to prove accomplice's intent to kill to convict of first-degree murder).

In *Beard,* the Third Circuit approvingly cited precedent from other circuits where counsel was held ineffective for failing to propose appropriate jury instructions. *See id.* at 514-515 (*citing Lutchenburg v. Smith,* 79 F.3d 388, 393 (4th Cir. 1996) (habeas relief granted in part due to trial counsel's failure to request instruction that more accurately described state law); "*Burns v. Gammon,* 260 F.3d 892, 897 (8th Cir. 2001) (granting habeas on ineffective assistance grounds due to counsel's failure to object and thus to prompt a curative cautionary jury instruction); *Freeman v. Class,* 95 F.3d 639, 642 (8th Cir. 1996) (granting habeas on ineffective assistance grounds due to counsel's failure to request cautionary instructions on accomplice testimony); *United States v. Span*, 75 F.3d 1383, 1389–90 (9th Cir. 1996) (finding ineffective assistance because counsel failed to request a significant jury instruction); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding ineffective

assistance due, inter alia, to 'failure to propose, or except to, jury instructions')."

**Prejudice**

The jury should have been instructed that when an informant has a penal interest in testifying favorably for the Commonwealth, his testimony should be examined closely and carefully and received with caution, because experience shows that such a witness, when caught committing a crime, may be incentivized to testify in support of the Commonwealth's case, in the hope of lenient treatment. SSJI § 4.06. The absence of this instruction prejudiced Petitioner.

As described above in the section entitled The Weakness of the Commonwealth's Case, the Commonwealth's overall case was not strong, and it hinged on the jury believing that Gaffney's prior statements were credible. The absence of an instruction from the judge that the jury should receive his prior testimony with caution shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, the writ should issue.

**Exhaustion and Procedural Default**

State PCRA counsel was ineffective for failing to raise this substantial claim of trial counsel ineffectiveness in state court, and thus there is no longer an available remedy to exhaust this ineffectiveness claim (*see Commonwealth v. Gamboa-*

*Taylor*, 753 A.2d 780 (Pa. 2000)), and it is procedurally barred. *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).

Because this claim is procedurally defaulted, Petitioner invokes *Martinez v. Ryan*, 566 U.S. 1 (2012) to demonstrate cause for the default of this ground. This claim is "substantial" and PCRA counsel ineffectively failed to raise this claim in the PCRA petition to allow for merits review.

"Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of counsel at trail." *Martinez* at 9. "To qualify for *Martinez*'s exception, a habeas petitioner must show: (1) that the procedural default was caused by either the lack of counsel or ineffective counsel on post-conviction review; (2) that this lack or ineffectiveness of counsel was the first collateral proceeding when the claim could have been heard; and (3) that the underlying claim of ineffective assistance of trial counsel is substantial." *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 762 (3d Cir. 2018) (internal quotation marks and citations omitted). A claim is substantial in this context if it meets the standard for issuance of a certificate of appealability (COA). *Bey v. Superintendent*, 856 F.3d 230, 238 (3d Cir. 2017).

The standard for issuance of a COA is not stringent. Under 28 U.S.C. §2253 and F.R.A.P. to obtain a COA, the applicant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). *Slack v. McDaniel*, 529

U.S. 473, 483 (2000) concluded that, "[e]xcept for substituting the word 'constitutional' for the word 'federal,'" AEDPA's COA requirement is merely "a codification of" the pre-AEDPA standard for granting a certificate of probable cause, as "announced in *Barefoot v. Estelle*," 463 U.S. 880, 894 (1983). Thus, the purpose of the COA requirement is "to prevent frivolous appeals." *Barefoot*, 463 U.S. at 893.

In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), the Court summarized this non-stringent standard: "A petitioner must show that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* at 336. The Court further explained:

> [A] COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with §2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot* at 893, n. 4.

*Miller-El*, 537 U.S. at 337.

PCRA counsel's ineffectiveness provides cause for Petitioner to raise this substantial claim of trial counsel ineffectiveness before this Court.

Assuming this Court agrees that Petitioner overcomes the default and is entitled to merits review of this claim per *Martinez*, such review is *de novo*. By its plain language, §2254(d) and its deferential review, applies only to a claim when it "was adjudicated on the merits" by the state court, and only where that adjudication resulted in a "decision" on the claim. *See Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002). The merits of this claim of trial counsel ineffectiveness have never been decided by the state courts due to the ineffective assistance of PCRA counsel, and consequently, review is *de novo*. *See Bey*, 856 F.3d at 236 (applying *de novo* review of a defaulted claim reviewed for the first time in habeas via *Martinez*); *Richardson*, 950 F.3d at 767 (same).

### CLAIM III – TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION FOR FAILING TO INVESTIGATE, INTERVIEW AND CALL DELISA GRIFFIN AS AN ALIBI WITNESS AT TRIAL[8]

Petitioner has consistently maintained that he did not commit this crime, a fact trial counsel confirmed in his PCRA testimony. 11/21/16 Tr. 146. Thus, a reasonably competent attorney would have conducted an investigation to determine whether there were any alibi witnesses or any other exculpatory evidence the defense could present to the jury. Trial counsel admitted to not remembering doing any such

---

[8] The order of Claims III and IV as numbered in the Amended Habeas Petition are reversed in this Brief in Support for the ease of the reader.

investigation, and because of this, he failed to call Delisa Griffin, an alibi witness that the PCRA court believed was telling the truth. *Id.* at 234.

The PCRA court ruled against Petitioner on this claim, and the Superior Court affirmed, based upon (1) a misapprehension of the facts adduced at the evidentiary hearing and (2) a misapplication of clearly established federal law. Petitioner can establish both that his trial attorney provided ineffective assistance of counsel, and that the state court's decision to the contrary was contrary to and involved an unreasonable application of Supreme Court precedent (28 U.S.C. § 2254(d)(1)) and an unreasonable determination of the facts (28 U.S.C. § 2254 (d) (2)), and thus the writ should issue.

### Trial Counsel Performed Deficiently When He Failed to Investigate Any Alibi, Even After He was Made Aware of One

At the PCRA hearing, Petitioner testified that on November 10, 2011, he went to his grandmother's house and washed up, and then called Delisa Griffin to find out what time he could come over to her house. 11/21/16 Tr. 7. Griffin told him to come over around 5:30 because it was her mother's birthday, so her mother was leaving the house around 5:00. *Id.* At this time his girlfriend was Jazmine Cobb, but he had a relationship with Griffin behind Cobb's back. *Id.* at 11. Cobb and Griffin were also friends. *Id.* at 11.

Around 5:00, he went to the store across the street from his house, the MJ Mini Market. *Id.* at 7-8. He went in and out of the mini market, and then he went

around the corner to Sayre High School to watch basketball until it was time to go to Griffin's house. *Id.* 8, 10. He got to Griffin's house at 5:30. *Id.* at 14.[9] They did not leave the apartment all night, and he left the next morning. *Id.* at 14-15.

Petitioner's account established that he was not present at the shooting of Butts-Sterns, and that Ms. Griffin would have been able to attest to that fact. *Id.* at 15.

Petitioner retained his trial attorney, Eugene Tinari, two months before trial. *Id.* at 16. Petitioner only ever saw trial counsel twice: the day he introduced himself when Petitioner agreed to retain him, and about thirty seconds before entering the courtroom for trial. *Id.* at 19-20.

At their first meeting, trial counsel had not yet received the discovery. *Id.* at 19-20. At this meeting, Petitioner told trial counsel that that he was innocent and not present at the shooting. *Id.* at 19-20. He told trial counsel that he was with a friend that night. *Id.* Trial counsel told Petitioner that he thought he could successfully defend him against the charges, so Petitioner retained him for $10,000. *Id.* at 20. At this meeting, Petitioner told trial counsel about Delisa Griffin. *Id.* at 20. He wrote down her name and telephone number. *Id.* at 20. Trial counsel told Petitioner that he would interview Griffin. *Id.* at 26.

---

[9] The shooting of the decedent occurred at approximately 6:30 p.m. 05/14/13 Tr. 40-41.

After this initial meeting, trial counsel never visited Petitioner again. Moreover, trial counsel never set up any private legal calls with Petitioner at the jail so that they could discuss his case. *Id.* at 21. Petitioner wrote trial counsel many letters, but trial counsel never once wrote him back. *Id.* at 22-23. The only mail Petitioner ever received from trial counsel were receipts when Petitioner made payments. *Id.* at 23. Before trial, trial counsel never discussed trial strategy with Petitioner. *Id.* at 23. They spoke on the phone two or three times, but they did not talk trial strategy on those calls because they were calls placed by Petitioner from the prison, and thus they were monitored and recorded. *Id.* at 23. The only way to have a confidential call with an attorney from jail is for the attorney to set up that call, but trial counsel never did. *Id.* at 25. Thus, when Petitioner called trial counsel, he would ask his lawyer if he had received Petitioner's letters and would ask him to write back; trial counsel said he would, but he never did. *Id.* at 25.

The PCRA court asked Petitioner why he did not tell the court that he objected when his attorney informed the court that he was not going to call any witnesses. *Id.* at 38-39. Petitioner responded: "I was following [trial counsel] Tinari's lead, Your Honor. That's what I hired him for. That's – this is his profession. I don't know about the law. This is his profession. This is what I hired him for." *Id.* at 39.

Delisa Griffin testified that on the morning of November 10, 2011, she spoke to Petitioner. 11/21/16 Tr. 81. She invited him to her residence and told him to come

over around 5:00 or 5:30 because her older sister was coming to get her mom to take her mom out for her birthday. *Id.* Griffin testified repeatedly that she was confident of the date because November 10 is her mother's birthday. *Id.* at 81, 84, 85.

Around 5:00, Griffin's mom left and shortly thereafter Petitioner came over. *Id.* at 82. He got to her house between 5:15 and 5:45. *Id.* at 85. He stayed all night and left the next morning. *Id.*

Griffin spoke to Petitioner's attorney before the trial. *Id.* at 87. Griffin was in a car with Jazmine Cobb. *Id.* at 87. Cobb called trial counsel while Griffin was in the car, and he picked up. *Id.* Griffin got on the phone and trial counsel indicated that he already knew who she was. *Id.* Trial counsel asked for her phone number. *Id.* Griffin told trial counsel that Petitioner was with her the night of the murder, but their conversation was brief—only about three minutes. *Id.*

After that conversation, trial counsel never contacted her before the trial. *Id.* at 88. Griffin attended the trial. *Id.* During the trial she approached trial counsel in the hallway. *Id.* at 89. She asked if she was still going to be used as a witness, and he said he was not sure but that she should stick around. *Id.* 89. She attended every day of the trial so she could be a witness for Petitioner, but she was never called. *Id.*

Trial counsel testified that he was retained two months prior to Petitioner's murder trial and that he believed this was a sufficient amount of time to prepare,

even though he accepted the case before even reading the discovery. 11/21/16 Tr. 164.

On direct examination, trial counsel testified that he did not "recall any information about an alibi defense." *Id.* at 114. He testified that he did not recall Petitioner giving him any information about any potential witnesses. *Id.* at 114. Trial counsel also initially testified that the only girlfriend he knew about was Jazmine Cobb, and that he did not remember Delisa Griffin. *Id.* at 114.

In fact, trial counsel did not recall having any conversations with Petitioner about the possibility of witnesses of any sort, either conversations initiated by Petitioner or conversations initiated by trial counsel. *Id.* at 115-116. Trial counsel testified that he only ever considered the strategy of impeaching Commonwealth witnesses during cross-examination and never considered developing independent defense evidence. *Id.*

Trial counsel was unable to offer the PCRA court any testimony or evidence of any efforts he undertook to learn about or develop Petitioner's version of the events. *Id.* at 125-126.

When asked about the letters Petitioner sent to him, trial counsel said that he handed over his entire file with all pretrial letters to appellate counsel, so he no longer had them. *Id.* at 126. He could only find one letter from Petitioner that he had saved electronically, but it was from after the trial. *Id.*

On cross-examination, trial counsel testified that he did not remember when he first spoke to Petitioner, including whether he had received the discovery at that point, and he did not recall anything about their first meeting. *Id.* at 133-134.

After their first meeting, trial counsel "couldn't tell you how often [he] communicated with" Petitioner. *Id.* at 139. When asked if he visited Petitioner after his initial meeting at the county jail, trial counsel said, "I can't tell you for sure." *Id.* at 140. Trial counsel testified that he did speak to Petitioner after this first visit. *Id.* at 147. When asked where those conversations occurred, he said, "[t]hey would have occurred at the prison or if he called me on the phone." *Id.* (thus, tacitly admitting that trial counsel never set up confidential attorney-client phone calls).

Trial counsel acknowledged that Petitioner had told him that he was innocent of murder. *Id.* at 146. When asked if he ever specifically asked Petitioner about an alibi, trial counsel said, "I don't recall." *Id.* at 167.

When asked what the most damaging evidence against Petitioner was, trial counsel answered that it was the video and eyewitness statements, especially Gaffney's statement. *Id.* at 166. Nonetheless, trial counsel did not try to interview any of the eyewitnesses prior to trial, including Gaffney. *Id.* at 169. Trial counsel was asked whether he believes it is important to interview eyewitnesses in an eyewitness case and he said, "Sometimes. Not always." *Id.* at 171-172.

The cross-examination turned to alibi witness Delisa Griffin. PCRA counsel asked:

> Q. Hypothetically speaking, if Delisa Griffin came in here and testified that she had a conversation with you, that's not true?
>
> A. I don't know. I don't recall having a conversation with her.
>
> Q. So you're saying it's possible you had a phone conversation with Delisa Griffin?
>
> A. It could be. I don't know who she is or when the conversation was that you're talking about.

*Id.* at 182.

PCRA counsel continued to ask trial counsel about possible conversations with Griffin, and trial counsel said that the questions refreshed his recollection. *Id.* at 184.

Trial counsel then testified that he *did* remember something about there being a love "triangle." *Id.* at 185 (presumably involving Griffin, Cobb and Petitioner). He remembered Petitioner speaking to him about another girl that Petitioner had been seeing during his relationship with Jazmine Cobb. *Id.* ("I remember him [Petitioner] saying I'm going through it with Jazzy or something…"). He also remembered speaking to Griffin ("this other girl called me"). *Id.* He did not remember the specifics of their conversation, however, or critically whether he spoke to Griffin before or after trial. *Id.* at 185.

76

As for trial counsel's overall trial preparation, when trial counsel was asked what he did to prepare for trial he said that he read the discovery and got ready for cross-examination; he did not interview witnesses or develop the defense case in any other way. *Id.* at 189.

> Q. Did you interview any witnesses?

> A. I don't—of the Commonwealth witnesses, I don't recall interviewing them before trial.

> Q. Did you interview any defense witnesses?

> A. We didn't have any defense witnesses.

> Q. So [Petitioner] just sat there, never said—never gave you—identified any one person to interview is that your testimony?

> A. (No response.)

> Q. He wrote you, like I'm innocent, I'm innocent. So for the eight weeks you represented him, he didn't mention one witness?

> A. Well, if you have a letter, show it to me. I don't recall.

*Id.* at 189-190.

Trial counsel reiterated that when he said that he did not recall a discussion with Petitioner about an alibi witness prior to trial, he could not say that the event did not occur; he simply did not remember. *Id.* at 190.

During Petitioner's rebuttal, Jazmine Cobb testified that she and Delisa Griffin were in her car, on their way to a religious service. 11/21/16 Tr. 212. Cobb called trial counsel to find out what was going on with Petitioner's case. *Id.* at 213.

Trial counsel often did not answer the phone when she called, but he did on this occasion. *Id.* at 211-212. She handed the phone over to Griffin and had trial counsel speak to Griffin. *Id.* at 213. Cobb heard Griffin give trial counsel her name, phone number and address. *Id.*

### Petitioner Establishes Ineffective Assistance of Counsel

Based upon the foregoing, there can be no serious contention that trial counsel performed as the reasonably competent attorney guaranteed by the Constitution. Trial counsel admitted that he undertook no investigation other than reading the discovery. 11/21/16 Tr. 189. "[T]he courts of appeals are in agreement that failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Gray*, 878 F.2 702, 711 (3d Cir. 1989) (citing *Thomas v. Lokhart*, 738 F.2d 304, 308 (8th Cir. 1984) (investigation consisting solely of reviewing prosecutor's file "fell short of what a reasonably competent attorney would have done."); *Sullivan v. Fairman*, 819 F.2d 1382, 1391-92 (perfunctory attempts to contact witnesses not reasonable); *code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986) (counsel's performance fell below competency standard where he interviewed only one witness); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("Though there

78

may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation."); *see also United States v. Debango*, 780 F.2d 81, 85 (D.C. Cir. 1986) (ineffectiveness shown by complete failure to investigation).

"Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (citing *Strickland*, 466 U.S. at 690-91; *Debango*, 780 F.2d at 85 ("The complete failure to investigate potentially corroborating witnesses…can hardly be considered a tactical decision."); *see also Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (when counsel bases an "alleged choice" on what evidence to present on "an unreasonable investigation," such decision is also "objectively unreasonable.").

Thus, because trial counsel did nothing to investigate this case, Petitioner received ineffective assistance of counsel and therefore, under *Strickland*, if Petitioner can show prejudice, the writ must issue.

**Prejudice**

The prejudice here is plain. Petitioner's defense was that he was not the shooter and was not present when the shooting occurred. Trial counsel presented no

defense evidence at all. Testimony that he was somewhere else when the murder occurred was critical to that defense.

Even though the PCRA judge ultimately ruled against Petitioner, she found Delisa Griffin's testimony to be believable. 11/21/16 Tr. 234. Ms. Griffin provided numerous details explaining how she knew that Petitioner was with her the night of the shooting, and her story harmonized with the surveillance video.

Thus, given the weakness of the Commonwealth's case (*see* The Weakness of the Commonwealth's Case, *supra*), "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The writ should issue.

**Exhaustion**

Pursuant to Title 28 U.S.C. §2254, a habeas petitioner must exhaust the remedies available in state courts before a federal court can exercise habeas corpus jurisdiction over his claim. In order to fulfill this requirement, the petitioner "must have presented both the factual and legal substance of his claim in the state court's highest tribunal."[10] *Rolan v. Coleman*, 680 F.3d 311, 317 (3d Cir. 2012) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

---

[10] In Pennsylvania, petitioners are not required to present their claims to the state's highest court on discretionary review in order to satisfy the exhaustion requirement, and thus for exhaustion purposes, the Superior Court is the highest court to which Petitioner was required to seek review. *Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

Petitioner exhausted this claim by raising it before the state PCRA court and then the Superior Court on appeal. *See Commonwealth v. Long*, 2018 WL 3015330 (June 18, 2018). Thus, this claim was fully exhausted in state court, and this Court should address the claim on the merits.

### The State Court's Decision Was Based on an Unreasonable Determination of the Facts

Where the state court plainly misstates or misapprehends the record in making its factual findings, and the misapprehension goes to a material factual issue, the misapprehension can fatally undermine the fact-finding process, rendering the state court's determination of the facts "unreasonable" under §2254(d)(2). *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *see also* Standard of Review Section, *supra*. Moreover, when the state court has before it, yet apparently ignores, evidence that is highly probative and central to the petitioner's claim, this can undermine the fact-finding process causing the state court's factual determination to be unreasonable and not entitled to deference. *See, e.g., Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005); *see also* Standard of Review Section, *supra*.

Because the Superior Court Opinion was based upon an unreasonable determination of the facts under (d)(2), this Court "must review the claim *de novo* to determine whether [Petitioner] is entitled to relief." *Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011).

The Superior Court held that the PCRA court's credibility determinations were supported by the record, and therefore the Superior Court was bound by them. Superior Opinion at *3. Specifically, the Superior Court held that it was dispositive to this claim that the PCRA court credited trial counsel's supposed testimony that he had never heard of Delisa Griffin over Griffin's testimony that she had spoken to trial counsel and told him that she was an alibi witness.[11]

One of the many problems with the Superior Court's analysis is that the trial court actually found Griffin to have been credible. 11/21/16 Tr. 234. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499-500 (1984) ("due regard shall be given to the trial judge's opportunity to observe the **demeanor of the witness**") (emphasis added). The PCRA court merely expressed doubt, not whether Griffin was telling the truth, but whether she was remembering the correct evening. But as discussed below, that factual finding—that Green was misremembering the night—is belied by the factual record. Thus, the PCRA court's findings, adopted by the Superior Court, are not entitled to any deference.

---

[11] Even if the PCRA court's factual determinations were reasonable, which they were not, those determinations would not be legally dispositive. *See* The State Court's Decision Was Contrary to Clearly Established Federal Law, *infra*. However, the Superior Court's unreasonable determination of the facts does in fact independently require this Court to address this claim *de novo*.

Echoing the trial court, the Superior Court accepted trial counsel's testimony that he "did not recall Ms. Griffin and did not remember ever discussing an alibi witness with Appellant as part of his defense." Superior Opinion at *2. The Superior Court then catalogued trial counsel's testimony that, in its view, indicated that he had never been informed of the existence of Griffin, including: (1) trial counsel "filed no [alibi] notice in Appellant's case '[b]ecause it wasn't an alibi defense,'" Superior Opinion at *2 (quoting trial counsel testimony), and (2) "the trial court asked Appellant after the Commonwealth rested whether Appellant has any witnesses that should have been called but were not, and Appellant indicated he did not," *id.* at *2.

The Superior Court also accepted the PCRA court's determination about Griffin's unreliability as to which evening she hosted Petitioner:

> Th[e PCRA c]ourt found [Ms.] Griffin's testimony unreliable as she could not conclusively establish that the events she described occurred on the night of the murder. While [she] described hosting [Appellant] at her home on the night of the murder, she appeared to describe a common pattern of her and [Appellant's] behavior instead of a specific recollection of events. When pressed to provide specifics, [Ms.] Griffin peppered her testimony with qualifiers and hedging.

Superior Opinion at *3 (quoting PCRA Court Opinion at 8).

None of this is supported by the record. First, while trial counsel did testify on direct examination that he did not "remember" speaking to Griffin, he emphasized that he was not saying that he never spoke to her, but that he simply did

not recall. 11/21/16 Tr. 190. Moreover, on cross-examination, trial counsel expressly stated that his recollection had been "refresh[ed]" and he now did remember Petitioner telling him about Griffin and *he did remember speaking to her. Id.* at 184. Trial counsel testified that he remembered Petitioner speaking to him about another girl that he had been seeing during his relationship with Jazmine Cobb. *Id.* at 185 ("I remember him [Petitioner] saying I'm going through it with Jazzy or something…"). He also remembered speaking to Griffin ("this other girl called me"). *Id*. Thus, the record flatly refutes the Superior Court's conclusion that the PCRA court's factual determinations were supported by the record since trial counsel admitted that Petitioner had told him about Griffin and he admitted that he had spoken to her.

Additionally, the fact that Petitioner did not raise an objection to the Court that no witnesses had been called by the defense is plainly not proof that trial counsel had never heard of Griffin, especially in light of his admission that he had, in fact, spoken to her. The more relevant inquiry is why, after trial counsel admitted that he had spoken to her, he never called her as a witness. In any event, nothing Petitioner said at trial could excuse trial counsel for failing to do a proper investigation. *See Gonzalez v. United States*, 553 U.S. 242, 249 (2008) ("Giving the attorney control of trial management matters is a practical necessity. The adversary process could not function effectively if every tactical decision required client approval. The presentation of a criminal defense can be a mystifying process even for well-

informed laypersons. This is one of the reasons for the right to counsel.") (internal citations and quotations omitted); *see also* 11/21/16 Tr. 39 (Petitioner's testimony when asked why he did not object to a lack of witnesses: "I was following Tinari's lead, Your Honor. That's what I hired him for. That's – this is his profession. I don't know about the law."). This was no hybrid defense; nor was Petitioner proceeding *pro se.* He had right under the Sixth Amendment to assume trial counsel's competency.

The PCRA court's factual findings regarding Griffin's testimony, findings affirmed by the Superior Court, are similarly unsupported by the record. The PCRA judge stated at the hearing that she found Delisa Griffin to be credible. 11/21/16 Tr. 234. ("The person that I did believe was telling the bulk of the truth is Ms. Griffin. But the question is how reliable of a witness is Ms. Griffin?"). However, the court found Griffin to be "unreliable" because the Court claimed that Griffin was not sure about the night on which Petitioner visited her and instead "appeared to describe a common practice of her and [Petitioner's] behavior instead of a specific recollection of events." Superior Opinion at *3 (quoting PCRA Opinion). This is flatly refuted by the record. Griffin testified repeatedly that she was confident that Petitioner visited her on November 10, 2011 because that is her mother's birthday. 11/21/16 Tr. 81, 84, and 85. She never hedged on this fact. That aspect of Griffin's testimony was never addressed by the PCRA or Superior Courts. There can be no doubt that

Griffin intentionally and deliberately claimed the association between her mother's birthday and Petitioner's visit. Thus, to find that this was not true, the PCRA court would have had to make an adverse credibility determination. *In the moment,* when Ms. Griffin was directly before that factfinder, the court made the exact opposite finding. 11/21/16 Tr. 234 (PCRA court stating that she believed that Griffin was generally telling the truth). Additionally, neither the PCRA nor Superior Courts ever addressed Jazmine Cobb's testimony that she was present when Griffin spoke to trial counsel on the phone. *See Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005) (when state court has before it, yet apparently ignores, evidence that is central to the petitioner's claim, this can undermine the fact-finding process causing the state court's factual determination to be unreasonable and not entitled to deference).

Thus, the Superior Court's decision was wholly based on an unreasonable determination of the facts. This reliance on erroneous factual findings "highlights the unreasonableness of the state court's decision," thus requiring relief under §2254(d)(2) and *de novo* review of Petitioner's claim. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

### The State Court's Decision Was Contrary to and an Unreasonable Application of Clearly Established Federal Law

The Superior Court's decision was also "contrary to clearly established federal law, as determined by the Supreme Court of the United States," and this

additionally and independently requires this Court to address this claim *de novo*. 28 U.S.C. §2254(d)(1).

The Superior Court held that Petitioner was not entitled to relief because the PCRA court credited trial counsel's testimony that he had never heard of Delisa Griffin[12] and that, according to trial counsel, Petitioner's case "wasn't an alibi defense." Superior Opinion at *2. However, whether trial counsel had heard of Griffin is not dispositive under the appropriate legal test, and trial counsel's determination that the defense would not include an alibi defense was ineffective assistance of counsel because it was not made after a competent investigation.

The law that applies to this claim is founded upon *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* is clearly established law. "That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence,' obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court.'" *Williams v. Taylor*, 529 U.S. 362, 391 (2000).

Here, the Superior Court only assessed whether trial counsel had actually learned of Delisa Griffin, effectively holding that if Petitioner had not made trial counsel aware of Griffin, then he acted effectively. This is a misapplication of law

---

[12] This is factually incorrect. *See* The State Court's Decision Was Based on an Unreasonable Interpretation of the Facts, *supra*. However, the fact that the Superior Court's decision was contrary to clearly established federal law also independently requires this Court to address this claim *de novo*.

87

because under *Strickland* "**counsel** has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691 (emphasis added). There is no dispute that Petitioner had informed trial counsel that he was innocent. 11/21/16 Tr. 146. Nonetheless, trial counsel could not remember a single thing that he did to investigate this case, including even asking Petitioner, *if you didn't do it, where were you when it happened, and who were you with? Id.* at 167. There can be no more basic an inquiry that a criminal practitioner must make in a case where his client claims absolute innocence. Trial counsel did not interview any witnesses or undertake any pretrial investigation other than reading the discovery. *Id.* at 169, 189-190. He barely even spoke to his client. 11/21/16 Tr. 21 (Petitioner testified that trial counsel only visited him once in jail, prior to even receiving the discovery, and trial counsel thereafter never wrote him or set up any confidential phone calls); *accord id.* at 147 (trial counsel could not remember how many times they spoke, but it may have been just the one time in the jail or "if he called me on the phone," which would have been on a recorded line).

Thus, even accepting, *arguendo*, that trial counsel had never been informed by anyone about Griffin's existence (which he had), trial counsel had a duty under *Strickland* to conduct a reasonable investigation to learn of any helpful defense evidence, and by his own admission he undertook no investigation whatsoever. *Id.* at 189 (when asked what he did to prepare for trial, trial counsel said he read the

discovery and got ready for cross-examination but interviewed no witnesses nor developed the defense in any other way).

Indeed, the United States Supreme Court has held that it is an unreasonable application of *Strickland* to not find trial counsel ineffective when counsel did not conduct an investigation where "the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Here, trial counsel knew that his client maintained that he was innocent and not present when the crime occurred. 11/21/16 Tr. 146. Based upon those facts, any reasonably competent attorney would have asked his client where he was, and who he was with, when the incident occurred. If this revealed any alibi witnesses, any reasonable attorney would have interviewed those witnesses. Trial counsel admitted to not remembering even speaking to Petitioner about the possibility of an alibi defense. *Id.* at 115-16. Thus, even if it were true (which it not based on trial counsel's own testimony) that trial counsel had not been expressly told about Griffin's existence, pursuant to *Strickland* and *Wiggins*, trial counsel was ineffective for failing to investigate an alibi defense when he knew that Petitioner maintained he was not present during the shooting. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (when the investigation that supports counsel's decision not to introduce evidence was itself unreasonable, counsel provided ineffective assistance of counsel).

89

The Superior Court's decision to the contrary was contrary to and an unreasonable application of clearly established federal law.

### CLAIM IV – TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION FOR FAILING TO INVESTIGATE, INTERVIEW AND CALL ERIC GREEN AS A WITNESS; GREEN WOULD HAVE TESTIFIED THAT HE WITNESSED THE SHOOTING AND THAT PETITIONER WAS NOT THE SHOOTER

Just as trial counsel conducted no investigation into any alibi witnesses (*see* Claim III *supra*), he conducted no investigation into any eyewitnesses either. Indeed, he did not interview a single witness prior to trial. 11/21/16 Tr. 169. Because of trial counsel's utter failure to conduct any investigation, he did not speak to Eric Green, even though Rashan Gaffney averred in his statement to police that Eric Green was at the scene of the shooting. A22. A competent defense attorney would have used the inconsistencies between the Police Activity Sheet, which stated that Green was not present at the shooting, and Gaffney's statement to, at the very least, interview Gaffney and Green before trial to ascertain the validity of the Police Activity Sheet.

The PCRA court ruled against Petitioner on this claim, and the Superior Court affirmed, based upon (1) an unreasonable determination of the facts adduced at the evidentiary hearing and (2) an unreasonable application of clearly established federal law. Petitioner can establish that his trial attorney provided him ineffective assistance, and thus the writ should issue.

90

**Trail Counsel Failed to Conduct Any Investigation Regarding Eric Green even though Rashan Gaffney's Statement Indicated that Eric Green Was Present at the Shooting**

Rashan Gaffney averred in his statement that he and his friends had met up with Eric Green just before the shooting started. Gaffney Statement; A22.

After the shooting started, he and his friends, now including Green, ran down Frazier Street. *Id.* Butts-Sterns got shot while they were running. *Id.* Gaffney grabbed Butts-Sterns' arm and told him to come on. *Id.* By this point, all of their other friends (including Green) had run away. *Id.* Gaffney ultimately left Butts-Sterns and ran under a truck. *Id.* Gaffney then saw a man in a black hoodie with a white stripe stand over Butts-Sterns and shoot him. *Id.*

After interrogating Gaffney, detectives interrogated Eric Green that same day (December 30, 2011), but according to the Police Activity Sheet, Green allegedly denied being with the group and denied knowing anything about the shooting, and for these reasons detectives let him go without obtaining a formal statement. *See* Activity Sheet; A40.

Eric Green ended up briefly being Petitioner's cellmate in the county jail. 11/18/16 Tr. 27. Green said that he knew Petitioner had not committed this murder, and Green was willing to come to court to testify to that. *Id.* at 28. Petitioner wrote to trial counsel about Green's potential as a witness. *Id.* at 27.

When Petitioner got to the trial, he asked trial counsel if he had interviewed Green and other witnesses; trial counsel said no and that it was now too late. *Id.* at 29.

At the PCRA hearing, Eric Green testified that on November 10, 2011, he went to school, came home and then fell asleep. 11/18/16 Tr. 30. His phone rang and it was Benderick Sterns. *Id.* at 30-31. Green asked his mom to drive him to his old neighborhood to meet up with his friends. *Id.* at 31. While Green was on the way, Sterns called him again and told him that Sterns and others had "got into it" with somebody in West Philly. *Id.* at 31. Sterns said that two people were following him and his friends, so Green stayed on the phone with him. *Id.* at 31. Sterns said the two guys turned off and were not following them anymore and he said to meet them at 56th Street; Green agreed and they hung up. *Id.* at 32. Green met them at 56th and Malcolm; the group consisted of Benderick Sterns, Rashan Gaffney, Ercel Butts-Stern, Lidell Brightman and now Green.

The group started walking again when Gaffney said, "who's this behind us?" *Id.* at 33. Green looked behind them and saw a guy running on the other side of the street coming toward them with a gun. *Id.*

"And by the time he got towards us, he came between the cars and he was pointing a gun at us and shots went off." *Id*. Green immediately ran to 57th and Pentridge. *Id.*

92

Green was able to see the gunman's face. *Id.* at 34. The gunman was not Petitioner. *Id.* Green knew it was not Petitioner because he knew Petitioner from school at Delaware Valley High School. *Id.* at 34. Green described the shooter as wearing a hoodie, older and with a beard. *Id.* at 35.

After the murder, Green was brought to Homicide to speak to detectives. *Id.* at 35. They asked him what happened, and he told them the above narrative. *Id.* Detectives showed Green a picture of Petitioner, and Green told detectives that he knew Petitioner was not the shooter because he went to school with Petitioner and that was not the man he saw. *Id.* Green never told detectives that he was not present for the shooting or that he did not see the shooting. *Id.* at 36. Green reaffirmed that he specifically told detectives that Petitioner was not the gunman. *Id.*

Green found out that Petitioner had been arrested for Butts-Sterns murder when Green was in county jail awaiting trial for his own case. *Id.* at 43. Green told Petitioner that he knew Petitioner had not committed murder, and he volunteered to speak to Petitioner's lawyer about it. *Id.* at 43-44.

Trial counsel testified at the PCRA hearing that all he remembered regarding Green was "[s]omething along the line he was interviewed and he didn't make an ID." 11/21/16 Tr. 121-122. Trial counsel testified that he did not recall Petitioner telling him that Green had information helpful to the defense. *Id.* at 124.

Trial counsel never tried to interview Eric Green. *Id.* at 181. PCRA counsel asked if it raised any red flags for him that Gaffney's statement said that Green was present at the shooting, but the Detective's activity sheet said otherwise. Trial counsel answered, "No." *Id.* at 177. Trial counsel claimed that he interpreted Gaffney's statement to indicate that Green was not present during the shooting, even though the statement says: "**We met up with Eric Green** on Malcolm and Frazier St and the two guys were about two or three houses from us on Malcolm Street. I seen them and I said to them, Yo, who are those two boys following us? They like where, and I like here and when they saw them **we started running and they started chasing us and we ran down Frazier to Hadfield and they was shooting at us the whole time**." *Id.* at 178-179; 180 (emphasis added) (PCRA counsel read this portion of the statement to trial counsel); *see also* Gaffney Statement at 3; A22. Trial counsel could not explain how his interpretation made sense given the words of the statement itself. *Id.*

**Deficient Performance**

Trial counsel performed deficiently in failing to interview Green prior to trial. Under *Strickland* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Thus, trial counsel had a duty under *Strickland* to conduct a reasonable investigation to learn of any helpful defense evidence, and by his own admission he undertook no

94

investigation whatsoever. *Id.* at 189 (when asked what he did to prepare for trial, trial counsel said he read the discovery and got ready for cross-examination but interviewed no witnesses nor developed the defense in any other way). "[T]he courts of appeals are in agreement that failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Gray*, 878 F.2 702, 711 (3d Cir. 1989); *see also* Claim III, *supra* (discussing how a lack of investigation is clear ineffectiveness).

Indeed, the United States Supreme Court has held that it is an unreasonable application of *Strickland* to not find trial counsel ineffective when counsel did not conduct an investigation where "the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Here, trial counsel knew that the Commonwealth's key witness said that Green was an eyewitness to the shooting. Pursuant to *Strickland* and *Wiggins*, trial counsel was ineffective for failing to conduct any investigation whatsoever, including failing to interview either Green or Gaffney. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (when the investigation that supports counsel's decision not to introduce evidence was itself unreasonable, counsel provided ineffective assistance of counsel).

**Prejudice**

To meet the *Strickland* prejudice standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The defendant need not prove "that counsel's deficient conduct more likely than not altered the outcome." *Strickland*, 466 U.S. at 693. But a defendant must demonstrate "that the errors had some conceivable effect on the outcome of the proceeding." *Id.*

Under *Strickland* the reviewing court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup v. Delo*, 513 U.S. 298, 330-32 (1995); *see also Strickland*, 466 U.S. at 695 ("The assessment of prejudice…should not depend on the idiosyncrasies of the particular decisionmaker…."); *Saranchak*, 802 F.3d at 588 ("the prejudice inquiry focuses on the effect the same evidence would have had on an unspecified, objective factfinder rather than a particular decisionmaker in the case") (internal quotation marks omitted). The question, then, is whether there is a reasonable probability that Green's testimony would affect the decision of a hypothetical jury in the context of the evidence presented at trial.

Here, the prejudice is plain. Petitioner's defense was that he was not the murderer. Trial counsel presented no defense evidence at all. Testimony from Eric Green that Petitioner was not the shooter would have dramatically buttressed his

defense. Here, the state's case was weak. Gaffney was its only identification witness, and he recanted his earlier identification. Given that weakness (*see* The Weakness of the Commonwealth's Case, *supra*), "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. There is a reasonable probability under *Strickland* that had trial counsel acted effectively and presented Green's testimony that Petitioner was not the shooter, Petitioner would have been acquitted.

The writ should issue.

**Exhaustion**

Pursuant to Title 28 U.S.C. §2254, a habeas petitioner must exhaust the remedies available in state courts before a federal court can exercise habeas corpus jurisdiction over his claim. In order to fulfill this requirement, the petitioner "must have presented both the factual and legal substance of his claim in the state court's highest tribunal."[13] *Rolan v. Coleman*, 680 F.3d 311, 317 (3d Cir. 2012) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

---

[13] In Pennsylvania, petitioners are not required to present their claims to the state's highest court on discretionary review in order to satisfy the exhaustion requirement, and thus for exhaustion purposes, the Superior Court is the highest court to which Petitioner was required to seek review. *Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

Petitioner exhausted this claim by raising it before the state PCRA court and then the Superior Court on appeal. *See Commonwealth v. Long*, 2018 WL 3015330 (June 18, 2018). Thus, this claim was fully exhausted in state court, and this Court should address the claim on the merits.

### The State Court's Decision Was Based on an Unreasonable Determination of the Facts

The Superior Court held that Petitioner was not entitled to relief because the PCRA court determined that "Green was not a credible witness"[14] for the following reasons:

> Mr. Green's testimony was not only unpersuasive but also incredible. Nothing in his recollection of the facts indicated that he was present at the shooting and that his observations were accurate. Mr. Green failed to corroborate Ms. Matthias, Ms. Hunter, and Mr. Gaffney's testimony that the shooter stood over the decedent and executed him. The statement given by another of the men who was with the decent that night does not mention that Mr. Green was present for the shooting, while Mr. Gaffney's statement can only confirm that Mr. Green was present prior to the shooting. Moreover, Mr. Green's testimony that he looked at the shooter's face for five minutes immediately before the shooting is implausible, as the eyewitnesses at trial testified that the decedent's group was running away from the perpetrator immediately before the shooting. Mr. Green's testimony is further clouded by the fact that he only developed this story after meeting Appellant in prison. Prior to that meeting, Mr. Green denied having been present at the shooting.

---

[14] As described below, this is not the correct legal test. *See* The State Court's Decision Was Contrary to and an Unreasonable Application of Clearly Established Federal Law*, infra*. However, the Superior Court's unreasonable determination of the facts independently require this Court to address this claim *de novo*.

*Commonwealth v. Long*, 2018 WL 3015330, *3 (Pa. Super. Ct. June 18, 2018). (quoting PCRA Opinion at 9-10) (citations omitted) (brackets omitted).

These findings by the PCRA court, adopted by the Superior Court, are erroneous.

First, Green gave a very detailed accounting of how, when, and where he met up with Rashon Gaffney and his friends. 11/18/16 Tr. 27-47. His accounting is corroborated by Gaffney's statement and testimony—testimony that the Commonwealth urged the jury to credit. 5/14/13 Tr. 155; *see also* Gaffney Statement 1-2; A22. The Commonwealth presented no evidence at the PCRA hearing to contradict Green's PCRA testimony. Thus, the uncontradicted evidence demonstrates that Green was with the group when the shooting occurred and the PCRA court's finding to the contrary is clearly erroneous and not supported by the record.

Second, contrary to the Superior Court's erroneous determination, Hazel Matthias' and Tracie Hunter's trial testimony did not contradict or undermine Green's credibility. Matthias and Hunter were driving south on 57th Street approaching Hadfield Street when they saw a group of 4-5 black males run out from Hadfield Street and turn south onto 57th Street. 5/14/13 Tr. 41. Shortly thereafter they heard a gunshot and saw one of the males fall to the ground on 57th Street approaching Willows Street. *Id.* They then saw a black male with a gun walk up to

the fallen male, stand over him, and shoot him again. *Id.* at 43. The gunman then ran north on 57th Street with another black male. *Id.* at 55-57.

The PCRA court and Superior Court focused on the last part of their testimony, where the gunman approached Ercel Butts-Sterns and shot him at pointblank range. According to the PCRA court and Superior Court, Green never mentioned this aspect of the shooting in his testimony, purportedly rendering his testimony incredible. Superior Opinion at *3 (quoting PCRA Opinion at 9-10). The PCRA and Superior Court are both wrong.

Green testified that once he saw the gunman begin shooting, he ran south on 57th Street towards Pentridge Street. 11/18/16 Tr. 33. Pentridge Street is more than a block south from where the gunman approached Butts-Sterns and fired again. Consequently, unlike Gaffney, who hid under a nearby truck after the shooting began and was therefore able to witness the last part of the shooting, and unlike Matthias and Hunter who saw the entire event, Green was not in a position to see the final shots. Indeed, Ebony Mitchell did not witness this portion of the shooting either, but that does not undermine her credibility. Consequently, contrary to the PCRA court's finding, Matthias' and Hunter's testimony does not undermine Green's testimony.

The uncontradicted record evidence, therefore, actually establishes the following: (1) Green was with the group when the shooting occurred, (2) Green saw the gunman's face; (3) Green did not recognize the gunman, but (4) knew the

gunman was not Petitioner because (5) he and Petitioner had attended the same high school for two years.

In short, the Superior Court's decision was based on an unreasonable determination of the facts. The transcript of the PCRA hearing itself proves this point. This reliance on erroneous factual findings "highlights the unreasonableness of the state court's decision," thus requiring relief under §2254(d)(2) and *de novo* review of Petitioner's claim. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

### The State Court's Decision Was Contrary to Clearly Established Federal Law

The Superior Court's decision was also "contrary to clearly established Federal law, as determined by the Supreme Court of the United States," and this additionally and independently requires this Court to address this claim *de novo*. 28 U.S.C. §2254(d)(1).

The Superior Court held that Petitioner was not entitled to relief because the PCRA court did not find Green to be a credible witness. While earlier in its opinion the Superior Court properly cited *Strickland v. Washington*, 466 U.S. 668 (1984), whether the PCRA court personally found Green to be credible is not an element of *Strickland*, and thus the Superior Court's decision was contrary to clearly established law. *See Saranchak v. Sec'y Pa. Dep't. of Corr.*, 802 F.3d 579, 598 (3d Cir. 2015) ("Although the PCRA court had previously recited the correct standard to determine

whether Saranchak suffered prejudice, its ostensible application of that standard raises serious doubt that the correct analysis was in fact undertaken.").

The test for determining whether a criminal defendant has been denied the right to effective assistance of counsel is twofold. To establish that counsel was constitutionally ineffective, first "[a] petitioner must show that counsel's performance was deficient." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687). The petitioner must secondly show that counsel's deficiency "prejudiced the defense." *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 687).

Whether the PCRA court found Green credible has no bearing on whether trial counsel performed deficiently by failing to interview Green prior to trial. Since trial counsel never interviewed Green, he would not have been in a position to assess his credibility. Under *Strickland* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Thus, trial counsel had a duty under *Strickland* to conduct a reasonable investigation to learn of any helpful defense evidence, and by his own admission he undertook no investigation whatsoever. *Id.* at 189 (when asked what he did to prepare for trial, trial counsel said he read the discovery but interviewed no witnesses nor developed the defense in any other way).

Indeed, the United States Supreme Court has held that it is an unreasonable application of *Strickland* to not find trial counsel ineffective when counsel did not conduct an investigation where "the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Here, trial counsel knew that the Commonwealth's key witness, Gaffney, said that Green was also an eyewitness to the shooting. Pursuant to *Strickland* and *Wiggins*, trial counsel was ineffective for failing to conduct any investigation whatsoever, including failing to interview either Green or Gaffney. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (when the investigation that supports counsel's decision not to introduce evidence was itself unreasonable, counsel provided ineffective assistance of counsel).

Presumably the Superior Court's focus on the PCRA court's credibility determination is related to the prejudice prong rather than the deficient performance prong of *Strickland*. In either event, the court misapplied *Strickland.*

To meet the *Strickland* prejudice standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The defendant need not prove "that counsel's deficient conduct more likely than not altered the outcome." *Strickland*, 466 U.S. at 693. But a defendant must demonstrate "that the errors had some conceivable effect on the outcome of the proceeding." *Id.*

The prejudice test under *Strickland* is not whether the PCRA court found Green credible and therefore whether the PCRA court's mind was changed by his testimony; instead, the reviewing court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup v. Delo*, 513 U.S. 298, 330-32 (1995); *see also Strickland*, 466 U.S. at 695 ("The assessment of prejudice…should not depend on the idiosyncrasies of the particular decisionmaker…."); *Saranchak*, 802 F.3d at 588 ("the prejudice inquiry focuses on the effect the same evidence would have had on an unspecified, objective factfinder rather than a particular decisionmaker in the case") (internal quotation marks omitted).

Thus, contrary to the Superior Court's faulty legal analysis, it is immaterial whether the PCRA court, itself, found the new evidence to be persuasive enough that the evidence would have affected its own verdict. The question, instead, is whether there is a reasonable probability that Green's testimony would affect the decision of a hypothetical jury in the context of the rest of the evidence presented at trial.

Here, the state's case was weak. *See* The Weakness of the Commonwealth's Case, *supra*. Gaffney was its only identification witness, and he recanted his earlier identification. Thus, there is a reasonable probability under *Strickland* that had trial counsel acted effectively and presented Green's testimony that Petitioner was not the shooter, Petitioner would have been acquitted.

The Superior Court's decision to the contrary was based upon a misapplication of clearly established federal law, and thus this Court should accord that determination no deference and conduct a *de novo* review. 28 U.S.C. §2254(d)(1).

### CLAIM V – THE COMMONWEALTH VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AS EXPLICATED IN *BRADY V. MARYLAND*, BY FAILING TO REVEAL ERIC GREEN'S EXCULPATORY STATEMENT

Petitioner incorporates by reference all of the averments made in Claim IV, *supra.* As described in Claim IV, the Superior Court's Decision was based upon the PCRA's factual findings that are not supported by the record, including its finding that Green did not make an exculpatory non-identification of Petitioner on December 30, 2011. Therefore, the Superior Court's decision is due no deference, and this Court should conduct a *de novo* review. 28 U.S.C. §2254(d)(2).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* encompasses material evidence "known only to police investigators and not to the prosecutor[.]" *Kyles v. Whitley,* 514 U.S. 419, 439 (1995).

Evidence "qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 136 S.Ct. 1002, 1006

105

(2016) (quotations and citations omitted). To prevail on his *Brady* claim, Petitioner need not show that he "more likely than not" would have been acquitted of murder had the jury known of Green's exculpatory non-identification. *Smith v. Cain*, 566 U.S. 73, 75-76 (2012). Rather, he "must show only that the new evidence is sufficient to undermine confidence in the verdict." *Wearry*, 136 S.Ct. at 1006. Stated differently, that Green's exculpatory non-identification had a reasonable probability of altering the jury's assessment of the Commonwealth's case against him. *Cone v. Bell*, 556 U.S. 449, 452 (2009).

Thus, the Commonwealth's suppression of Green's non-identification was material, and thus the writ should issue.

### CLAIM VI – PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE

Petitioner maintains that each of his claims independently entitles him to relief. Alternatively, Petitioner maintains that the cumulative impact of the errors in this case entitles Petitioner to relief.

*Strickland* prejudice is always assessed cumulatively. Indeed, *Strickland* itself acknowledges this when it wrote that prejudice is established "when counsel's **errors** were so serious as to deprive the defendant of a fair trial." *Strickland,* 466 U.S. 668, 687 (1984). The use of the plural shows that prejudice is assessed cumulatively. Addressing a claim of trial counsel ineffectiveness (IAC) in capital sentencing, *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), also assessed the prejudicial

impact of all of "counsel's **failures,**" by "reweigh[ing] the evidence in aggravation against the **totality of available mitigating evidence**," *i.e.* all of the evidence that was not presented because of counsel's multiple deficiencies; *Outten v. Kearney*, 464 F.3d 401, 419 (3d Cir. 2006) (same). Thus, because *Strickland* prejudice analysis necessarily considers the cumulative impact of the counsel's deficiencies, no separate cumulative error claim must be presented or exhausted.

*Strickland* prejudice "**finds its roots** in the test for materiality of exculpatory information not disclosed to the defense by the prosecution," *Strickland*, 466 U.S. at 694, *i.e.* a *Brady* violation. *Brady* materiality, like *Strickland* prejudice, which are coextensive,[15] has long been assessed cumulatively. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) ("stressing" that materiality is considered "**collectively, not item by item**"); *Dennis v. Secretary*, 834 F.3d 263, 360 (3d Cir. 2016) (en banc) (same) (quoting *Kyles*, 514 U.S. at 436)).

Pennsylvania courts do the same cumulative analysis. *Commonwealth v. W. Johnson*, 139 A.3d 1257, 1287-88 (Pa. 2016) ("[I]f counsel is found to be ineffective in more than one instance, the question of whether prejudice resulted may be tallied **cumulatively**."); *Commonwealth v. R. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (same).

---

[15] *Marshall v. Hendricks*, 307 F.3d 36, 53, 85, n.9 (3d Cir. 2002).

In Petitioner's trial, there were multiple and serious instances of trial counsel ineffectiveness as well as multiple *Brady* violations. No defendant in a murder case, no matter his innocence, could survive such an onslaught of constitutional error. This is a case where there truly was cumulative error that denied Petitioner a fair trial, in a real and tangible way. But for these errors, there is a reasonable probability that the outcome would have been different in this case.

**CONCLUSION**

For all of the above reasons, and based upon the full record of this matter, Petitioner, Butchie Long, requests that the Court provide the following relief:

A) That leave to amend this Petition, if necessary, be granted;

B) That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

C) That Respondents be Ordered to respond to this Petition; and

D) That Petitioner's convictions and sentence be vacated.

Respectfully Submitted:

*s/Karl Schwartz*
KARL SCHWARTZ, ESQ.
KATHERINE ERNST, ESQ.
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 N
Philadelphia, PA 19106
schwartz@wisemanschwartz.com
(215) 360 – 3988

DATE:      October 13, 2021
           Philadelphia, PA

109

## Certificate of Service

I, Karl Schwartz, hereby certify that on this 13th day of October, 2021, I served the foregoing upon the following persons by filing the same with this Court's ECF Filing System:

> Matthew Stiegler
> Federal Litigation Supervisor
> Philadelphia County
> District Attorney's Office

> */s/ Karl Schwartz*

> Karl Schwartz

110