IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | | |
| BUTCHIE LONG | : | 19-cv-3192 |
| Petitioner, | : | |
| v. | : | HON. WENDY BEETLESTONE |
| | : | UNITED STATES DISTRICT JUDGE |
| THOMAS McGINLEY, et al., | : | |
| Respondents. | : | HON. LYNNE A. SITARSKI |
| | : | UNITED STATES MAGISTRATE JUDGE |
| | : | |
| _____ | | |

**PETITIONER'S POST-HEARING OPENING BRIEF
IN SUPPORT OF HIS PETITION FOR A WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. §2254**

Karl Schwartz
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 360-3988
schwartz@wisemanschwartz.com

Counsel for Petitioner
Butchie Long

Dated: June 27, 2023
Philadelphia, PA

# Table of Contents

Preliminary Statement ........................................................................ 1

The Evidentiary Hearing Evidence ..................................................... 2

Argument ............................................................................................. 11

The Prosecutor Committed a Material Fraud on the Court and Jury,
Prejudicing Mr. Long. Even if Her Comment Can Be Construed as
Forthright – Which it Cannot – She Was Obliged to Disclose the Email,
Which Was Both Exculpatory and Material ................................................. 11

I.   The *Brady* Standard ................................................................ 11

II.  The *Napue* Standard ............................................................... 14

III. The Weakness of the Commonwealth's Case ......................................... 20

IV.  The Email was Exculpatory and Material ............................................ 21

A.   Trial Counsel Would Have Used the Email to Mr. Long's Advantage,
     Establishing the Inference that Gaffney was Incentivized by His
     Knowledge He Would Not be Charged .................................................. 21

B.   In the Unlikely Event that the Jury Concluded that Gaffney Did Not
     Know that He Would Not be Charged, Mr. Cameron's Comment that
     "We needed him as a witness, so I did not approve an arrest[,]" Still
     Demonstrates Materiality ...................................................................... 25

C.   Although *Brady, Dennis* and *Wilson* Do Not Require Such a
     Conclusive Showing, the Evidentiary Record Establishes that Before
     He Gave His December 30, 2011, Statement, and Before He Testified
     at the Preliminary Hearing, Gaffney was Told He Would Not
     Be Arrested ............................................................................................ 30

Conclusion ............................................................................................ 34

# Table of Authorities

## Federal Cases

*Albrecht v. Horn,* 485 F.3d 103 (3d Cir. 2007) ............................................ 20

*Atkins v. Attorney General of Alabama,* 932 F.2d 1430 (11th Cir. 1991).... 20

*Banks v. Dretke,* 540 U.S. 668 (2004) ............................................. 11-12, 14

*Banks v. Reynolds,* 54 F.3d 1508 (10th Cir. 1995) ....................................... 22

*Brady v. Maryland,* 373 U.S. 83 (1963) .............. 11-12, 15, 18, 21-22, 29-30

*Chapman v. California,* 386 U.S. 18 (1967)..................................... 16, 18-19

*Davis v. Alaska,* 415 U.S. 308 (1974)........................................................ 28

*Dennis v. Sec'y,* 834 F.3d 263 (3d Cir. 2016) (en banc)........................ 22, 30

*Giglio v. United States,* 405 U.S. 150 (1972) ...............................11-12, 14-16

*Haskell v. Superintendent Green SCI,* 866 F.3d 139 (3d Cir. 2017) ...... 16, 18

*Hayes v. Brown,* 399 F.3d 972 (9th Cir. 2005) (en banc)....................... 18-20

*Hull v. Kyler,* 190 F.3d 88 (3d Cir. 1999)................................................... 13

*Jenkins v. Artuz,* 294 F.3d 284 (2d Cir. 2002) .................................. 15, 17, 24

*Kyles v. Whiley,* 514 U.S. 419 (1995).......................................................11-13

*Mooney v. Holohan,* 294 U.S. 103 (1935) ................................................... 14

*Napue v. Illinois,* 360 U.S. 264 (1959) .......................................14-19, 21-22

*Ouimette v. Moran,* 942 F.2d 1 (1st Cir. 1991) ........................................... 15

*Slutzker v. Johnson,* 393 F. 3d 373 (3d Cir. 2004) ...................................... 12

*United States v. Alzate,* 47 F.3d 1103 (11th Cir. 1995)................................ 15

*United States v. Bagley,* 473 U.AS. 667 (1985) ....................11-12, 15-16, 18

*United States v. Barham,* 595 F.2d 231 (5th Cir. 1979) ............................. 15

*United States v. Davis,* 609 F.3d 663 (5th Cir. 2010)............................14-15

*Wilson v. Beard,* 589 F.3d 556 (3d Cir. 2009)...................................21-22, 30

## Pennsylvania Cases

*Commonwealth v. Esquillin,* 2020 Pa. Super. Unpub. LEXIS 602 (Feb. 8). 27

*Commonwealth v. Hill,* 566 A.2d 252 (Pa. 1989)...................................27-28

*Commonwealth v. Hutchinson,* 25 A.3d 277 (Pa. 20111) ............................ 27

*Commonwealth v. McGriff,* 2021 Pa. Super. Unpub. LEXIS (Aug. 13) ...... 27

*Commonwealth v. Murphy,* 591 A.2d 278 (Pa. 1991) ................................. 28

*Commonwealth v. Williams,* 168 A.3d 97 (Pa. 2017)................................... 29

## PRELIMINARY STATEMENT

Petitioner, Butchie Long, submits his *Post-Hearing Brief* following the evidentiary hearing held before this Court on March 8, 2023.

Mr. Long filed his first counseled pleadings in this matter (an *Amended Habeas Petition* (Doc. 20) on March 5, 2021, and a *Brief in Support* (Doc. 29) on October 13, 2021). Respondent filed a *Response* (Doc. 38) on May 5, 2022. Respondent conceded the necessity of an evidentiary hearing on Claim I in the *Amended Petition*.[1] On December 5, 2022, the Court ordered that an evidentiary hearing on Claim I be held on February 14, 2023. Doc. 42. On January 17, 2023, the Court reset the hearing date for March 8, 2023. Doc. 43.

Respondent has not yet filed merits responses to any of the claims, including the five (5) claims in the *Amended Petition* and *Brief in Support* not involved in the evidentiary hearing. The parties agree that all the claims remain active.

On March 8, 2023, the hearing was held, and the Court received the testimony of Rashon Gaffney and Nino Tinari, Esq. The Court ordered post-hearing briefing.

This is Mr. Long's *Post-Hearing Opening Brief*.

---

[1] The prior procedural history of this matter is set forth in the *Brief in Support* Doc. 29. The *Brief in Support* and the *Amended Petition* are incorporated by reference to avoid repetition.

## THE EVIDENTIARY HEARING EVIDENCE

**Rashon Gaffney**, testified via video conference from a New Jersey prison that he had a discussion with Mr. Long's investigator Ronald Felder about the statement Gaffney gave to Philadelphia detectives in December of 2011. Hearing Transcript ("T") at 10. He recognized his signature on Exhibit P1, a February 23, 2023, declaration. T11-12. The declaration states in relevant part that Gaffney was told by detectives questioning him "that [he] would not be arrested for possessing a gun and for firing a gun during the incident that they were questioning [him] about, as long as [he] cooperated with police[;]" and that before he testified at the preliminary hearing he was told again, "this time by the prosecutor, that as long as I testified consistent with my police statement made three months earlier, I would not be arrested." T12-13.[2]

Gaffney testified that during his interview with detectives they showed him a video of him firing a gun. T14-15. Detectives told him "[c]ooperate and you will not be charged with the firing – for firing a firearm." T15. He then affirmed that this is what he was talking about in the declaration when he mentioned not being arrested. *Id.* Gaffney confirmed that this was told to him when he gave his statement at the

---

[2] After identifying his signature on the declaration, Gaffney answered "no" to follow-up questions ("is this the declaration that you signed" and ""is it true and correct"). T13. In his subsequent examination, however, he adopted the declaration and testified consistent with its contents, suggesting an earlier misunderstanding on his part. Respondent's counsel on cross did not suggest that Gaffney's direct testimony was inconsistent with the declaration.

Police Administration Building. T15. He confirmed that the prosecutor also told him at Mr. Long's preliminary hearing that he would not be charged if he cooperated. T16. Finally, he agreed that on more than one occasion he was told he would not be arrested or charged. *Id.*

On cross-examination Gaffney testified that he did not remember the name of prosecutor he spoke with at the preliminary hearing, but the conversation happened before his testimony. T17. He had no recollection of a question being put to him at that hearing regarding immunity. *Id.* But he did recall being told that if he testified (which he did), he "won't get [arrested]."[3]

At several points during the cross-examination, Gaffney insisted that Mr. Long was innocent and should not be in custody. T19-21; 24-26.

On further cross-examination Gaffney affirmed that he gave the declaration and stated that he was told by detectives and the prosecutor that he would not be arrested if he testified consistent with his police statement. T20. He did not recall other details of the conversation. *Id.* He did not recall the detectives' names but offered that their names would be in the police paperwork. *Id.*

The cross-examination returned to the question of whether Gaffney testified truthfully regarding the "particular kind" of immunity that he was offered at the

---

[3] Instead of "arrested", the transcript reads "(indiscernible)". However, undersigned counsel's recollection is that the word Gaffney used was "arrested." Counsel will seek a stipulation to that effect and move to correct the transcript.

preliminary hearing. T22. Gaffney answered, "I was going – I was doing what ya'll was telling me to do to cover my ass." *Id.* Gaffney was then asked if he remembered acknowledging at trial that his immunity meant "nothing that [he] said could be used against [him]." T24. He answered that he did not remember that point. *Id.*

On redirect examination Gaffney confirmed that he had never been arrested for possessing or firing a gun during the incident. T27. He also testified that he was ignorant of the various types of immunity that may be offered; however, he knew what it meant to be promised that he would not be arrested. T27. He again stated that he was promised that if he cooperated, he would not be arrested. T28.

On recross-examination Gaffney reiterated that he did not remember the details of his conversations with the detectives or prosecutors, or their names. T29.

**Nino Tinari, Esq.** testified that he was Mr. Long's trial attorney. T31. He identified his signed declaration and testified that he stood by all its assertions. The declaration, marked as P2, reads as follows:

> I, Eugene P. Tinari hereby declare:
>
> 1.  I represented Butchie Long ("Long") in his murder trial held in May of 2013. The victim in the case was Ercel Butts-Sterns ("Butts-Sterns"), who was shot to death in West Philadelphia.
>
> 2.  The defense was that Long was not the person who shot Butts-Sterns, and thus the identity of the shooter was the critical issue at trial.
>
> 3.  Rashan Gaffney ("Gaffney") was the only eyewitness to the crime to testify at trial who ever claimed to be able to identify the shooter.

3. Gaffney was with Butts-Sterns on the day of the shooting, and Gaffney appeared on a surveillance video shooting a gun during a confrontation with other people on the street. He was not legally permitted to possess the gun, let alone shoot it on a public street.

4. On March 21, 2012, at Long's preliminary hearing, the Commonwealth offered Gaffney immunity in exchange for his identification of Long. The Philadelphia Municipal Court granted the Commonwealth's immunity petition, and ordered Gaffney to testify at Long's preliminary hearing and that, pursuant to 42 Pa.C.S.A. §5947, no testimony compelled under that order could be used against him. At the preliminary hearing, Gaffney identified Long as the shooter.

5. No other agreements for immunity were ever disclosed to me during discovery.

6. At trial, Gaffney disavowed his preliminary hearing identification of Long (as well as an earlier photo identification the Commonwealth alleged he had made to police). These identifications were admitted into evidence, and formed the only identification of Long as the shooter.

7. During my cross-examination of Gaffney, I inquired into Gaffney's immunity deal. Bridget Kirn, the prosecutor, objected. The trial judge stated to the jury that the Commonwealth "couldn't prosecute [Gaffney] for his behavior." Kirn corrected the trial judge, declaring that the immunity "was just for testimony." Having been corrected, the trial judge then clarified and confirmed for the jury that the immunity "was just for testimony[, i]t was just use immunity." Kirn stated "yes," and the trial judge then reconfirmed the point.

8. Based upon the materials provided to me in discovery, I had no reason to dispute or disbelieve Bridget Kirn's representations that Gaffney was only given *use* immunity in exchange for his testimony.

9. Because there was ample evidence independent of Gaffney's testimony to prove him guilty of felony firearms charges, reckless endangerment and quite possibly aggravated assault, there was little impeachment value to the use immunity granted to Gaffney, especially since, to my knowledge, it was granted by the court to

prevent Gaffney from asserting his Fifth Amendment Rights and was not a part of any larger deal with the Commonwealth.

10.    Recently I have been made aware of an email [] that contains information that was never disclosed to me in discovery. The email is dated January 25, 2012, two months prior to the preliminary hearing. In that email, the Chief of the Homicide Unit advises Bridget Kirn that Gaffney was not arrested, and makes clear that, as long as he cooperates, he had no risk of being arrested. In pertinent part, the email reads: "Bridget, [y]ou will need to immuniuze (sic) witness Rashan Gaffney. He had a gun earlier on in the incident and either fired it at a person or at the ground. We need[] him as a witness, so I did not approve an arrest. That position may change if he gives you a hard time."

11.    Neither the email, nor the critical information demonstrating that the Commonwealth had given Gaffney full transactional immunity, was ever disclosed to me. If I had known that Gaffney's immunity ensured that he would not be prosecuted for his crimes in exchange for his testimony, I would have used this evidence to Long's advantage.

12.    During my closing, I argued that the jury should believe Gaffney's in- court testimony (disavowing his identification of Long) rather than his earlier identifications. I urged the jury to find that Gaffney had an incentive to lie previously, and pin the blame on Long, because he was ***hoping*** to avoid being prosecuted.

13.    In the absence of the evidence that Gaffney was getting off "scot-free," the prosecutor was able to credit Gaffney's motives in identifying Long as pure. She did so in her closing. Her argument would have been infinitely weaker, and mine infinitely stronger, had the jury known that from the very outset, the decision was made to not to prosecute Gaffney if he cooperated. This is because Gaffney's incentive to lie at the preliminary hearing to avoid charges, was far more than a question of ***hope.*** He had a guarantee, that only the Commonwealth knew about. My argument would have been stronger because it would have been based on fact, rather than speculation. I could have pointed to the deal for transactional immunity and argued that there had to be reasonable doubt when the Commonwealth was seeking a murder conviction based upon the disavowed identification of a man incentivized

before the preliminary hearing by the knowledge that he would not be prosecuted for his serious crimes.

14.   Additionally, and critically, in light of the Homicide Chief's threat of prosecution in the event Gaffney stopped cooperating, I would have argued to the jury that if Gaffney had any secondary motive it would have been to continue to satisfy the Commonwealth. There was nothing "in it" for Gaffney to disavow the identification. Indeed, the risk of prosecution, based on that disavowal, was a powerful indicator of its credibility.

*        *        *        *        *        *

[15].   This failure to disclose *Brady* material fundamentally affected Long's defense and my argument to the jury regarding the Commonwealth's key witness—the only witness to have ever identified Long as the shooter. As discussed above, if it had been disclosed to me before trial, I would have been able to utilize this information to undercut the Commonwealth's case. But for the jury never having learned of this *Brady* evidence, there is a reasonable likelihood that the jury would not have convicted Mr. Long.

Tinari testified that P3, the immunity petition for Gaffney that the Commonwealth provided, granted Gaffney immunity for "anything he testified to," but did "not provide immunity for his behavior." T34. Tinari testified that during the incident Gaffney fired a firearm that he was neither licensed nor eligible to carry. T34. Additionally, Gaffney's firing the gun was captured on video and he confessed those criminal actions to detectives on December 30, 2011. *Id.,* Therefore, he was subject to criminal prosecution. *Id.*

Tinari was directed to a portion of the trial transcript containing his trial cross-

examination of Gaffney, during which the trial court interjected and asked whether the Commonwealth "couldn't prosecute [Gaffney] for his behavior." T36/P4. Tinari testified that the trial court was suggesting that Gaffney had "blanket immunity." Tinari agreed that the prosecutor Kirn stated "This was just for testimony[,]" and the Court responded "[i]t was just for testimony." T37. The trial court then asked "[i]t was just use immunity[,] to which the trial prosecutor responded "[y]es." *Id.*

Tinari testified that he had no reason to believe, or information suggesting that Gaffney would not or could not be arrested or charged. T37.  He did not "know how you could have any more powerful testimony than an admission and a video." T39. Had he known that the Commonwealth had decided that they would not arrest Gaffney he would have utilized that information in both his cross-examination of Gaffney and in his closing. T38-39. In contrast, the use immunity was of little value since the Commonwealth had the video and confession evidence to prosecute Gaffney regardless of what he said as a witness. T39-40.

Tinari reviewed P5, an email from Edward Cameron to the trial prosecutor. He read the contents of the email into the record:

> From Edward Cameron, DA Philadelphia, to Olivia Caccoma, Jennifer Selber DA and Michele O'Kane, and Bridget Kirn are all copied on it, all DA's in Philadelphia, as well as Lynn Nichols, DA in Philadelphia. Subject, Butchie Long.
>
> Please assign this case to Bridget Kirn. Bridget, this case has a history that is a little complicated. You will need to immunize witness Rashan Gaffney. He had a gun earlier on in the incident and either fired it at a

person or at the ground. We needed him as a witness, so I did not approve an arrest. That position may change if he gives you a hard time. There is a related murder wherein a relative of the decedent, Ben Stern, killed someone in retaliation for this case.

T42. Tinari confirmed that the contents of the email were never disclosed to him. *Id.* The parties stipulated that "the email from ADA Edward Cameron, Assistant Chief of the DA's homicide unit, to ADA Bridget Kirn that is included as [an exhibit to the] petition [] is authentic." T41. The parties further stipulated "that the Commonwealth has no record of the email's disclosure to the defense." *Id.* Lastly, the parties stipulated "that counsel for [Mr. Long] discovered the email inside the District Attorney's trial file upon the review of that file on March 2nd, 2021." *Id.*

Tinari testified that that had the contents of the email been disclosed to him it would have "certainly enhanced [his] ability to discredit Gaffney." T43. It would have supported his argument that Gaffney's original statements implicating Mr. Long were false, and that his in court testimony denying them were true. *Id.* It would have allowed him to credibly suggest that Gaffney's statement and preliminary hearing testimony was based on his understanding that if he said what they wanted him to say, he would never be arrested. *Id.* Tinari testified that not being arrested for firing a gun, after being seen on video firing a gun, would have been high value evidence. T44. He maintained that the value could not be overstated; so much so, that he would have put the email on a large poster board for all the jurors to see. *Id.*

Tinari dismissed the idea that the Commonwealth's denial of a deal for blanket immunity would lessen the impact of cross-examination based on the email. In fact, he suggested that the implausibility of such a denial would itself be impactful:

> I would have cross-examined Mr. Gaffney on whether or not they actually -- with this, P5 -- whether or not they actually told him, and I would suggest to the jury that that testimony that they never told him, or he was never told, is incred[ible][4] based on this. I mean, *I don't know how they could convince a jury that we never told him that when there's an email from, what I believe to be, I think he was a chief at the time . . . .*

T45.

Tinari observed that because the only thing that would change the decision not to arrest would be a lack of cooperation, it was clear that the Commonwealth was overlooking the seriousness of Gaffney's criminal conduct. T46.  It came as no surprise to Tinari that Gaffney was never arrested. T46-47.

On cross-examination Tinari admitted to cross-examining Gaffney about use immunity. T47. He reiterated that had he known that the decision had been made not arrest or charge Gaffney, his argument would have been stronger. T47-48.

Tinari was asked why in his closing he did not mention the use immunity in the written agreement. T52-53. He answered that he was sure that if he had referenced "immunity", "Ms. Kirn would have said, 'Well, you heard Tinari say that he got use immunity, but we never gave him the transactional immunity, which

---

[4] Tinari used the word "incredulous". It is assumed he meant to say "incredible".

wouldn't mean we could have never have locked him up. So we could have always locked him up just based on the video.'" T53-54. Instead, Tinari believed that the more persuasive argument would be that he "could be locked up for shooting a gun, which obviously, the jury knows they didn't do." T53.

On redirect examination Tinari agreed that since the Commonwealth had video evidence of Gaffney firing a gun and his confession that he did so, there would be little benefit in pointing out the fact of use immunity, because it would have had little value to Gaffney. T59. Finally, Tinari acknowledged that disclosure of the suppressed email would have made his closing materially stronger. T59-60.

## ARGUMENT

### THE PROSECUTOR COMMITTED A MATERIAL FRAUD ON THE COURT AND JURY, PREJUDICING MR. LONG. EVEN IF HER COMMENT CAN BE CONSTRUED AS FORTHRIGHT – WHICH IT CANNOT – SHE WAS OBLIGED TO DISCLOSE THE EMAIL, WHICH WAS BOTH EXCULPATORY AND MATERIAL.[5]

### I.   THE *BRADY STANDARD*

Due process requires the prosecution to disclose evidence favorable to the defense. *Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are

---

[5] As noted in footnote 1, Mr. Long incorporates by reference his *Amended Petition* and *Brief in Support*. The only repetition in this pleading is contained in Sections I, II and III of this Argument. Portions of those sections are lifted from the *Brief in Support* for the convenience of the Court.

two components to a *Brady* claim: (1) the government suppressed favorable evidence, either intentionally or inadvertently; and (2) the suppressed evidence was material to the outcome of the trial. *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004). Favorable evidence includes impeachment evidence and exculpatory evidence. *Bagley*, 473 U.S. at 676. The prosecution's disclosure duty is not limited to information known to the trial prosecutor but, instead, includes all information in the possession of the prosecutor's office, police, and others responsible for or acting on behalf of the prosecutor's office. *Id.* at 437, 482 ("prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in this case, including the police"; "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf"); *Giglio*, 405 U.S. at 154 ("prosecutor's office is an entity"; knowledge of anyone in office attributed to the trial prosecutor).

A prosecutor's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. *Kyles*, 514 U.S. at 432 (quoting *Brady*, 373 U.S. at 87); *see also Banks*, 540 U.S. at 675-76. A "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Instead, the "touchstone of materiality is a 'reasonable probability' of a different result," which is "shown when the government's

evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*; *see also Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (the "undermines confidence" standard "is not a stringent one. It is less demanding than the preponderance standard."). It is "not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial…." *Kyles*, 514 U.S. at 434.

As discussed in Section IV below, there are several ways in which competent counsel would have utilized information that the Commonwealth was not going to arrest or charge Gaffney. As Tinari pointed out, if the Commonwealth denied that Gaffney knew he would never be charged, Tinari had a powerful argument that any such denial would be incredible, or at the very least implausible. Not only is there Gaffney's evidentiary hearing admission to knowledge that he would not be charged, but also incontrovertible documented evidence that the Commonwealth had made that decision and had done so for a tactical reason. Thus, even if a juror might accept the improbable theory that Gaffney never knew of the decision, because the decision itself was indisputably based on a perceived need to "sanitize" Gaffney,[6] it was exculpatory regardless of any lack of knowledge.

For these reasons, Mr. Long establishes a *Brady* violation, and *Brady* alone compels the grant of relief.

---

[6] *See* Section IV, B, *infra* at 25.

Considering the trial prosecutor's conduct, however, there is an alternative basis for relief, pursuant to *Napue*.

## II.    The *Napue* Standard

Due process is also violated when the state knowingly presents false evidence. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Such deliberate deception is incompatible "with the rudimentary demands of justice." *Id.* That, however, is not the extent of the state's obligation. The prosecution also violates due process when, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The state may not knowingly rely on false evidence even where such evidence goes only to the credibility of a witness, because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors…that a defendant's life or liberty may depend." *Id*.; *see also Banks*, 540 U.S. at 694 ("It has long been established that the prosecution's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.") (internal citation and quotation marks omitted).

Thus, in *Napue*, where a key witness denied having received any promise of lenient treatment, the prosecutor's failure to correct that testimony, which he knew to be false, resulted in a denial of due process. *Napue*, 360 U.S. at 270-71. *See also United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010) ("A *Giglio* violation usually

occurs when a cooperating witness denies having a plea agreement and the prosecutor fails to correct the misstatement.'"); *Jenkins v. Artuz*, 294 F.3d 284, 292-93 (2d Cir. 2002) (holding prosecution's knowing use of false testimony by witness, consisting of witness's statement that he had not entered a plea agreement with the state, could reasonably have affected the outcome, and state therefore violated *Napue* and *Giglio*); *Ouimette v. Moran*, 942 F.2d 1, 9-12 (1st Cir. 1991) (holding defendant's due process rights were violated by state's failure to disclose witness's criminal record, as well as existence and nature of deals between witness and state); *United States v. Barham*, 595 F.2d 231, 242-43 (5th Cir. 1979) (holding defendant's due process rights violated by prosecutor's failure to correct false testimony concerning promises of lenience made to government witnesses, which prosecutor knew to be false).

*Napue* applies equally to the situation in which the prosecutor makes false statements to the jury, a concern implicated in this case. *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995). A false representation, like false evidence, "involves prosecutorial misconduct and a corruption of the truth-seeking function as well, albeit through somewhat different means." *Id.*

The materiality threshold imposed when the prosecution knowingly presents false testimony or makes false representations is less demanding than the "reasonable probability" standard governing a *Brady* claim. It is sufficient for a

*Napue*/*Giglio* claim that there is "any reasonable likelihood that the false testimony [or false representation] could have affected the jury's verdict." *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985). This standard is equivalent to the petitioner-friendly harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967) (requiring the beneficiary—the prosecution—of a constitutional error to demonstrate that it was harmless beyond a reasonable doubt), *see Bagley*, 473 U.S. at 680 n. 9. This is the only prejudice showing that must be made, even on federal habeas review. *See Haskell v. Superintendent Green SCI*, 866 F.3d 139, 152 (3d Cir. 2017) (holding that even on habeas review, when there is false evidence claim, no additional "actual prejudice" showing under *Brecht* need be shown).

Tinari's trial questioning of Gaffney about his immunity, prompted the trial court to interject and ask a simple and direct question: "But so we're clear, they couldn't prosecute him for his behavior." 5/14/13, 242-43. Kirn had within her file the email from her Supervisor, Edward Cameron making clear that Gaffney would not be prosecuted unless Mr. Cameron changed his mind, which in turn would have happened only if Gaffney ceased cooperating. The trial court's question referenced neither "immunity" nor "agreement" nor Gaffney's expectation. It simply stated the assumption that Gaffney could not be arrested for his behavior.

Although the immunity agreement in Kirn's file was just for "use immunity," that was beside the point. A complete, direct, and accurate response to the trial

court's question would have alerted the trial court to the content of the email: that she could not prosecute Gaffney for his behavior because her supervisor had decided he was too important as a witness. Instead, Kirn was able to conceal this information by responding to a question that was not asked and by simply characterizing the immunity order.

This type of partial representation that evades the full truth by misdirection is no less a *Napue* violation than a direct misrepresentation. In *Jenkins v. Artuz,* 294 F.3d 284 (2d Cir. 2002), the Court granted habeas relief based on a *Napue* violation involving misdirection by the prosecutor. On cross-examination the cooperating witness only grudgingly admitted the existence of a cooperation agreement he had entered with the state. *Id.,* 289. On redirect the prosecutor elicited that she had not met with the witness until the day of trial, and that the witness had made no deals with her personally. *Id.* Thereafter, in closing, the prosecutor reiterated those points. *Id.* These were half-truths at best, just as Kirn's response to the Court and jury that "this was just for testimony" was a half-truth. In both cases the prosecutor misled the court. In Mr. Long's case it also enabled Kirn to evade disclosure of the email that directly addressed the trial court's assumption. Kirn could not arrest Gaffney considering her supervisor's decision, and no one ever did. A criminal justice system that strives to increase transparency, integrity and trust in the criminal justice system,

and hold accountable those who abuse their positions of authority should not tolerate such misdirection and deception.[7]

As referenced above, and discussed in detail below, Mr. Long maintains that under *Brady*'s reasonable probability of a different result standard, where the due process violation was the suppression of the email, he establishes materiality. However, based on the prosecutor's response to the trial court's statement, a response that concealed exculpatory evidence the court's statement directly requested, the materiality standard of *Napue* applies. As noted, that standard is co-extensive with the *Chapman* harmless error standard that requires the beneficiary of a constitutional error to demonstrate that it was harmless beyond a reasonable doubt), *see Bagley*, 473 U.S. at 680 n. 9.

In *Hayes v. Brown,* 399 F.3d 972, (9th Cir. 2005) (en banc)[8], the Court rejected the state's arguments that because the cooperator was unaware of a deal, the state committed no *Napue* violation when it concealed the benefit he received. *Id.,* 980. While *Hayes* involved an additional layer of misconduct not present here– the cooperator was kept in the dark by his trial counsel, as well as the prosecutor, to allow him to deny incentivization – the ultimate holding is no less applicable: When

---

[7] This Court knows of Ms. Kirn's documented history of misconduct and like kinds of deception, as discussed in the *Brief in Support*.

[8] In *Haskell v. Superintendent Greene, SCI*, 866 F.3d 139, 150-51 (3d Cir. 2017), the Third Circuit, citing *Hayes,* adopted the 9th Circuit's approach in applying the *Chapman* harmlessness standard to *Napue* error.

the prosecutor misleads the judge and jury, *Napue* error results, triggering a *Chapman* materiality analysis. *Id.,* 981.

In that respect, *Hayes* found several ways that competent trial counsel would have used the undisclosed evidence, finding materiality in a trial where the evidence against the defendant was greater than the evidence against Mr. Long. The Court did so notwithstanding the state's argument that concealing from the cooperator the *quid pro quo* was determinative on the question of materiality. *See* 399 F.3d at 987 (Court dismissing the significance of not having "expressly" told the cooperator of the deal, so the state could have him "deny" its existence). The circumstances supporting materiality in *Hayes* are present here, and to an even stronger degree.

In *Hayes,* the cooperator "was a key witness." *Id.,* 986. Here Gaffney was the only identification witness, and his prior statements the only identification evidence the jury heard. In *Hayes,* the jury might have surmised that the cooperator knew something was afoot, since it was otherwise not logical for him to agree to extradition. *Id.,* 987. Yet, without definitive evidence that the cooperator knew of the deal, there was a plausible inference that he cooperated merely in the hope that his cooperation would assist him in his open matters. Similarly, at Mr. Long's trial, the jury might have surmised that Gaffney knew something was afoot, since he was allowed to walk out of the Police Administration Building and was never again even questioned by police after admitting to serious felony gun charges. Yet, for both Mr.

Hayes and Mr. Long, "thanks to the careful machinations of the prosecution," *id.,* 987, the jury was kept in the dark regarding the prosecution's true plans for each cooperator. In the case of *Hayes,* the cooperator "could deny the existence of any deal[,]" ensuring the jurors would not "surmise" a deal. *Id.,* 987. In Mr. Long's case, the prosecutor's answer to the judge's question misled the jury into believing that Gaffney had exposure that he did not have, rendering futile Tinari's attempts to suggest that Gaffney would never be arrested.

## III.   THE WEAKNESS OF THE COMMONWEALTH'S CASE

As Mr. Long pointed out in his *Brief in Support,* any determination of prejudice is inextricably bound to the weakness of the Commonwealth's case. *See, e.g., Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) (tying quantum of evidence to prejudice determination); *see also Atkins v. Attorney General of Alabama*, 932 F.2d 1430, 1433 (11th Cir. 1991) (where "evidence of guilt not overwhelming" trial counsel's deficiency—there, permitting evidence of a prior arrest—was likely to have prejudiced petitioner).   The evidence against Mr. Long was plainly not overwhelming. The Commonwealth's evidence included a surveillance video of him hours before the shooting wearing a common, black hoodie with white stripes. 05/14/2013, 236 ("The whole city wear[s] that jacket.").

The shooter was later described by two disinterested eyewitnesses as also wearing a black hoodie with white stripes. 5/14/13, 44 (Hazel Mathias); 5/15/13, 12-

13 (Tracie Hunter). A third disinterested eyewitness, however, did not describe a black hoodie with white stripes—she only described someone wearing black clothing generally. 5/14/13, 112. None of the witnesses described the shooter as wearing sweatpants with large white stripes down the side, even though that is the most noticeable thing about Mr. Long's attire in the surveillance video from that day. 5/16/13, 37-38.

Moreover, there was no forensic evidence, including DNA, fingerprint analysis, or ballistics that connected Mr. Long to the crime.

Without the Gaffney's testimony, the Commonwealth's case was that (1) Mr. Long was wearing a similar jacket to the shooter's on the day of the shooting, an extremely common jacket, and (2) he had been at a convenience store more than an hour prior to a dispute that led to the later shooting. It is not an overstatement to say that the Commonwealth's case rose or fell on Gaffney's testimony, or more accurately, his prior preliminary hearing testimony and statement to detectives.

## IV.   THE EMAIL WAS EXCULPATORY AND MATERIAL

### A.   Trial Counsel Would Have Used the Email to Mr. Long's Advantage, Establishing the Inference that Gaffney was Incentivized by His Knowledge He Would Not be Charged.

The Third Circuit has repeatedly held that *Napue/Brady* evidence is material if "in the hands of a competent defense attorney [it] may be used to uncover other leads and defense theories [and the Circuit has endorsed] the drawing of reasonable

inferences as to what those other lines of defense may have been." *Wilson v. Beard,* 589 F.3d 556 (3d Cir. 2009) (citing *Banks v. Reynolds,* 54 F.3d 1508, 1519 (10th Cir. 1995) (quotations marks and internal alterations omitted). In *Wilson,* despite that the *Brady* material (a criminal record) did not include a critical mental health report, disclosure of the criminal record would have led a reasonably competent attorney to discover the mental health report. *Id.,* 664-66. In *Dennis v. Sec'y, Pa. Dep't of Corr.,* 834 F.3d 263, 293-311 (3d Cir. 2016) (en banc), the Court again made clear that a *Brady* materiality analysis should address what a competent lawyer could have done with the undisclosed evidence. *Dennis* envisaged the various ways competent trial counsel could have used the undisclosed evidence. *Id*

Thus, the crucial question is how Tinari could have utilized Mr. Cameron's email. His thoughtful, credible analysis on this subject leaves little doubt that either the *Napue* and/or *Brady* standard is satisfied. He testified that he would have put Mr. Cameron's email "on a poster board [] and highlighted everything that [he thought] the jury should have been made aware of. *I did not approve an arrest. We needed him as a witness. It may change if he give you a hard time.* So to me, I think the value of that is very, very high." T44. Tinari dismissed any concern that it would make a difference if the Commonwealth represented at trial that Gaffney did not know he would not be charged. In his cross-examination of Gaffney, he would have used the email to "suggest to the jury that testimony that they never told him, or he

was never told, is [incredible] based on [the email]." T45. Based on Gaffney's testimony at the evidentiary hearing it would have required little effort on Tinari's part to elicit such testimony, especially if he had been able to confront Gaffney with the email evidence demonstrating that Tinari knew what the Commonwealth knew. Confronted with the smoking gun, Gaffney would have likely come clean, as he did before this Court (even absent that confrontation). Tinari could not comprehend how "they could convince a jury that [they] never told him that when there's an email from, what I believe to be, I think he was a chief at the time, or high up . . . ." T45.

Tinari's position is a compelling one. If the email had been disclosed to him, Tinari would have had a persuasive argument that the benefit Gaffney received had been conveyed to Gaffney. If the prosecuting supervisor believed it necessary to keep Gaffney free to keep him in line as a witness, then informing him of that fact would make it infinitely more likely that he would stay in line. At trial, Tinari never asked Gaffney the question "did they tell you they would not arrest you?" He had no basis to ask that question considering the prosecutor's suppression of the email.

In questioning Tinari, the prosecutor made the point that he cross-examined Gaffney "about the immunity he was given, the use immunity." T47, 50, 52-53. But this cross-examination was ineffectual. Tinari explained why, in response to an inquiry from this Court. He testified that use immunity was of "little value" to Gaffney, because the "Commonwealth didn't need his testimony in court to

prosecute him for the gun, if that makes sense because [] they could have just played the video, and there he is. [] And they had an admission, so they don't – giving him use immunity [] meant nothing." T39-40.

The Commonwealth also pointed out that Tinari did not mention the use immunity agreement in his closing argument. T48-52. He explained why he did not do so: Because the Commonwealth had suppressed the evidence that Gaffney would not be arrested, had Tinari mentioned immunity, he was "sure Ms. Kirn would have said '[w]ell, you heard Tinari say that he got use immunity, but we never gave him the transactional immunity, which wouldn't mean we could have never have locked him up. So we could have always locked him up just based on the video." T53-54. The Court in *Jenkins* found that this cautious approach by defense counsel in closing – necessitated by the prosecutor's misdirection –was a factor supporting materiality. 294 F.3d at 296. Tinari's answer further demonstrates the materiality of the suppressed email. Had he known of its existence he would have had no fear of Kirn's rebuttal. "Immunity" would have been ubiquitous in his closing, and he would have challenged the prosecutor to suggest with a straight face that Gaffney was never informed that he would not be arrested. *See* T45 ("I would suggest to the jury that that testimony that they never told him, or he was never told, is incred[ible] based on this. I mean, I don't know how they could convince a jury that we never told him

that when there's an email from, what I believe to be, I think he was a chief at the time . . . .")

Instead, Tinari was left to speculate about what the email confirmed, that they did not lock Gaffney up because they needed him as a witness. Yet, that was the very message Mr. Cameron conveyed in his email. *See* P5 ("We needed him as a witness, so I did not approve an arrest.") Keeping him free was the best way to ensure his cooperation. All Tinari could do is suggest that possibility to the jury. *See, e.g.* T52 (Tinari :"[H]e could be locked up for shooting a gun at 56th and Walnut, that's what I was referring to, that they didn't lock him up, and that was part of the incentive as to why he chose to give that statement. The fact that he would have been down there for a long period of time, the fact that they weren't going to let him go until he gave a statement, at least that's what I was alluding to.") T52-53.  The jury expected Tinari to posit such a theory, after all he was defending Mr. Long. Absent evidence, it was likely taken with a grain of salt. The jurors would not have taken the theory with a grain of salt, if the theory had been turned into fact by disclosure of the email.

**B.    In the Unlikely Event that the Jury Concluded that Gaffney Did Not Know He Would Not be Charged, Mr. Cameron's Comment that "We needed him as a witness, so I did not approve an arrest[,]" Still Demonstrates Materiality.**

In cross-examining Tinari at the evidentiary hearing, the prosecutor noted that the email from Mr. Cameron did not state that Gaffney was told that he would not be arrested. T51-52. This point was made to suggest that if Gaffney was not aware

of the true nature of the immunity that was given to him, then it could not have incentivized him. Although Mr. Long maintains that the evidence demonstrates that Gaffney knew that he would not be arrested, even if that remains an open question, the Commonwealth's still suppressed exculpatory evidence, and that constitutional violation was material.

Tinari made the point in closing that the Commonwealth did not arrest Rashon Gaffney because they needed him as a witness. *See, e.g.,* 5/16/13, 34 (closing) ("Was he free to leave until he signed a statement? The answer to that is no. What happens after he gives a statement? From the words of the detective: We cut him loose. Did you arrest him for carrying a firearm? Answer: No."). Even though the evidence confirming Tinari's point was suppressed, the prosecutor did not object to this argument. Nor could she have. If it is a legitimate defense *theory* that the Commonwealth decided for tactical reasons to keep Gaffney arrest-free, then evidence supporting that theory is relevant, admissible and exculpatory. The email reveals that the decision was driven 100% by the prosecutor's recognition that: 1) the witness would be more likely to go along with the Commonwealth's theory if the Commonwealth was not pitted against the witness, and 2) that the witness would more likely be believed if he did not have open criminal charges stemming from the same incident.

In a variety of contexts Pennsylvania precedent recognizes that tactical motivations of the defense and prosecution are relevant considerations for the jury in assessing trial evidence. *See, e.g., Commonwealth v. McGriff,* 2021 Pa. Super. Unpub. LEXIS at *32 (Aug. 13) (approving of prosecutor arguing *inter alia* that trial counsel was trying to "distract" the jury and get the jury to "forget the evidence"); *Commonwealth v. Hutchinson,* 25 A.3d 277, 317-18 (Pa. 2011) (describing defense counsel's theory that challenged the prosecutor as "rush[ing] to judgment" as "appropriate"); *Commonwealth v. Esquillin,* 2020 Pa. Super. Unpub. LEXIS 602 at *16-*17 (Feb. 8) (approving of prosecutor's pointing out to jury, trial counsel's presumably tactical decision to avoid damaging areas on cross-examination). What makes Mr. Long's case infinitely stronger than any of these cases is that at his trial the prosecutor's tactical motivation was proven *beyond any doubt*. It was to sanitize the witness and make him more compliant. Gaffney was made more believable by ensuring that he would have no open criminal matter during these proceedings; and he was made more inclined to cooperate by not charging him. Mr. Cameron essentially said so. The jury was entitled to know.

The relevance and exculpatory nature of the tactical considerations in this case is demonstrated by Pennsylvania law regarding individuals like Gaffney, who would normally be facing criminal charges for their conduct. The Pennsylvania Supreme Court has recognized the imperative of impeaching a critical Commonwealth

witness with the fact of his or her pending criminal matter with the same prosecuting authority that is prosecuting the defendant. *See, e.g., Commonwealth v. Hill,* 566 A.2d 252 (Pa. 1989) (where witness had open sentencing, such "questioning is to attempt to establish a possible prosecution bias in the witness due to the pendency of sentence and the implied control the Commonwealth might exercise over that sentence if the witness' testimony is not favorable to the prosecutor's theory of the case."). *Davis v. Alaska,* 415 U.S. 308, 317-18 (1974), held that this type of bias evidence—there, that the witness may have been incentivized because he was on probation and a potential suspect—is so important that the Confrontation Clause requires a defendant in a criminal case to be allowed to impeach a prosecution witness on bias or motivation to fabricate stemming from his bias relating to his hope of leniency from the same government that is prosecuting him. In *Commonwealth v. Murphy,* 591 A.2d 278, 280 (Pa. 1991), the Pennsylvania Supreme Court took the next step, finding trial counsel's performance deficient for failing to cross-examine the eyewitness in an identification case, with her then-existing probation. The Court characterized such impeachment for bias as "legitimate" in order "to show bias based on his or her [] probationary status." *Id.,*

Here, Mr. Long was deprived of this critical impeachment of the only identification witness, a witness who was by any estimation profoundly and provably guilty of the offenses with which he was charged. Where, as here, a defendant is

28

deprived of such impeachment for the sole purpose of making the Commonwealth's case stronger (i.e., "we needed him as a witness"), due process is violated when trial counsel is not so informed. *Brady* is violated when a defendant is deprived of necessary impeachment of a critical Commonwealth witness because of the Commonwealth's self-interested need to "sanitize" the witness. *Commonwealth v. Williams,* 168 A.3d 97, 112 (Pa. 2017).

Tinari had a theory – they did not arrest Gaffney because they needed him. He had no proof of that theory. The proof, however, was sitting in the prosecutor's case file. Disclosing it would have enabled Tinari to reasonably request that the jury be instructed that, but for that wholly tactical decision, Gaffney would have found himself under the thumb of the Commonwealth with open gun charges (or worse). It is unimaginable that such evidence would not be relevant and material to the jury's assessment of Gaffney's credibility.

The Commonwealth's intentionality in sanitizing Gaffney in this way was exculpatory and material. It allowed the Commonwealth to present him as a person who bore no criminal responsibility for his criminal acts and eliminated any inference of bias for Gaffney as a witness under prosecution by the Commonwealth.

C.    **Although *Brady, Dennis* and *Wilson* Do Not Require Such a Conclusive Showing, the Evidentiary Record Establishes that Before He Gave His December 30, 2011, Statement, and Before He Testified at the Preliminary Hearing, Gaffney was Told He Would Not Be Arrested.**

Gaffney testified repeatedly that when he gave his statement on December 30, 2011, and when he testified at the preliminary hearing, he was told that he would not be arrested. *See* T11 (authenticating signature on his declaration attesting to this fact); T15 (when he was at the Police Administration Building, detectives told him to "[c]ooperate and you will not be charged with firing – firing a firearm."); T16 (he was told this on more than one occasion); T19 (before he testified the prosecutor told him that he would not get arrested); T20 (reaffirming on cross-examination that he was told by detectives, and by the prosecutor at the preliminary hearing that if he testified consistent his police statement, he would not be arrested); T21 (that it was the detectives who initially interviewed him and assured him he would not be arrested).

In cross-examining Gaffney, the Commonwealth focused on details in the case history that Gaffney was not able to remember, to suggest that if he did not remember those details, it was curious that he remembered being told he would not be arrested. The nature of those details compared to what it meant to an 18-year-old who had confessed to firing an illegal gun to be told he would not be locked up, provides a persuasive explanation for this purported discrepancy. It is not difficult

to understand how an 18-year-old like Gaffney would not recall the name of the prosecutor (T17), the precise nature of the immunity provided to him at the preliminary hearing, (*id.,* T21), the names of the detectives (T20), or the immunity definition that was read to him at trial (T23-24). Those details had little relevance to an 18-year-old ensnared in the criminal justice system; however, his freedom, and what it would take to ensure it, was a different story.

Much of the Commonwealth's questioning of Gaffney suggested that it was also curious that he was unable to "recall the exact kind of immunity that was given," since he was given the definition of use immunity during questioning at trial. T23-24. But even lawyers have difficulty teasing out the distinctions between "use," "use and fruits" and "transactional immunity." Finding fault with Gaffney's testimony because he did not recall (or appreciate) the type of immunity he received because he answered "yes" to questions referencing a use immunity definition, applies an exacting and unrealistic expectation to a young man in his position. The Commonwealth's suggestion that "you don't recall the exact kind of immunity that was given, you just recall that you wouldn't be arrested in this matter[,]" T24, is an apt characterization of the situation. It is also a credible and reasonable understanding on the part of Gaffney.

These points were emphasized on redirect examination. Gaffney had no understanding of the distinctions between the **various** types of immunity. T27. Why

would he? He did know what it meant to be arrested, and he knew what it meant to be freed. *Id.*

Finally, any concerns this Court might have about Gaffney's unsolicited testimony that Mr. Long is innocent are easily dispelled considering his original trial testimony. Absent that relevant context, his evidentiary hearing testimony about Mr. Long's innocence might otherwise be seen as evidence of secondary motive, i.e., for whatever reason, Gaffney wanted to help Mr. Long, and that is why he testified the way he did.

But in this case, we have some insight into why Gaffney testified to Mr. Long's innocence. At trial he repeatedly testified that he could not identify Mr. Long as the shooter. *See, e.g.,* 5/14/13, 164 (denying on direct examination that he saw the face of the perpetrator); 171, 236, 242 (indicating that he made a photo identification of Mr. Long to police on December 30, 2011 based a generic jacket that "the whole city" wears" including Gaffney himself and a second person on the crime scene video; and that he did not see the perpetrator's face); 195 (telling the prosecutor in pretrial prep that he did not see the shooter's face); 221 (testifying that he did not see the defendant, Mr. Long). At the evidentiary hearing Gaffney affirmed that his hearing testimony was consistent with his trial testimony. T28. He also confessed that his earlier inconsistent statements to the police and prosecutor were made "to cover my tracks up and down. [] I was doing what ya'll was telling me to

do to cover my ass." T22. That testimony was spontaneous, emotional, and evinced no indicia of prevarication.

It made sense of Gaffney's protestations of Mr. Long's innocence. They are consistent with his recognition at trial and at the evidentiary hearing that his statements to detectives and prosecutors at the preliminary hearing were not true, and that the consequences (to Mr. Long) were catastrophic. Notably, Gaffney's concern in this regard is also consistent with the argument that Gaffney was incentivized to make the earlier statements and that incentivization raised reliability issues, especially because the email was not revealed.

Mr. Long was deprived of the single piece of evidence that would have corroborated the claim that Gaffney knew what the detectives and prosecutors knew: that he would not be arrested.

## CONCLUSION

For all the above reasons, and based upon the full record of this matter, Petitioner, Butchie Long, requests that the Court vacate his convictions and sentence:

Respectfully Submitted:

*s/Karl Schwartz*
KARL SCHWARTZ, ESQ.
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 N
Philadelphia, PA 19106
schwartz@wisemanschwartz.com
(215) 360 – 3988

DATE:      June 27, 2023
           Philadelphia, PA

## Certificate of Service

I, Karl Schwartz, hereby certify that on this 27 day of June, 2023, I served the foregoing upon the following persons by filing the same with this Court's ECF Filing System:

> Shoshana Silverstein, Esq.
> Philadelphia County
> District Attorney's Office

*/s/ Karl Schwartz*

Karl Schwartz