IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

BUTCHIE LONG                      :        19-cv-3192
     Petitioner,              :
 v.                               :        HON. WENDY BEETLESTONE
                          :        UNITED STATES DISTRICT JUDGE
THOMAS MCGINLEY, et al.,          :
     Respondents.             :        HON. LYNNE A. SITARSKI
                          :        UNITED STATES MAGISTRATE JUDGE
                          :

_____

***LONG'S REPLY BRIEF IN SUPPORT OF***
***PETITION FOR WRIT OF HABEAS CORPUS***

Karl Schwartz
Wiseman, Schwartz, Cioschi & Trama, LLP
718 Arch Street, Suite 701 North
Philadelphia, PA 19106
(215) 360-3988
schwartz@wisemanschwartz.com

Nilam A. Sanghvi
Clay Waterman
Pennsylvania Innocence Project
1515 Market Street, Ste. 300
Philadelphia, PA 19102
(215) 204-4255
nilam.sanghvi@painnocence.org
clayton.waterman@painnocence.org

Counsel for Butchie Long

Dated: February 2, 2026
Philadelphia, PA

## INTRODUCTION

Petitioner Butchie Long's conviction and life sentence for the murder of Ercel Butts-Sterns rest on a single eyewitness, Rashan Gaffney. No physical evidence tied Long to the crime, no other witnesses tied Long to the crime (indeed, other witnesses contradicted Gaffney), and Gaffney ultimately recanted his identification at trial. Most significantly, the Commonwealth suppressed extensive evidence that would have allowed Long to thoroughly impeach Gaffney and thus the Commonwealth's entire case. The jury never learned that Gaffney had been given the most powerful incentive imaginable—**full protection from arrest and prosecution for a serious gun crime captured on video**, an extraordinary grant of transactional immunity that the Commonwealth both concealed and affirmatively denied existed. *The trial prosecutor made this false denial in front of the jury.*

The Commonwealth also suppressed extensive impeachment evidence from files related to a second murder, including Gaffney's interrogation about that murder for which members of his "crew" were charged and convicted. That interrogation occurred ten minutes before his interrogation in this case, yet it was not turned over. The Commonwealth also suppressed Gaffney's acts of witness intimidation, condemned by the trial prosecutor at the murder trial related to Gaffney's interrogation that was not disclosed to Long. Also suppressed from Long were detectives' notes naming Gaffney as a suspect in yet another murder and labeling him "weak," notes that predated Gaffney's inculpatory statement, Had the jury received this evidence, it would have fundamentally altered its assessment of the credibility of the only witness linking Long to the crime.

Compounding those due process violations, Long's trial counsel failed to investigate or present readily available exculpatory evidence. Justin Swain was an eyewitness to a convenience store confrontation that the Commonwealth relied on as the starting point in the chain of events

leading to the decedent's murder. The Commonwealth theorized that Long was present at the confrontation and that it precipitated his chasing down the decedent and shooting him. Swain, however, told detectives that Long was not present at the confrontation at all. Due to counsel's failure of investigation and the Commonwealth's suppression of information, the jury never learned this. It allowed the prosecutor to capitalize on counsel's failure, by falsely arguing that Swain told nothing to the detectives, yet another due process violation.

Trial counsel also failed to investigate other witnesses who could have provided time-anchored evidence of Long's whereabouts and testimony directly contradicting the Commonwealth's identification theory. He also failed to request a necessary jury instruction regarding the highly incentivized Gaffney. In a case with no corroboration, no motive, and a sole witness whose reliability collapses once the suppressed evidence is considered, the cumulative effect of the Commonwealth's misconduct and counsel's deficiencies overwhelmingly undermines confidence in the verdict.

## I. THE COMMONWEALTH'S CONCEALMENT OF THE CAMERON E-MAIL AND THE NATURE OF GAFFNEY'S IMMUNITY, AND ITS MISLEADING OF THE COURT, WERE MATERIAL UNDER *BRADY*, *KYLES*, AND *NAPUE*

This claim is addressed at ECF No. 20-2 at 11-17 (Mar. 5, 2021 Amended Habeas Pet'n); ECF No. 29 (Oct. 13, 2021 Trial Br.) at 49-65; ECF No. 54 (June 27, 2023 Post-Hr'g Br.); and ECF No. 62 (Nov. 28, 2023 Amended Habeas Pet'n) at Claim I(a).[1]

The Commonwealth's case rose and fell on a single witness: Rashan Gaffney. He was the only person to identify Long, had profound credibility problems, and later recanted his

---

[1] In its response, the Commonwealth addresses Long's claims asserted in a series of pleadings (i.e., amendments and briefs in support) during this habeas proceeding. For the ease of the reader, at the beginning of each section of this reply, Long identifies the document ("ECF No.") and PDF page numbers where the original claims are found. The first time we refer to a document number, we identify the document in parentheses.

identification at trial. Yet, the prosecutor read his prior statements to the jury and urged the jury to rely on them. At the same time, the Commonwealth concealed that it had granted Gaffney the ultimate inducement—not merely protection for his testimony, but protection from arrest and prosecution for shooting at someone on camera—in exchange for implicating Long.

The withheld evidence came in the form of an e-mail from Edward Cameron, then Deputy Chief of the Homicide Division, that told Long's prosecutor, former ADA Bridget Kirn, that Gaffney would not be prosecuted for his crimes in exchange for cooperation. The Commonwealth agrees that the Cameron e-mail indicates that Gaffney's immunity "may have been something more than mere use immunity," would have been favorable to the defense, and was not disclosed to defense counsel. *See* ECF No. 90 (Sept. 5, 2025 Commw. Resp.) at 28. It argues, however, that this supposedly does not matter because the difference between the disclosed use immunity and the undisclosed transactional immunity is insignificant and because Gaffney recanted his implication of Long at trial. These arguments misapprehend the significance of the suppressed evidence. Use immunity and transactional immunity are vastly different, particularly for a witness who is captured on video shooting at an unarmed person. The incentive of absolute freedom from criminal responsibility, concealed from the jury, informed Gaffney's implications of Long in Gaffney's police statement and preliminary hearing testimony, both of which were accepted by the jury over his recantation at trial at the Commonwealth's urging. Had the jury known of the true nature of Gaffney's protection from prosecution, there is a reasonable probability it would have reached a different result.

### A.    Background

Rashan Gaffney was the sole witness to identify Long as the shooter in a case devoid of any other credible evidence. Gaffney—a witness with serious credibility issues—ultimately recanted his identification at trial. The jury never learned that in exchange for his cooperation,

Gaffney had been promised that he would not be arrested for shooting a gun at another person in the same incident, a shooting that was captured by surveillance camera. Nor did the jury learn of the decision of the then-Deputy Chief of the District Attorney's Homicide Division, Edward Cameron, to not arrest Gaffney in exchange for his cooperation—a decision that was made *before* the March 21, 2012, preliminary hearing at which Gaffney implicated Long.

About 20 minutes before Ercel Butts-Sterns was shot and killed, convenience store security cameras recorded Gaffney and Butts-Sterns being approached by a man in a red hoodie. Gaffney pulled out a gun (unlicensed) and shot at that man. N.T. 5/14/2013, 151-52. After that, Gaffney, Butts-Sterns, and their other friends left the area, were pursued by at least one man, and Butts-Sterns was shot and killed about 1.8 miles away from the store. *Id.* at 154-60.

Gaffney first identified Long as Butts-Sterns's shooter when detectives interrogated him on December 30, 2011, almost two months after the shooting and just ten minutes after Gaffney was interrogated on another murder case. *See* Section II, *infra*. Gaffney again identified Long at the March 21, 2012, preliminary hearing. Before that hearing, the Commonwealth disclosed only that it granted Gaffney "use immunity," meaning only that Gaffney's *testimony* could not be used against him. ECF No. 29 at A34.

Gaffney recanted at trial, but the Commonwealth urged the jury to disregard that recantation and instead credit his prior implications of Long. The prosecutor read the statement to the jury line by line. She also elicited Gaffney's preliminary hearing testimony in which he identified Long as the shooter. N.T. 5/14/2013, 181-87.

Defense counsel cross-examined Gaffney, highlighting his incentives to lie during his interrogation and preliminary hearing. As he cross-examined Graffney regarding his immunity, the court interjected for clarification and asked whether the Commonwealth "couldn't prosecute

[Gaffney] for his behavior." *Id.* at 243. The prosecutor, then-ADA Bridget Kirn, answered the

court stating, "This was just for testimony." *Id.* The court asked "It was just for testimony? It was

just use immunity?" and Kirn responded "*Yes.*" *Id.* (emphasis added). This exchange took place

in open court, before the jury. Following the court's questions and ADA Kirn's explanation,

defense counsel did not address immunity in closing.

Files recently produced by the Commonwealth show that ADA Kirn misled the judge,

jury, and defense counsel. Contrary to what ADA Kirn told the trial judge, the prosecutor's office

had decided to fully immunize Gaffney for his actions. A previously suppressed January 25, 2012

email from the then-Deputy Chief of the Homicide Division Edward Cameron to ADA Kirn and

others in the District Attorney's Office, demonstrated that the Commonwealth fully immunized

Gaffney for his "gun incident" and never arrested him, in exchange for his cooperation. The

email reads as follows:



Edward Cameron/DA/Phila
01/25/2012 11:57 AM

To   Olivia Caccoma/DA/Phila@PHILA, Michele
     O'Kane/DA/Phila@Phila, Bridget Kirn/DA/Phila@Phila
cc   Jennifer Selber/DA/Phila@Phila, Lynn
     Nichols/DA/Phila@PHILA
bcc
Subject   Butchie Long

Please assign this case to Bridget Kirn.. Bridget, this case has a history that is a little complicated. You
will need to immuniuze witness Rashan Gaffney. He had a gun earlier on in the incident and either fired it
at a person or at the ground. We needed him as a witness, so I did not approve an arrest. That position
may change if he gives you a hard time. There is a related murder wherein   a relative of the decedent,
Ben Stern killed someone in retaliation for this case

ECF No. 29 at A34.

Indeed, the Commonwealth never charged Gaffney with possession of that illegal weapon

or crimes related to shooting the weapon. The statute of limitations regarding those crimes is

now expired. *See* 42 Pa. C.S. § 5552.

This suppressed evidence is the subject of *Brady* and *Napue* claims in Long's currently pending habeas petition, and this Court held an evidentiary hearing on those claims on March 8, 2023. At that hearing, Eugene Tinari, Long's defense counsel, testified unequivocally that no transactional immunity deal was ever disclosed to him, nor the Cameron memo or its substance, and stated in his declaration that his argument would have been "infinitely stronger" had the jury known from the outset that the Commonwealth had decided not to prosecute Gaffney in exchange for his cooperation. N.T. 3/8/2023, 30-47; *see also* ECF No. 54 at P2 (Tinari Declaration). Mr. Tinari had no reason to believe that a decision had been made that Gaffney would not be arrested for provably shooting at someone without any justification for doing so. *Id.* at 38-39.

Mr. Tinari testified that, had he possessed the suppressed information, he "would have cross-examined Mr. Gaffney on that. I probably would have cross-examined whatever detective was involved in the taking of Gaffney's statement with this, and I think it would have certainly enhanced my ability to discredit Mr. Gaffney." *Id.* at 43. He explained that he did not "*think it could be overstated, the value of [the agreement]. We would have blown this up. I would have put this on a poster board the size of that desk there*." *Id.* at 44 (emphasis added).

He further testified that he did not raise immunity in closing because of ADA Kirn's misrepresentation to the court. *Id.* at 53-54. As Mr. Tinari pointed out, absent the suppressed evidence that the Commonwealth had determined in exchange for Gaffney's cooperation he would never be arrested, the fact that Gaffney had been given use immunity at the preliminary hearing (and then later at trial), would not have been seen by the jury as any kind of inducement. *Id.* All that meant was that in a prosecution against him for shooting at another person, they

could not use his testimony against him; but they had him on video committing the shooting, so use immunity was hardly an incentive for him to accuse Long. *Id.*

Gaffney likewise testified at the 2023 hearing via video conference from a New Jersey prison. He explained that during his December 11, 2011 interrogation, detectives showed him a video of himself firing a gun and told him, "[c]ooperate and you will not be charged with the firing – for firing a firearm." *Id.* at 15. He testified that he was given the same assurance at the preliminary hearing. *Id.* at 16. Although he did not remember the details of his testimony or the name of the prosecutor, he consistently stated that he remembered being told he would not be charged if he cooperated. *Id.* at 16, 20, 22.

The Commonwealth's September 2025 response is its first filing to address the evidentiary hearing. In that response, the Commonwealth barely mentions Mr. Tinari's testimony on this issue. As to Gaffney's testimony, the Commonwealth focuses on Gaffney's inability to recall the names of the prosecutor and detectives and his combative demeanor. *See* ECF No. 90 at 31. However, Gaffney testified more than 10 years after the events at issue, and the record is clear that, while he did not understand the technical terms of "use immunity" and "transactional immunity," what he did understand was that he would not be arrested as long as he cooperated. *See, e.g.*, N.T. 3/8/2023, 27-29. As he put it, "I was going—I was doing what ya'll was telling me to do to cover my ass." *Id.* at 22. Indeed, even the Commonwealth acknowledges that Gaffney did testify "[a]t times" "that a detective or prosecutor told him at some point that he would not be prosecuted if he cooperated. . . ." ECF No. 90 at 31.

Absent from the Commonwealth's response is any recognition that such a promise was completely consistent with the Cameron e-mail written shortly after Gaffney's contact with the detectives. That e-mail provides strong circumstantial evidence that the non-arrest referenced by

then-Deputy Chief Cameron did not arise from whole cloth but rather was informed by the previous promise made to Gaffney by Homicide detectives, that Gaffney testified to. And this is what ADA Kirn misrepresented to Long, his trial counsel, the trial court, and the jury.

It is important to understand that ADA Kirn's conduct in this case is not an isolated lapse but part of a documented pattern of misleading courts and juries about critical facts needed to secure convictions. In Anthony Wright's re-trial, for example, she stood silent while detectives gave testimony she knew was false about Wright's alleged confession and the supposed recovery of incriminating clothing—facts disproven by DNA evidence and by Wright's acquittal. *See* ECF No. 29 at A127. Likewise, in the prosecutions of Theophalis Wilson and Christopher Williams, Kirn helped perpetuate the suppression and misrepresentation of a key witness's prior cooperation, repeatedly assuring the court that the witness had merely been an "eyewitness" despite records showing he had acted as a cooperating participant in another homicide investigation; these misstatements were uncovered only years later through open-file discovery and contributed to both men's exonerations. *See* Overturning Convictions—and an Era: Philadelphia CIU, January 2008-June 2021 at 24, *link to report available at* https://data.philadao.com/Research (last accessed Jan. 26, 2026); ECF No. 29 at A64.

That same pattern is evident here. Kirn not only misled the court and jury about the true nature of Gaffney's immunity—concealing that he had been granted transactional immunity and would not be arrested—but she also verified false factual assertions in the Commonwealth's formal petition for a grant of immunity to Gaffney, including the claim that Long approached and attempted to punch Gaffney outside the mini-market, a claim flatly contradicted by surveillance video in the Commonwealth's possession. *See* ECF No. 90-3.

The concealment and misrepresentation of the scope of Gaffney's immunity violated Long's due process rights and requires relief.

**B.    Argument**

**1.    The Suppression of the True Nature of Gaffney's Protection Requires Relief Under *Brady* and its Progeny**

**a.    The Evidence Was Material**

Due process requires the prosecution to disclose material evidence favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three elements to a *Brady* claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the government must have suppressed the evidence, whether intentionally or inadvertently; and (3) the suppressed evidence must be material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Here, as noted above, the Commonwealth concedes that this evidence was favorable[2] and that it was suppressed. *See* ECF No. 90 at 28. It argues, however, that the email was not material because "[e]ven had the jury 1) been told that Gaffney had actually been offered something more like a broader transactional immunity, and (2) understood the nuances of the difference between the two types of immunity, no reasonable likelihood exists that such knowledge would have affected the judgment." *Id.* at 28-29. This argument significantly understates the impact of the suppressed evidence. The suppressed email and the transactional

---

[2] For reasons discussed here, and in Long's previous pleadings, the evidence is compelling that Gaffney was explicitly informed that he would not face arrest. Nevertheless, the Commonwealth's concession that this evidence was "favorable" regardless, resolves the question relative to *Brady*'s first prong. *See, e.g., Hayes v. Brown,* 399 U.S. 972, 980-81, 986-87 (9th Cir. 2005) (*en banc*) (discussing ways counsel would use the decision not to arrest the witness, even if the witness was not expressly informed of that decision); *see also* ECF No. 54 at 18-20 (noting that *Hayes* counsels that even then disclosure is mandatory because defense counsel has the right to establish that Gaffney surmised that something was afoot, as he was allowed to walk out of the police station).

immunity given Gaffney undermined the fairness and reliability of the entire proceeding, affecting the outcome of the case.

To establish materiality, a petitioner "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (*per curiam*). Rather, evidence is material "when there is *any* reasonable likelihood it could have affected the judgment of the jury." *Id.* (emphasis added) (citations and internal quotation marks omitted); *see also Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 285 (3d Cir. 2016) (*en banc*). Here, as further explained below, the suppressed evidence was material because it would have fundamentally altered the credibility of the Commonwealth's only inculpatory witness. The jury never learned that Gaffney was fully insulated from prosecution for firing an illegal gun—a benefit far beyond "use immunity," which offered absolutely nothing in this case as Gaffney was caught on video firing the illegal weapon at an unarmed person. That concealment deprived the defense of its most powerful impeachment tool at the very moment the Commonwealth urged jurors to credit Gaffney's prior hearsay statement and incentivized preliminary hearing testimony as substantive evidence. Had the jury known that the District Attorney's Office had decided Gaffney would not be arrested or charged, it would have understood the extraordinary incentive he had to implicate Long, and this creates a reasonable probability of a different result.

    **b. The True Nature of the Immunity Gaffney Actually Received Is Critical**

ADA Kirn affirmatively misled the court into believing that Gaffney received only use immunity—protection limited to his testimony, not his underlying conduct. Yet, because Gaffney was captured on video firing a gun, use immunity offered him no meaningful protection from prosecution. The transactional immunity he actually received, by contrast, fully shielded him

from being charged for those serious felonies. Contrary to the Commonwealth's arguments, the true nature of this immunity is critical, as the jury was *not* "able to consider whether *and to what extent* Gaffney's testimony may have . . . been colored by his own self-interest." ECF No. 90 at 29 (emphasis added).

Any *Brady* materiality analysis must consider what a competent attorney could have done had the suppressed evidence been disclosed. *See Dennis,* 834 F.3d at 293-311. Because ADA Kirn misled the court—and because defense counsel had no reason to know she was being deceitful—defense counsel refrained from pursuing a line of questioning regarding the true nature of Gaffney's immunity and from making corresponding arguments in closing. In this case, one need not only imagine what a competent attorney would have done, but also what defense counsel himself testified he would have done. At the 2023 evidentiary hearing, Mr. Tinari stated that, had the Commonwealth disclosed Deputy Chief Cameron's e-mail, he would have "put [the email] on a poster board" and highlighted the critical language—"I did not approve an arrest. We needed him as a witness. It may change if it gives you a hard time"—because the impeachment value was "very, very high." N.T. 3/8/2023, 44.

Mr. Tinari never asked the pivotal question— "Did they tell you they would not arrest you?"—because he understandably assumed that the answer would be "no." *Id.* at 53-54. During the 2023 evidentiary hearing, the prosecutor suggested that counsel had cross-examined Gaffney "about the immunity he was given, the use immunity." *Id.* at 47, 50, 52-53. But Mr. Tinari explained why that questioning was ineffectual. Use immunity was of "little value" to Gaffney because the Commonwealth could have prosecuted him solely by playing the videotape of him firing the gun. *Id.* at 39. "[Giving him use immunity] meant nothing." *Id*. at 39-40.

Mr. Tinari further explained why he did not argue immunity in closing—because the Commonwealth had suppressed the evidence showing that Gaffney would not be arrested. Had he raised the issue, he anticipated that "Ms. Kirn would have said, 'Well, you heard Tinar[i] say he got use immunity, but we never gave him transactional immunity, which wouldn't mean we could have never have locked him up. So we could have always locked him up just based on the video.'" *Id.* at 53-54.

Indeed, courts have long recognized the fundamental distinction between transactional immunity and use immunity. *See United States v. Quatermain*, 613 F.2d 38, 40 (3d Cir. 1980). Transactional immunity "accords full immunity from prosecution," *Kastigar v. United States*, 406 U.S. 441, 453 (1972), whereas use immunity "leaves [a witness's] legal rights precisely as they were before he testified," *United States v. Turkish*, 623 F.2d 769, 775 (2d Cir. 1980). It is easy for a jury to understand the benefit the first has to a witness; the latter is a legal technicality unlikely to be fully understood by a juror or the witness himself.

It bears emphasis that Gaffney was already a highly problematic witness, and disclosure of the suppressed immunity agreement would have further undermined the reliability of his initial statement. Another telling indication of how critical the type of immunity was is that the prosecutor believed she needed to mislead the judge, the jury, defense counsel, and even the witness. She had done so at the preliminary hearing as well, after receiving Deputy Chief Cameron's e-mail and learning that Gaffney would never face arrest.

Finally, the suppressed Cameron e-mail confirming a non-prosecution guarantee given to Gaffney is material because its suppression deprived the defense of material it could have used to call into question the reliability of the police investigation. Any competent defense attorney who had the e-mail would have immediately revealed to competent counsel why detectives did not

12

investigate Gaffney as a suspect and instead uncritically accepted his implication of Long. This

is classic *Brady* material that is required to be disclosed under *Kyles v. Whitley*, 514 U.S. 419

(1995), which recognized that suppressed evidence is material when it would give the defense

the ability to attack the "thoroughness and even the good faith of the investigation. . . ." *Id.* at

445 (holding suppressed witness statements were material where "[t]heir disclosure would have

revealed a remarkably uncritical attitude on the part of the police"); *see also Dennis*, 834 F.3d at

312-13 (holding that evidence is material for *Brady* purposes where it would allow the defense to

challenge the credibility of the police investigation).[3]

Given the above, the Commonwealth's assertion that there is "no reasonable likelihood"

that disclosure of Gaffney's transactional immunity would have affected the verdict is untenable.

### c.    Gaffney's Recantation at Trial Does Not Alter the Materiality of the True Nature of His Immunity

The Commonwealth argues that "any argument that Gaffney had only identified Long

previously for self-interested reasons would have been undercut by the fact that Gaffney did not

continue to identify Long at trial." ECF No. 90 at 32. The Commonwealth's argument fails. The

Commonwealth could only fairly advance such an argument if it had complied with *Brady* and

disclosed the full scope of the incentive it gave Gaffney—a guarantee that he would not be

arrested or prosecuted for firing an illegal gun—so the jury could evaluate what actually

motivated his earlier accusations.

Even on its own terms, the argument is unpersuasive. The powerful incentive to implicate

Long operated at the time Gaffney gave his police statement and preliminary-hearing testimony,

---

[3] Long raised a *Kyles*-based claim in his November 28, 2023 amendment to his habeas petition.
*See* ECF No. 62. We have addressed it here so the Court can consider all legal theories related to
the materiality of the Cameron e-mail at once. The Commonwealth's response does not address
this claim. Whether viewed as part of the overall materiality analysis or as a stand-alone claim,
*Kyles* requires relief.

when avoiding arrest depended on his cooperation. By the time of trial, a year and a half later, the prospect of prosecution had evaporated, a reality confirmed by the fact that he was never arrested. His eventual recantation therefore sheds no light on—and certainly does not negate— the self-interested motive that existed when his earlier statements were made. Only with the suppressed evidence could the jury have made an informed determination about what drove those identifications.

The Commonwealth's suggestion, that incentivization informing that earlier statement and testimony was not material, ignores the fact that the jury convicted Long *only* because it credited Gaffney's prior out-of-court hearsay statement and prior preliminary hearing testimony. There was essentially no other incriminating evidence. The Supreme Court of Pennsylvania has allowed out-of-court hearsay statements, like Gaffney's, to be admitted as substantive evidence precisely because the declarant becomes an in-court witness who can be placed under oath and vigorously cross-examined. *Commonwealth v. Brady*, 507 A.2d 66, 69 (Pa. 1986), *abrogated on other grounds by Commonwealth v. Wilson*, 707 A.2d 1114 (Pa. 1998); *see also Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992). When the Commonwealth suppresses critical impeachment evidence or knowingly elicits false testimony to insulate that prior statement from attack—as occurred here—it prevents the defense from meaningfully cross-examining the witness and undermines the very rationale for admitting the prior statement as substantive evidence in the first place.

The Commonwealth's closing argument underscores the centrality of Gaffney's earlier accusations. Gaffney's prior hearsay statement and preliminary hearing testimony, both of which the prosecution elicited line by line, were the focus of the Commonwealth's case, and ADA Kirn

continually urged the jury to accept them as substantive evidence. In her closing argument, Kirn

stated:

> Take a look at Rashan Gaffney's testimony. He previously identified the defendant.
> He identified him in his statement to Detective Byard, and he testified and identified
> him under oath in this courthouse four months after the murder. You know, counsel
> slips over that and says, yeah, he does it down at the police station but never again.
> Doesn't do it when he comes in here. He did it at this courthouse in open court in
> front of a judge, in front of a DA, in front of a defense attorney who got to cross-
> examine him however he wanted about it. . . . and he identified the defendant.

> He was asked about the statement: Was there any problem when you gave the
> statement? No. Is what you said in the statement true? Yes. Did you review the
> statement? Yes. Was it accurate? Yes. When you signed the photo array, were you
> certain that that was the shooter? Yes.

> He didn't just do that down at the police station. He did that in this courthouse under
> oath sitting in a witness chair. But the difference is, when he comes in here in a
> packed courtroom from the neighborhood, he can't do it. . . . Read between the lines
> here, people. . . . Now he's got some story about, oh, well, I saw the surveillance
> photo. But he admitted under oath and the testimony he says is true. . . .

N.T. 5/16/2013, 92-94.

Kirn went on to quote Gaffney's preliminary hearing testimony identifying Long in the

courtroom and stated that the "law recognizes that sometimes when people come into court, that

for whatever reason, whether they're scared, whether their circumstances changed . . . that if a

person, a witness, says that their former statement was signed and adopted at the time that they

did it or that their testimony was under oath, that you consider that testimony as substantive,

meaning direct evidence that comes in, the same as if he had had the courage to come in here and

do it before you. *You may choose to regard this evidence, that is, the prior signed statement and

his under-oath testimony on direct and cross, as proof of the truth of anything the witness said in

the earlier statement. That's our law*." *Id.* at 95-97 (emphasis added).

The suppressed e-mail showing that Gaffney was guaranteed freedom would have been

devastating impeachment of that statement at the precise moment the Commonwealth asked

jurors to rely on it. In a one-identification-witness case with no corroboration, this undisclosed

assurance easily meets *Brady*'s materiality standard; it creates a reasonable probability of a

different result because it undermines confidence in the verdict.

Under *Brady* and *Lively*, the prosecution cannot have it both ways. It cannot invite the

jury to rely on a hearsay accusation while simultaneously concealing evidence that would have

undermined the credibility of the only person who made it. That sort of gamesmanship is

precisely what due process forbids.

> **d.    The Weakness of the Case Against Long Underscores**
> **The Materiality of the Concealed Evidence**

Finally, the weakness of the Commonwealth's case against Long only highlights the

importance of disclosing the full scope of Long's immunity. The *Brady* materiality inquiry is

identical to the *Strickland* prejudice standard. *See United States v. Bagley*, 473 U.S. 667, 682

(1985). And, it "is firmly established that a court must consider the strength of the evidence in

decided whether the *Strickland* prejudice prong has been satisfied." *Albrecht v. Horn*, 485 F.3d

103, 129 (3d Cir. 2007).

Here, Gaffney's credibility was not only central to the Commonwealth's case, it was the

linchpin. Given the absence of corroborating evidence, the prosecution's case was exceedingly

weak and relied almost entirely on a single, recanted statement. The Commonwealth concedes

that the truly independent eyewitnesses who were not looking for any personal gain—Ebony

Mitchell, Tracie Hunter, and Hazel Matthias—were not "able to identify the shooter by anything

more specific than his race and clothing." ECF No. 90 at 4. And, while the Commonwealth

claims that that convenience store surveillance video shows "Long wearing an outfit consistent

with the one described by Hunter and Matthias," *id.*, the record does not bear this out.

The video shows that—one and a half hours before Butts-Sterns's shooting and far from

16

the crime scene—Long was at the store, which was near his grandmother's home, wearing a hoodie and black track jacket with a large white stripe *across the chest* and black pants with large white stripes down the legs. *See* ECF No. 90-1. Matthias, however, described the shooter as having a hoodie with a white stripe *on the sleeve* and specifically testified that she did not tell police there was a white stripe across the chest. *See* Nov. 10, 2011 Hazel Matthias Statement (attached as Exhibit 1); N.T. 5/14/2013, 61. Matthias was asked: "It had a white stripe on the sleeve; correct? A. Yes; You didn't say that it had a white stripe across the chest. You described the white stripe as being on his sleeve – A. Uh-huh. *Id.* Hunter told police that the shooter wore a blue, not black, hoodie, and could not remember where the stripes were. *See* Nov. 10, 2011 Tracie Hunter Statement (attached as Exhibit 2).[4] Moreover, even if Long's clothing—that he wore an hour and a half before, and 1.8 miles away from, the shooting—was somewhat similar to what the eyewitnesses described, that has little, if any, probative value as the outfit Long wore was common at the time. In fact, surveillance video shows another person, unrelated to any of the events at issue, wearing an almost identical jacket at the store, and Gaffney testified, "The whole city wear[s] that jacket." N.T. 5/14/2013, 236; *see also* Surveillance Photo (attached as Exhibit 3).

---

[4] The third eyewitness, Mitchell, described three people chasing the victim—one wearing a bright multi-colored track jacket, one wearing a red shirt, and one that had a little cut wearing dark clothes. *See* N.T. 5/14/2013, 109-12.



*The surveillance footage of Long, more than one hour before the shooting, shows him wearing a ubiquitous black and white hoodie. A man behind Long (wearing a red hat) is pictured with the same, or a markedly similar, jacket.*

The remaining evidence presented at Long's trial was a gun cleaning kit for a 9mm handgun, the type of gun used in this shooting, that police found in the house where Long was staying when they arrested him. *See* ECF No. 90 at 5-6. However, the Commonwealth fails to mention that this was an antique kit that had never been used. *See* N.T. 5/15/2013, 64-65. The kit had no evidentiary value; it bore a $2 price tag from a store that had closed a decade earlier, and the brush inside was deteriorated and falling apart. *Id.* at 174-80.

Given the utter lack of any other evidence implicating Long, there is certainly a reasonable probability that a jury that heard the full scope of Gaffney's immunity would reach a different result.

### 2. The Commonwealth's Misrepresentations About Gaffney's Immunity also Violated Long's Due Process Rights Under *Napue* and *Giglio*

In addition to violating its obligations under *Brady*, the Commonwealth also violated its obligation to provide truthful information to the Court. A *Napue*/*Giglio* violation occurs when the Commonwealth allows false or misleading evidence to go uncorrected, and there is any reasonable likelihood that the falsehood affected the verdict. *Napue v. Illinois*, 360 U.S. 264, 269, 272 (1959). This rule applies equally where the prosecutor herself provides the false or misleading information. *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995); *see also, e.g.*, *Hayes*, 399 F.3d at 981 ("There is nothing in *Napue*, its predecessors, or its progeny, to suggest that the Constitution protects defendants only against the knowing use of perjured testimony. . . . *Napue* forbids the knowing presentation of false evidence by the State in a criminal trial, whether through direct presentation or through covert subornation of perjury."); *United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977) ("Thus the Government not only permitted false testimony of one of its witnesses to go to the jury, but argued it as a relevant matter for the jury to consider. Whether either instance alone would merit reversal, we need not decide, for together they do.").

A *Napue* violation is established where the government "'knew or should have known'" of the falsity. *See Rega v. Sec'y, Pa. Dep't of Corrections*, 115 F.4th 235, 244 (3d Cir. 2024), *cert. denied*, 145 S. Ct. 1315 (2025) (quoting *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004)). *Napue*'s "reasonable likelihood" standard is also "lower, more favorable to the defendant[ ] and hostile to the prosecution as compared to the standard for a general *Brady* withholding violation." *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 150 (3d Cir. 2017) (internal quotation marks omitted). This materiality standard requires "the beneficiary of [the]

constitutional error to prove beyond a reasonable doubt that the error complained of did not

contribute to the verdict obtained." *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025).

Beyond the *Napue*/*Giglio* context, the Supreme Court has long held that prosecutorial

argument violates due process when it "so infected the trial with unfairness as to make the

resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974); *see also Darden v. Wainwright,* 477 U.S. 168, 181–82 (1986); *Parker v. Matthews*, 567

U.S. 37, 45 (2012). Such arguments "constitute[] [a] failure to observe that fundamental fairness

essential to the very concept of justice." *Donnelly*, 416 U.S. at 642.

Here, the Commonwealth contends that there was "nothing to correct" because

Gaffney did not lie under oath about the scope of his immunity, claiming "there is scant evidence

that Gaffney was aware that a supervising Homicide attorney had suggested that he may be

eligible for something closer to transactional immunity." ECF No. 90 at 31. As an initial matter,

*Napue* claims are not limited to situations involving perjured testimony. *See Hayes*, 399 F.3d at

983. But, as discussed above, even if Gaffney did not know about the Cameron e-mail itself or

have a technical understanding of transactional immunity, it is very clear that he knew he would

not be charged for shooting a gun, a crime caught on video—which is precisely what the

Cameron e-mail says.

Even more significantly, the Commonwealth's contention that that there was "nothing

to correct" because Gaffney did not knowingly lie misses the point that *ADA Kirn misled the*

*court.* Likewise, the Commonwealth's contention that the misdirection was immaterial is

incorrect. All elements of *Napue* are satisfied here:

1.  Kirn's statements created a false and materially misleading impression that the
    only protection the Commonwealth provided Gaffney was protection from the use
    of his testimony.

2. The Commonwealth knew the true scope of the benefit, as shown by the Cameron e-mail; and

3. The misrepresentation was material under *Napue*'s lower standard—especially given that the case rose and fell on Gaffney's statement and prior testimony.

ADA Kirn's representation to the trial judge, in front of the jury, that "it was just use immunity," N.T. 5/14/2013, 243, was false. The Cameron e-mail lays out Gaffney's criminal conduct and expressly states he "did not approve an arrest" because "[w]e needed him as a witness." ECF No. 29 at A34. This concealment is precisely the type of misconduct that *Napue* condemns.

As the Ninth Circuit explained in *Hayes*, even when a cooperating witness is unaware of the full benefit he has been given, the prosecution commits a *Napue* violation by concealing that benefit and misleading the judge and jury about the witness's exposure. *See* 399 F.3d at 980-81. The same is true here. Kirn's misrepresentation led the jury to believe that Gaffney remained vulnerable to prosecution, when in fact the Commonwealth had already decided he would not be charged. Thus, necessarily, *Napue* applies even when the witness is confused or unaware of the full arrangement, so long as the prosecution knows the truth and allows a false impression to stand. That is exactly what occurred.

ADA Kirn's false characterization of the immunity order cemented the misimpression. A direct and truthful answer to the court's question would have revealed that she *could not* prosecute Gaffney because her supervisor had already decided he must remain free as a witness. Instead, she sidestepped the question and referred only to the formal "use immunity" paperwork—concealing the only immunity that actually mattered. This is no different from the misdirection condemned in *Jenkins v. Artuz*, 294 F.3d 284, 289 (2d Cir. 2002), where habeas relief was granted after the prosecutor created a misleading impression about a witness's

cooperation agreement. *See id.* (prosecutor's assertion that witness made no deals with her personally, while technically correct, was misleading, since there was a deal with the state).

And, the misrepresentation not only cemented the misimpression for the jury, but also for defense counsel. As discussed above, Mr. Tinari based his strategy in cross-examining Gaffney and for his closing argument around his belief that Gaffney had use immunity and that he would open himself up to attack from ADA Kirn if he implied that the scope of the immunity was broader. A misrepresentation that affects trial strategy is material.

Because *Napue* imposes a materially *lower* threshold than *Brady*, and because the Commonwealth must carry the burden of proving harmlessness beyond a reasonable doubt, its failure cannot be excused. Its misleading of the court, the jury, defense counsel, and even the witness strikes at the core of the truth-seeking-function and compels relief.

### C.    Procedural Posture

The Commonwealth agreed to waive exhaustion on this claim. *See* ECF No. 38 (May 5, 2022 Commw. Resp.) at 10-11. This Court held a hearing on the claim on March 8, 2023.

## II.    THE COMMONWEALTH'S *NAPUE* AND *BRADY* VIOLATIONS RELATED TO THE HORTON CASE—INCLUDING GAFFNEY'S PRIOR HOMICIDE INTERROGATION, DETECTIVES' NOTES LINKING HIM TO ANOTHER MURDER, HIS IDENTIFIED VULNERABILITY, AND HIS WITNESS INTIMIDATION—ARE MATERIAL AND REQUIRE HABEAS RELIEF

This claim is addressed at ECF No. 73 (Oct. 21, 2024 Third Amended Habeas Pet'n) at 10-33.

### A.    Background

Seventeen days after the Ercel Butts-Sterns homicide, Rymeek Horton was shot and killed. The two individuals ultimately convicted of Horton's murder—Benderick Sterns (Butts-Sterns's cousin, who was with Gaffney on the night of the Butts-Sterns shooting) and Kahhim Odom—were, by all accounts, close friends of Rashan Gaffney. The Horton investigation,

preliminary hearings, and trial occurred contemporaneously with the proceedings in this case and

centered on Gaffney and his "crew."

The Horton case files contained material impeachment evidence about Gaffney that was

not disclosed to Long's counsel. As detailed further below, the evidence showed:

- On December 30, 2011, Detectives Nordo and Kane interrogated Gaffney regarding the Horton homicide from 4:39 to 5:44 p.m. and gave a signed statement. Just *ten minutes later*, Detectives Byard and Singleton Mirandized and interrogated Gaffney in Long's case. ECF No. 73 at A3. This is contrary to Gaffney's and Detective Byard's testimony at Long's trial that Gaffney was sitting and waiting at Homicide until Byard interrogated him in Long's case. N.T. 5/14/2013, 216-18; N.T. 5/15/2013, 84-87.

- Before both interrogations, Detective Nordo wrote a note describing Gaffney as "weak" and suggesting his involvement in yet another shooting/homicide. ECF No. 73 at A2.

- The Horton files further included evidence tying Gaffney to witness intimidation connected to the Horton proceedings. This evidence included the fact that the police believed Gaffney *shot at and attempted to murder witness Omar Jones* (hitting Richard Oxner, and David McCormick) following the Horton preliminary hearing—evidence that Horton's prosecutor viewed as significant enough to present to the jury in that trial. *Id.* at A34, A38, A44-50; N.T., Horton Trial, 4/16/2013, 233. It also included evidence that Gaffney engaged in witness intimidation in the courtroom during the Horton trial—again evidence Horton's prosecutor argued to the jury. N.T., Horton Trial, 4/16/2013, 303-06, 343.

The Commonwealth agrees that it "*undoubtedly* should have turned over all of this

evidence before Long's trial," ECF No. 90 at 35 (emphasis added), but argues that is not material

because Gaffney had already been impeached. This is incorrect. Every item the Commonwealth

suppressed would have provided further powerful impeachment of Gaffney—whom the

Commonwealth now concedes was already a fragile witness—and in a case with no other

meaningful evidence, each piece, independently and certainly cumulatively, would have

devastated the credibility of the Commonwealth's sole identifying witness. Having chosen to

build its case against Long based on a witness like Gaffney, the Commonwealth cannot now

argue that Long was not entitled to have the jury hear every piece of impeachment evidence so

that it could make a fully informed decision. Indeed, as discussed below, precedent is clear that

the fact that a witness has been highly impeached does not mean that further impeachment

evidence is not material. The suppression of this evidence constitutes profound due process

violations and warrants relief.

    **B.**    **Argument**

        **1.**    **The Commonwealth Withheld Exculpatory Evidence, Elicited False Testimony, and Presented False Evidence Related to Its Interrogation of Gaffney in the Horton Murder that Materially Prejudiced Long**

On December 30, 2011, Gaffney was interrogated in relation to the Horton homicide

from 4:39 to 5:44 p.m., and he gave a signed statement. ECF No. 73 at A3. Just ten minutes later,

he was Mirandized and then interrogated in this case. Gaffney's involvement in the Horton

homicide was not disclosed, and, at trial, both Gaffney and Detective Byard falsely testified that

Gaffney had merely been waiting in the Homicide unit to speak with Byard before his

interrogation about the Butts-Sterns homicide. Before both interrogations, Detective Nordo

handwrote a note describing Gaffney as "weak" and suggesting his involvement in yet another

shooting. *Id.* at A2. This note cannot be separated from the interrogations; its standalone

significance is addressed further below.

In addition to the suppression of evidence, ADA Kirn failed to correct false testimony

from Detective Byard and Gaffney related to Gaffney's interrogation in the Horton case. On

cross-examination, Gaffney affirmed that he was at Homicide for five hours before they made

him give a statement. N.T. 5/14/2013, 216. He said that homicide detectives were speaking to

him in a little interview room before he gave his statement against Long. *Id.* at 217. He also

stated that he was not free to leave, and they questioned him before they took his statement. *Id.* at

218.

Detective Byard testified that Gaffney was brought to Homicide at 1:10 p.m. on December 30, 2011, and that Byard's shift started at 4:00 p.m. N.T. 5/15/2013, 84. When he arrived for work at 4:00 p.m., Gaffney was sitting on a bench. *Id.* According to Byard, once he got himself "together and put [his] jacket on and what not, [he] began to talk to [Gaffney]. So he wasn't just sitting there. And at that time – at four or five – at 6:01 p.m. we were talking. We were talking before that." *Id.* at 87. However, the Commonwealth knew that Gaffney was actually being interrogated by Detectives Nordo and Singleton about the Horton murder during this exact time frame, from 4:39 to 5:44 p.m., before being interrogated about the Butts-Sterns murder.

### a. The Suppressed Gaffney Interrogation Was Material and Warrants Relief Under Brady

The Commonwealth acknowledges that evidence of Gaffney's interrogation in the Horton case was both suppressed and favorable, *see* ECF No. 90 at 33, but disputes its materiality on the grounds that Gaffney was not a suspect in the Horton murder, the jury already knew Gaffney was illegally carrying a firearm, he recanted at trial, and that Detective Nordo's note was speculative. These arguments ignore Supreme Court and Third Circuit precedent holding that suppressed evidence may still be material even when the defense has already attacked a witness's credibility on other grounds. For example, in *Banks*, the Supreme Court rejected the state's argument that suppressed impeachment evidence was "merely cumulative" where a witness had been "heavily impeached at trial." 540 U.S. at 702 (cleaned up). Similarly, the Third Circuit held in *Dennis* that "[t]he mere fact that a witness has been heavily cross-examined or impeached at trial does not preclude a determination that additional impeachment evidence is material under *Brady*." 834 F.3d at 300.

25

Any *Brady* materiality analysis must consider what a competent attorney could have done had the suppressed evidence been disclosed. *See id.* at 293-311. Because of the suppression, defense counsel could not:

- Confront Gaffney about hours-long custodial pressure and the prior homicide interrogation;

- Confront Gaffney about the police interrogation regarding his association with Horton's alleged killer and its impact on his willingness to go assist the Commonwealth;

- Question Gaffney about leverage created by the gun video in combination with the multiple interrogations;

- Tie Gaffney's accusation to Detective Nordo's "weak" note, which suggested the necessity of providing Gaffney a secondary incentive to testify consistent with the Commonwealth's version of events;

- Expose that Gaffney's Butts-Sterns statement followed the Horton interrogation by ten minutes; or

- Call Detectives Nordo or Singleton to probe their views of Gaffney.

The suppression deprived the jury of knowing about the extraordinary leverage detectives exerted during back-to-back interrogations of Gaffney related to this case and the Horton case. That leverage was amplified by the fact that Gaffney was only 18 years old, had been video recorded firing an illegal gun, was questioned by four seasoned detectives (including one later imprisoned for sexually assaulting witnesses[5]), was noted as a suspect in another homicide, and was described as "weak." ECF No. 73 at A2.

Deprived of this evidence, the defense could not challenge Gaffney's credibility in the way the Confrontation Clause and Pennsylvania evidentiary law presuppose and in the way that Pennsylvania's *Brady/Lively* doctrine, discussed above, requires. The jury was left with a

---

[5] The Commonwealth acknowledges that, "Philip Nordo was fired from the PPD in 2017 based on an internal affairs investigation, and, in 2022, sentenced to 24.5 and 49 years of imprisonment." ECF No. 90 at 19 n.5.

misleadingly sanitized version of the custodial context leading to Gaffney's implication of Long. As a result, it heard his prior statement as substantive evidence without the adversarial testing that is the entire foundation of the rule.

The Commonwealth's claim that the suppressed evidence was not material because Gaffney was not a suspect in the Horton murder takes an extraordinarily narrow view of its *Brady* responsibility. While he may or may not have been a suspect, Gaffney was connected enough to that killing to have been described by the prosecutor in the trial for the Horton murder, former ADA Andrew Notaristefano, as one of the killer's "crew" and accused by the same prosecutor of intimidating the witnesses against the killer—points that ADA Notaristefano emphasized during his closing argument in that trial. *See* pp. 33-36, *infra* (further detailing Gaffney's intimidation of witnesses, including shooting at them). The Commonwealth now finds itself in the odd position of contradicting those points. It argues that the evidence of Gaffney intimidation was weak in the Horton trial even though the Horton prosecutor believed it was strong enough to argue to a jury. Advocacy, and the pursuit of a "win" should not create such strange bedfellows—the Gaffney whose former intimidation was reviled by an earlier prosecutor and is now excused by this one—especially among those responsible for seeking justice.

Presumably Gaffney knew that he was a member of the killer's "crew." But defense counsel did not. Disclosure would have allowed defense counsel to develop on cross-examination both Gaffney's concern over being interrogated about the Horton murder and his desire to stay in the good graces of the prosecutors and detectives who knew who he was, what he did, and with whom he associated.

The jury's limited knowledge that Gaffney appeared on video with a firearm does not diminish the materiality of the suppressed evidence showing the pressure and incentives he

faced, especially because the jury never learned he was immunized for cooperating in the first place. Under *Kyles* and *Wearry*, that suppressed evidence alone establishes materiality—the jury was denied information that would have reframed the credibility of the Commonwealth's only witness.

This additional suppressed evidence obliterates the rationale for admitting Gaffney's prior statement as substantive evidence in the first place, defeating the Commonwealth's argument that the suppressed information was not material because Gaffney recanted at trial. As noted above, Pennsylvania permits prior inconsistent statements to be used substantively only because the declarant appears for meaningful, vigorous cross-examination enabling the jury to apply its "experience, common sense and logic" to assess credibility. *Brady*, 507 A.2d at 69. But here the Commonwealth suppressed additional evidence that would have made that cross-examination meaningful and enabled the jury to apply its "experience, common sense and logic" to assess credibility.

The decision in *Miller v. District Attorney for the County of Philadelphia*,[6] confirms materiality in nearly identical circumstances. *See* Civ. A. No. 12-0742, 2019 WL 2869641 (E.D. Pa. June 12, 2019), *report and recommendation adopted*, 2019 WL 2866506 (E.D. Pa. July 1, 2019). There, the court granted habeas relief where prosecutors suppressed evidence that the key witness had made a statement in another homicide investigation before implicating the defendant in the charged case. *See id. at* *13-18. The court held that knowing this sequence would have provided critical impeachment, deepened the jury's understanding of the witness's motives to provide information to help himself on his own cases, and undermined confidence in the verdict in a case resting on a recanted statement such that, as here, the Commonwealth's case depended

---

[6] The Pennsylvania Innocence Project represented Miller.

on the jury believing the witness's original statement. *Id.* at *17-18. The court recognized that, even though the witness had recanted, providing evidence of his additional police statement in a separate murder would have "provid[ed] the jury a fuller understanding of the veracity, or lack thereof, of [the witness's] statement to police" implicating the petitioner. *Id.* at *18. That the suppression of the information undermined confidence in the verdict in *Miller* was underscored because there, as here, there was a "relative paucity of other evidence" connecting the petitioner to the murder. *Id.* at *23.

Had this evidence not been suppressed, there is a reasonable probability that its disclosure would have produced a different result.

> **b.    The Commonwealth also Elicited and Failed to Correct False Testimony Regarding Gaffney's Interrogation About the Horton Homicide**

As discussed in detail above, ADA Kirn failed to correct false testimony from Detective Byard and Gaffney related to the Horton interrogation, Gaffney misled the jury, testifying that he was at Homicide and speaking with detectives before the interrogation about the Butts-Sterns murder without telling the jury that this discussion with detectives was *actually another interrogation in another homicide case*. N.T. 5/14/2013, 216-18. Likewise, Detective Byard testified that Gaffney was brought to Homicide at 1:10 p.m. and when he arrived for work at 4:00 p.m., Gaffney was sitting on a bench. N.T. 5/15/2013, 84. According to Byard, once he got himself "together and put [his] jacket on and what not, [he] began to talk to [Gaffney]. So he wasn't just sitting there. And at that time – at four or five – at 6:01 p.m. we were talking. We were talking before that." *Id.* at 87. In reality, Gaffney was being interrogated by two other detectives in the same unit on a different murder during that time.

The Commonwealth argues that "[e]ven assuming for the sake of argument that Byard's testimony was false and that the prosecutor should have corrected it, thereby opening the door to

evidence of Gaffney's involvement in incidents surrounding the Horton murder, such evidence was not material." ECF No. 90 at 35. The Commonwealth does not address Gaffney's misleading testimony. The Commonwealth goes on to say that the *Napue* claim "fails for the same reason" as the *Brady* claim. *Id.* This response ignores the psychological effect that being interrogated for two homicides in a row would have on a teenage witness facing criminal exposure as Gaffney did.

The Supreme Court's decision *Glossip* reaffirms that when the prosecution's key witness lies under oath about a material fact and the falsehood goes uncorrected, relief is required. *See* 604 U.S. at 246. Under the "harmless-error standard" articulated in *Chapman v. California*, which is applicable to *Napue* violations, *Bagley*, 473 U.S. at 680, ADA Kirn's failure to correct Byard's and Gaffney's testimony is undoubtably material for the same reasons discussed above.

Further, Gaffney's false testimony, which the Commonwealth's response does not address, is even more crucial. Under *Glossip*, this is precisely the kind of credibility-shattering falsehood that requires relief: exposing a lie where credibility "plainly would have suffered," especially where the witness is already "nobody's idea of a strong witness." 604 U.S. at 248-49 (cleaned up). The suppressed impeachment evidence and uncorrected false testimony are not merely material—they are dispositive under both *Brady* and *Napue*.

### 2.    The Suppression of Detective Nordo's Note that Gaffney Was Involved in the Hock murder and that Gaffney Is Weak Materially Prejudiced Long

As noted above, Detective Nordo recorded that Gaffney had been "involved" in a shooting at 57th and Elliott and that "Rashon is weak too" on November 30, 2011, a month before detectives interrogated Gaffney on this case and the Horton case. ECF No. 73 at A2. The Commonwealth does not dispute this evidence was suppressed and favorable to Long but argues that this evidence was immaterial, stating "the speculative nature of the note about the 'Hock'

murder gives it limited evidentiary value." ECF No. 90 at 34. However, this note—contained in the Horton homicide file—was powerful impeachment evidence—particularly as the note was written a month before detectives brought Gaffney into Homicide to obtain statements. Labeling Gaffney as "weak" signaled that detectives viewed him as particularly susceptible to pressure and manipulation. Linking him to another shooting supplied detectives with additional leverage when questioning him. Together, these details painted a picture of a vulnerable, intimidated 18-year-old facing implied criminal exposure on multiple fronts while in custody.

The Commonwealth's attempt to minimize this as "a different, unknown murder," *id.* at 33, ignores its direct relevance to credibility. Whether the shooting at 57th and Elliott was ultimately solved is immaterial; what matters is that detectives believed that Gaffney was connected to another murder. Therefore, they could use Gaffney's suspected involvement as leverage to exert pressure on a vulnerable individual, heightening the risk of coerced or unreliable statements. Even if they did not, once informed that detectives suspected his involvement, Gaffney would again be incentivized to curry the favor of detectives who might arrest him for a murder. Defense counsel would have explored all these avenues of impeachment on cross-examination, not to mention conducting pretrial discovery and investigation around this evidence as well. But defense counsel was precluded from investigating the Hock murder because the Commonwealth suppressed the evidence.

The case mirrors *Johnson v. Folino*, 705 F.3d 117 (3d Cir. 2013). In *Johnson*, the sole inculpatory witness—Robles—had no convictions or arrests, leaving defense counsel with little more than "allegations" to use in cross-examination. *Id.* at 124. The Commonwealth, however, had suppressed evidence that Robles had been linked to multiple other criminal investigations and was questioned as a suspect in those cases—information that would have fundamentally

31

reshaped the jury's assessment of his motives and credibility. *Id*. at 123. The District Court had

initially denied Johnson's petition because the suppressed evidence would not have been

admissible despite its potential probative value because much of it was speculative. *Id.* at 129.

The Third Circuit disagreed and remanded for further proceedings, finding that this evidence,

even if inadmissible, could be material for *Brady* purposes because "it could have led to the

discovery of admissible evidence" and because it "could have been used effectively to impeach

or corral witnesses during cross-examination." *Id.* at 130; *see also id.* at 131 (instructing the

district court on remand to consider the cumulative effect of the evidence and "where it might

have led the defense in its efforts to undermine Robles").

 The same dynamic is present here. The Commonwealth's case against Long likewise

rested entirely on Gaffney, and the Commonwealth similarly suppressed critical impeachment

evidence showing that Gaffney potentially faced his own serious criminal exposure and was

considered "weak" and susceptible to influence by detectives. Just as in *Johnson*, the suppression

deprived defense counsel of the opportunity to expose the witness's powerful incentives to

cooperate and the reasons his accusation was unreliable. Under *Brady*'s materiality standard,

evidence that directly undermines the credibility of the prosecution's only witness in an

otherwise thin case easily creates a reasonable probability of a different result.

 The analysis in *Dennis* further underscores the materiality of the suppression here. There,

the court noted that "the mere fact that a witness has been heavily cross-examined or impeached

at trial does not preclude a determination that additional impeachment evidence is material under

*Brady*," particularly where there are "material differences between the type of cross-examination

defense counsel engaged in and what he could have done had he known of the [suppressed

evidence]." 834 F.3d at 301. The same is true here. The suppressed Nordo note would have

fundamentally changed the nature and force of the cross-examination the defense could have conducted.

### 3. The Suppression of Gaffney's Shooting of Oxner and McCormick, Attempted Shooting of Witness Omar Jones, and Additional Witness Intimidation Materially Prejudiced Long

While Gaffney was deeply entangled in the investigations surrounding the Butts-Sterns and Horton homicides and closely connected to several of the individuals involved, police obtained evidence that he attempted to kill and intimidate witnesses involved in the Horton case, further demonstrating his willingness to subvert and obstruct the administration of justice.

The Horton preliminary hearing took place on February 29, 2012, and the Butts-Sterns preliminary hearing took place on March 21, 2012. On May 13, 2012, someone attempted to shoot and kill Omar Jones after he testified at the Horton preliminary hearing (striking Richard Oxner and David McCormick). Oxner twice told police that Omar Jones saw the shooting and told him Gaffney was the shooter. ECF No. 73 at A34, A38. Police issued a search warrant for Gaffney's address and police interrogated him for five hours on June 11, 2012. *Id.* at A34, A38, A44-50, Officer Antonini testified at the Horton trial that Gaffney was the key suspect in the shooting, which was never solved. N.T., Horton Trial, 4/16/2013, 233.

On top of the highest form of intimidation—shooting at a witness—Gaffney also intimidated witnesses in the courtroom and its halls during the Horton trial which occurred *less than a month* before the Butt-Sterns trial. The Commonwealth's focus on witness intimidation at the Horton trial underscores the gravity of Gaffney's conduct. Almost the entire Commonwealth closing in the Horton case focused on witness intimidation by the defendants' crew (which included Gaffney). The prosecutor, ADA Notaristefano, stated that, "snitches get stitches," and argued that this was why a Commonwealth witness to the shooting, Paula Sharp, did not want to testify. *Id.* at 303-04 (Gaffney was accused of intimidating Sharp). He referenced the attempted

shooting of Omar Jones and described hallway intimidation that caused Sharp to scream and flee

the courtroom. *Id.* at 304-06. ADA Notaristefano further emphasized that the defendants' crew—

including Gaffney—knew where the Joneses and Sharp lived and noted that Omar Jones had

identified Gaffney as one of the individuals who confronted witnesses, even while sheriffs lined

the hallways. *Id.* at 206, 343.

The Commonwealth acknowledges that this was favorable impeachment evidence that

was suppressed but incorrectly asserts that this intimidation evidence was not material because

"the Oxner shooting remains unsolved" and Gaffney's "statement implicating Long predates him

being a suspect, and he actually stopped implicating Long after he was made aware that he was a

suspect." ECF No. 90 at 34. The Commonwealth also argued that the "alleged witness

intimidation was nothing more than Gaffney's presence in the courthouse during the Horton trial

and a purportedly threatening look." *Id.*

For several reasons, the Commonwealth's arguments fail.

*First*, while the Oxner and McCormick shooting incident remains "unsolved," Oxner

made multiple statements that Gaffney was the shooter, statements that provided probable cause

to search Gaffney's residence and a basis for police to interrogate Gaffney for five hours on June

11, 2012. That evidence surely would have provided defense counsel with a good faith basis to

question Gaffney about his willingness to obstruct justice, especially since Long's defense

hinged on the jury finding that this is what informed his false accusations against Long. As noted

above, it is particularly ironic that the same prosecutor's office that made Gaffney's attempted

shooing of Oxner a critical component of its case in the Horton homicide now runs from that

accusation.

*Second*, the Commonwealth's attempt to further distance itself from its former accusations against Gaffney by suggesting that the intimidation was just "purportedly looking back" understates the reality (and its own prior allegations) of Gaffney's intimidation of witness Paula Sharp in the courtroom and his alleged shooting at a key Commonwealth witness. Indeed, as discussed above, it was so significant that the prosecutor at the Horton trial dedicated a significant part of his closing to the intimidation.

*Third*, the Commonwealth's assertions that the intimidation evidence is immaterial because Gaffney's statement "predates him being a suspect" or that he stopped implicating Long afterward are also untenable. Timing does not erase impeachment value. Evidence that the prosecution's sole witness later attempted to murder someone to prevent testimony against his friend reveals a willingness to obstruct justice and a character for violence that would have shattered his credibility.

As noted above, any *Brady* materiality analysis must consider what a competent attorney could have done had the suppressed evidence been disclosed. *See Dennis*, 834 F.3d at 293-311. Long's defense counsel was deprived of critical impeachment material and therefore could not cross-examine Gaffney about his willingness to obstruct justice/intimidation of witnesses, nor could he call Detective Antonini or investigate Gaffney's role in these incidents—steps any reasonable attorney would have taken to undermine the Commonwealth's sole witness, particularly where that witness later recanted at trial. Had counsel known that there was evidence that Gaffney attempted to murder Omar Jones to prevent testimony and intimidated witnesses in a courtroom during the Horton trial, he could have investigated those issues, examined Gaffney on them, and argued that Gaffney was willing to obstruct justice and resort to violence to protect himself and his associates. Counsel could have highlighted that the Commonwealth itself viewed

this intimidation as so serious that it made it a key component of its closing argument in Horton, describing Gaffney as part of a crew that threatened witnesses and caused one to flee the courtroom in terror. These facts would have allowed counsel to argue that Gaffney's accusation against Long was not only unreliable but came from someone who demonstrated a pattern of coercion and lawlessness.

In a one-witness case with no corroboration, evidence that the sole witness engaged in violent intimidation is devastating impeachment material—exactly the sort of evidence that would make any juror question the reliability of a statement given while Gaffney was being held against his will. *See Dennis*, 834 F.3d at 309 (the court must weigh the suppressed evidence's strength against the disclosed evidence, not critique the character of the suppressed evidence).

Had the intimidation evidence from the Horton case been disclosed, there is a reasonable probability that the result of the case would have been different.

### C.    Procedural Posture

The Commonwealth waived exhaustion for this claim. *See* ECF No. 90 at 22-24. The claim is record-based, and no further evidentiary development is necessary. However, if the Court believes additional development is required, 28 U.S.C. § 2254(e)(2) does not bar such development because, as the Commonwealth concedes, Long did not develop this claim in state court because the Commonwealth suppressed the evidence at issue. *See* ECF No. 90 at 22-23.

## III.    DEFENSE COUNSEL WAS INEFFECTIVE FOR NOT REQUESTING A CORRUPT SOURCE INSTRUCTION FOR GAFFNEY

This claim is addressed at ECF No. 20-2 at 17-20 and ECF No. 29 at 65-72.

### A.    Background

Long's trial counsel failed to request an appropriate, well recognized jury instruction for Gaffney—a witness who had been held at the Police Homicide Unit, faced obvious penal

exposure tied to his shooting at an unarmed person, a shooting that was captured on video. Pennsylvania law provides a tailored instruction—Pa. SSJI (Crim.) § 4.06—warning jurors that testimony from an informer with a penal or pecuniary interest must be "examined closely and carefully and received with caution." Pa. SSJI (Crim.) § 4.06 & Subcommittee Notes (2010). Despite arguing that Gaffney had a penal interest in testifying favorably for the Commonwealth and despite the existence of a specific instruction designed for these circumstances, counsel did not request it.

The Commonwealth contends that counsel was not deficient because the court gave a general credibility instruction, and argues that even if counsel was deficient, Long cannot show prejudice from the omission of a corrupt-source charge. That position ignores Pennsylvania law and the trial record.

### B.    Argument

#### 1.    Trial Counsel's Failure to Request a Corrupt Source Instruction Constituted Deficient Performance Under *Strickland*

The Pennsylvania jury instruction warning jurors that testimony from an informer with a penal or pecuniary interest must be "examined closely and carefully and received with caution," was well known at the time of trial and was critical here given Gaffney's penal exposure. The generic credibility instruction did not substitute for § 4.06. The court's general charge addressed bias and demeanor but did not warn jurors of the heightened risk of fabrication when a witness faces penal exposure. Where the entire case turns on whether jurors will accept a prior out-of-court statement over a recantation, and the witness has an obvious personal stake, the tailored corrupt-source charge is not optional—it is the very guidance the law provides to ensure a reliable verdict.

Defense counsel's own theory made Gaffney's penal incentive the centerpiece of the defense. He argued Gaffney lied to avoid exposure "based on the video." N.T. 5/16/2013, 35. In closing, counsel expressly argued that Gaffney lied "because he could be possibly accused of carrying a firearm on the street, shooting it, looking at God knows how long in jail based on the video." *Id.* at 35-36. Further, the Commonwealth's case turned entirely on Gaffney, whose prior police statement was read line by line to the jury and urged as substantive evidence—despite his in-court recantation. Yet counsel did not request § 4.06—the instruction tailored to precisely to the danger that aptly concerned counsel, namely, reliance on a witness incentivized to avoid incarceration.

Nothing in the record suggests a strategic reason for omitting the charge, and there is none. Once counsel framed credibility around Gaffney's motive, requesting a § 4.06 instruction was the logical, routine, and constitutionally expected step. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Indeed, the Supreme Court has recognized the importance of the "customary, truth-promoting precautions that generally accompany informant testimony." *Banks*, 540 U.S. at 701-02 (citing K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 15.02 (5th ed. 2000) for a discussion of jury instructions that highlight the "special caution appropriate in assessing informant testimony"). Courts repeatedly find deficient performance where counsel fails to request a cautionary instruction tailored to the case. *See, e.g.*, *Breakiron v. Horn*, 642 F.2d 126, 137 (3d Cir. 2011) (counsel's failure to request a lesser-included crime of theft instruction was objectively unreasonable); *Freeman v. Class*, 95 F.3d 639, 642 (8th Cir. 1996) (granting habeas on ineffective assistance grounds due to counsel's failure to request cautionary instructions on accomplice testimony); *see also Everett v. Beard*,

290 F.3d 500, 516 (3d Cir. 2002) (counsel ineffective for failing to object to a jury charge not

requiring the Commonwealth to prove accomplice's intent to kill to convict of first-degree

murder), *abrogated on other grounds by Priester v. Vaughn*, 382 F.3d 394 (3d Cir. 2004); *Bey v.*

*Superintendent Greene SCI*, 856 F.3d 230, 244 (3d Cir. 2017) (counsel ineffective for failure to

object to a *Kloiber* charge that misstated the wording of *Kloiber* itself); *Burns v. Gammon*, 260

F.3d 892, 897 (8th Cir. 2001) (granting habeas on ineffective assistance grounds due to counsel's

failure to object and thus to prompt a curative cautionary jury instruction).

Tellingly, the Commonwealth cites a single, decades-old Pennsylvania Superior Court

decision to support its argument that trial counsel was not deficient for requesting the corrupt-

source charge where the trial court had given a general credibility instruction. *See* ECF No. 90 at

38-39 (citing *Commonwealth v. Slyman*, 483 A.2d 519, 528-29 (Pa. Super. 1984)). State cases,

however, are not dispositive of trial counsel's federal constitutional obligations. Moreover, the

conviction of the defendant in *Slyman* did not center on the informant's testimony as Long's

does here. Indeed, the defendant there was arrested in an undercover drug buy, and the dispute

centered not on whether he was involved but on whether the drugs qualified as controlled

substances. *See Slyman*, 483 A.2d at 523-24. Here, where Long denied any involvement in Butts-

Sterns's murder and Gaffney provided the only evidence linking him to it, it was critical that the

jury be instructed to give Gaffney's testimony special scrutiny.

### 2.    Counsel's Deficient Performance Prejudiced Long

Prejudice is clear. The case rose and fell on Gaffney's prior statement and testimony;

there was no corroborating evidence. In a direct credibility contest—prior statements versus

recantation—a corrupt-source charge naturally shifts weight away from the unreliable accusation

and toward the recantation, thereby "undermin[ing] confidence" in the verdict as *Strickland*

defines prejudice. 466 U.S. at 694; *see also Freeman*, 95 F.3d at 642; *Burns*, 260 F.3d at 897. The Commonwealth notes that, in 2024, the "informer" category was removed from the list of situations where the corrupt-source instruction is applicable. *See* ECF No. 90 at 37 n.8. But it does not note that the only reason this occurred was the adoption of a new, separate, and detailed suggested jury instruction *specifically tailored to informants*. *See* Pa. SSJI (Crim.) § 4.06A (4th ed. Sept. 2024 revision). This change only underscores the importance of the instruction, especially in a case like this one that rose and fell on one incentivized witness.

If a general jury instruction on credibility was sufficient to deal with this issue, as the Commonwealth claims, there would be no reason for the jury instructions committee to have suggested the corrupt-source instruction in effect at the time of Long's trial, much less to have strengthened it now. When a witness has an interest like Gaffney did, the instructions appropriately recognize that the interest should be emphasized for the jury. There can be no confidence in the outcome of a trial where Long's attorney did not request this instruction and thus where the jury did not have the appropriate context for how to view Gaffney's testimony.

## C.    Procedural Posture

The Commonwealth did not waive exhaustion or procedural default for this claim. *See* ECF No. 90 at 24. Regarding procedural default, the Commonwealth asserts that *Martinez v. Ryan*, 566 U.S. 1 (2012), does not apply because the underlying ineffectiveness claim is not "substantial." ECF No. 90 at 38. But this claim is at least "of debatable merit." The record demanded § 4.06, counsel's failure to request it was objectively unreasonable, and the omission prejudiced the defense in a case turning entirely on credibility. *See Martinez*, 566 U.S. at 17-18; *Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014). PCRA counsel's failure to raise this substantial defense counsel ineffectiveness claim was itself unreasonable, thereby excusing the default. *See Bey*, 856 F.3d at 236 (defaulted ineffective assistance of counsel claim reviewed *de novo* via

*Martinez*); *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 762, 767 (3d Cir. 2018) (same). Further, *Martinez* parallels the certificate of appealability standard, which is intentionally non-stringent. *See Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Miller-El- v. Cockrell*, 537 U.S. 322, 336-37 (2003); *Barefoot v. Estelle*, 463 U.S. 880, 893-94 (1983).

Finally, because trial counsel's ineffectiveness is obvious from the state court record, if this Court determines that further evidentiary development is necessary to establish post-conviction counsel's ineffectiveness, *Shinn v. Ramirez*, 596 U.S. 880 (2022), does not bar an evidentiary hearing. *See Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 724 (3d Cir. 2022) (preserving the rule of *Christin v. Brennan*, 281 F.3d 404, 413 (3d Cir. 2002), that § 2254(e)(2) does not preclude federal hearings on excuses for procedural default).

IV.     **DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND CALL JUSTIN SWAIN, AND THE COMMONWEALTH VIOLATED DUE PROCESS BY FAILING TO DISCLOSE SWAIN'S EXCULPATORY STATEMENT AND THEN BY FALSELY SUGGESTING THE STATEMENT WAS NEVER MADE**

These claims are addressed at ECF No. 73 at 33-43 and ECF No. 80 (May 2, 2025 Fourth Amended Habeas Pet'n) at 6-13.

A.     **Background**

There is no dispute that 20 minutes before Ercel Butts-Sterns was shot and killed, an altercation erupted at a convenience store between Gaffney and an unknown man in a red hoodie where Gaffney fired at the man in the red hoodie. *See* ECF No. 73 at 31-41. Detective Lucke interviewed Justin Swain, who was seen on video at the scene of the altercation, on November 23, 2011, but the statement Swain gave was never documented.[7] *See id.* at A62 (Nov. 28, 2011

---

[7] The Commonwealth asserts in its response that police spoke to Swain "the next day," after the shooting, *see* ECF No. 90 at 4-5, but Swain was not brought in until November 23, after the police obtained surveillance video and saw him outside the store during the altercation with Gaffney, *see* ECF 73 No. 73 at A62.

Activity Sheet). Long's current counsel interviewed Swain on July 19, 2024. Swain confirmed

that he knew Long and talked with him in the market an hour before the altercation. *See id.* at

A64 (July 19, 2024 Declaration of Justin Swain). Swain also stated that: (1) he remained outside

the market until the time the altercation occurred; (2) he witnessed the altercation, and Long was

not anywhere on the street when it occurred; and (3) he told this to detectives. *Id*.

      Despite this, the Commonwealth maintained at trial that: (1) Long was present when the

dispute with the man in the red hoodie occurred; and (2) this dispute *led directly to Butts-Sterns's*

*murder*. In its opening statement, the Commonwealth explained:

> [Y]ou'll hear that Ercel never made it back onto a bus *because there was a little*
> *confrontation outside the store, and Ercel and his friends left* . . . They didn't make
> it home because . . . they're being followed by a group of guys. And one of those
> guys is the defendant, and the defendant has a gun . . . [t]he defendant's following,
> he's stalking, and now he's firing. He shoots at them over and over. Ercel gets hit
> time and time again.

N.T. 5/14/2013, 23 (emphasis added). On redirect examination of Gaffney, ADA Kirn elicited his

admission that although Long could not be seen on the surveillance video that captured Gaffney

firing the gun, he could not say that Long was not at the scene (but out of the camera's view). *Id.*

at 253-55. In closing the prosecutor returned to this theme, characterizing as "nonsense" the

notion that Long was not at the scene simply because he was not on camera. N.T. 5/16/2013,

102-03.

      Further, during the trial, Detective Lucke testified that he knew who Swain was, knew he

was at the scene, and had several "encounters" with him. N.T. 5/15/2013, 135. He did not

describe the encounters or the interview, but during closing, ADA Kirn assured the jury that

Swain made no statement. She exploited this supposed fact when she argued that, "[Detective

Lucke] [brought] in the defendant's own friend and the defendant's friend doesn't want to say

anything to him, what else can he do?" N.T. 5/16/2013, 91.

At trial, Long had no way to combat these assertions because his trial counsel never spoke with Swain to learn what he had told police, and the Commonwealth not only failed to disclose the information Swain provided but then elicited false testimony from Detective Lucke about his interactions with Swain and falsely asserted during closing arguments that Swain did not "want to say anything" to the police. *Id.* Accordingly, Swain's statement undermines the prosecution's entire theory.

**B.** **Argument**

**1.** **Swain's Statement Is Material and Thus Establishes Both Trial Counsel's Ineffectiveness for Failing to Investigate Swain and the Commonwealth's Violation of Due Process by Suppressing the Statement**

The Commonwealth's response to Long's ineffective assistance of counsel and *Brady* claims related to Swain boils down to an assertion that both claims fail because, even assuming Swain is credible, Long cannot establish materiality. *See* ECF No. 90 at 40-41 (noting, correctly, that both claims employ the same prejudice analysis). Specifically, the Commonwealth argues that Long's absence at the convenience store when the altercation occurred is "*not material . . .* because Swain openly admits he did not witness the murder," and that "the prosecution in turn *could have still argued* that Long had joined up with the second shooter as he chased Ercel . . . *which is feasible* because of how close he lived to the corner store, and that it was irrelevant whether he was present during the altercation." *Id.* at 41 (emphasis added). In making this argument, however, it acknowledges that "Swain's testimony . . . would have perhaps shifted an underlying argument at trial. . . ." *Id.*

The Commonwealth's position that it could have presented a different theory of Butts-Stern's murder to accommodate Swain's statement that Long was not present during the precipitating altercation and acknowledgment that it may have "shifted" a trial argument in

themselves establish materiality. The Commonwealth would not have to change its argument or theory of the case to accommodate evidence that was truly immaterial.

Moreover, the notion that new/suppressed evidence is not material because the Commonwealth could still make arguments to try to obtain a conviction rests on a misapprehension of the governing law. It is well settled that Long need not prove he definitely would be acquitted or that it would have been impossible for him to have committed the crime to succeed on either a *Strickland* or a *Brady* claim. Indeed, *Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered." *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).

That rejected standard is frankly still less onerous than the "could have argued" standard the Commonwealth suggests. Here, as a result of counsel's deficiency and the Commonwealth's violation of due process, the defense was deprived of critical evidence from Swain that would have removed a key piece of the Commonwealth's theory of Long's guilt—namely, that Long was present at the convenience store altercation precipitating Butts-Sterns's murder even though he could not be seen on video. This theory was important enough for ADA Kirn to reference it several times during the trial, including in her closing argument, where she expressly claimed that the defense theory that Long was not at the altercation was "nonsense" and asked the jury to infer that Swain did not provide police with information about Long. The prosecutor's reference to this evidence in closing left no doubt about its significance and its prejudicial impact. *See, e.g.*, *Banks*, 540 U.S. at 700 (in assessing materiality of suppressed impeachment evidence, prosecutor's reliance on witness in summation is a critical fact).

The Third Circuit's decision in *Dennis* is instructive. There, as here, the Commonwealth argued that new evidence suggesting the defendant was not present at the scene of the crime was

neither favorable nor material. It explained that "the corrected testimony [in light of the new evidence] would not have made *it impossible* for [the defendant] to have been at Fern Rock station when [the victim] was murdered." *Dennis*, 834 F.3d at 287 (emphasis added). The Third Circuit rejected this, holding that: "Although [the witness's] corrected testimony . . . would not *definitively place Dennis in a location where it was impossible* for him to commit the murder, Cason's testimony would have strengthened Dennis's and his father's testimony that Dennis . . . was on the bus at the time of the murder." *Id.* (emphasis added).

The *Dennis* court thus had little trouble concluding that the evidence at issue was material:

> *Kyles* explained that *Brady* materiality . . . requires the court to consider the constitutional error *in light of all the evidence* to determine whether it "put[s] the whole case in such a different light as to undermine confidence in the verdict." . . . Transforming Cason, a disinterested individual . . . into a defense witness meets the materiality requirements of Brady . . . *because it would have necessarily bolstered Dennis's alibi defense narrative and "put the whole case in . . . a different light."*

*Id.* at 295 (emphasis added; quoting *Kyles*, 514 U.S. at 435).

Further, the evidence at issue here is significantly stronger than what the Third Circuit deemed material in *Dennis*. There, the Court acknowledged that the Commonwealth's theory at trial—which it stood by during habeas proceedings—was not "impossible." *Dennis*, 834 F.3d at 287. Here, the Commonwealth implicitly acknowledges that the new evidence renders its theory at trial impossible because it adopts a new one. This "necessarily" places the whole case in an entirely "different light" so as to "undermine confidence in the verdict." *Id.*

The Commonwealth's argument to the contrary downplays the significance of Long's supposed presence at the convenience store altercation at trial. Not only did the prosecution advance this theory multiple times as discussed above, but, significantly, Long's defense counsel

then centered his trial strategy on countering the Commonwealth's claim as to Long's presence at the convenience store altercation occurred. In his opening statement, defense counsel told the jury: "I want you to listen to the evidence in this case *and see whether or not Mr. Long is even present at or near that confrontation. I suggest you will not in any way see that on video*." N.T. 5/14/2013, 36 (emphasis added). He attempted to make the same point through cross examination of Gaffney. *Id.* at 243. So here, as in *Dennis*, the new evidence would have "necessarily bolstered [Long's] . . . defense narrative and put the whole case in a different light." *Dennis*, 834 F.3d at 295.

Finally, even if the Commonwealth's new theory about Long's potential involvement had any relevance to the legal analysis, which it does not, the new theory that Long "joined up with the second shooter," presents a far less compelling case against Long. The Commonwealth's new theory would require a jury to believe that somehow Long either: (1) was immediately notified of the confrontation at which he was not present and joined the group; or (2) was at some later point notified of where Butts-Sterns was and traveled 1.8 miles in the course of 20 minutes to be part of the shooting. Neither scenario is plausible. The Commonwealth argued at trial that Long was present at the convenience store during the altercation because this was the only theory that made sense, not because it had evidence that this was the case; in fact, it had no such evidence. N.T. 5/14/2013, 23.

Ultimately, as Long's defense counsel argued, the Commonwealth put forth no evidence of Long's motive to kill Butts-Sterns beyond his supposed presence at the convenience store when the inciting incident occurred: "[T]his man had no reason, no motive, no incentive to harm or in any way hurry Ercel." *Id.* at 37-38. If Long was not present at the convenience store altercation, which Swain's testimony would establish, Long had no motive at all.

Accordingly, relief is required under either a *Strickland* or a *Brady* theory or both. Trial counsel knew the police had talked to Swain from the activity sheets provided in discovery and should have interviewed him. The Commonwealth also knew that Swain provided exculpatory information to the police and should have disclosed it. And, as discussed above, the new evidence Swain provides that Long was not at the critical precipitating convenience store altercation places the entire case in a different light and undermines confidence in the verdict. There is a reasonable probability that a jury that heard Swain's testimony would reach a different result.

**2.    The Commonwealth also Violated *Napue* by Presenting False Testimony and Argument About Swain's Interactions with Police**

Compounding its suppression of information from Swain, the Commonwealth also presented false testimony and argument to the jury on this topic. Detective Lucke testified that he knew who Swain was and that he had several "encounters" with him. N.T. 5/15/2013, 135. He implied that Swain did not communicate any information during these encounters—an implication ADA Kirn made express when she told the jury during her closing argument that Detective Lucke "brought in Justin Swain," Swain did not "want to say anything" to detectives, and thus Lucke did not "have a statement from him." N.T. 5/16/2013, 91. This was a lie. As set forth above, Swain told police that Long was not at the convenience store altercation that led to Butts-Sterns's death.

In its response, the Commonwealth argues that Long is nevertheless not entitled to relief on his *Napue* claim related to Swain, asserting that, even assuming Swain's credibility, "he does not explain what police personnel he spoke with, either by name or description. As a result, Long has not shown that Detective Lucke's testimony was false, or that the prosecutor knew or should

have known that the testimony was false." ECF No. 90 at 43. This argument misstates the record and the law.

*First*, Detective Lucke's *own* activity sheet leaves no doubt as to who Swain communicated with. The activity sheet documents that: (1) Lucke himself, along with Byard, brought Swain to Homicide; (2) Lucke learned directly from Swain that Swain "observed the argument and shooting incident;" and (3) Swain "provided information about some of the people observed in the surveillance video." ECF No. 73 at A62. Further, the property receipt for Swain's cellular phone lists Detective Lucke as the "assigned investigator." *Id.* at A63. Not only does this demonstrate that Swain spoke to Detective Lucke, but it also exposes the falsity of ADA Kirn's assurance to the jury that Swain did not say anything to detectives.

*Second*, even if it were not clear that Swain's affidavit refers to his conversation with Detective Lucke, knowledge of one government actor is imputed to others. *See, e.g.*, *Kyles*, 514 U.S. at 438. Swain's declaration, in combination with the activity sheet demonstrating his conversation with Lucke occurred, provides powerful support for Long's claim that Swain exculpated Long to a detective acting on the government's behalf. This knowledge was imputed to the prosecutor. Detective Lucke's testimony implying that Swain had not given any information was false, the prosecutor knew or should have known it was false, and the prosecutor failed to correct the false testimony. This violated *Napue*.

Even more significantly, as the Commonwealth acknowledges, "[i]n closing argument, the prosecutor referred to Swain's unwillingness to give a statement as evidence of Long's guilt." ECF No. 90 at 42-43. This was also false, and it is of little concern to the Due Process Clause that that violation is connected to the prosecutor's false statement. The *Napue* standard is equally applicable where the prosecutor makes false statements to the jury. *See* pp. 19-21, *supra*

(surveying authority for this principle). This is because "the reason the lower materiality burden applies where there is knowing use of perjured testimony is that such a situation involves prosecutorial misconduct and a corruption of the truth-seeking function of the trial." *Alzate*, 47 F.3d at 1110 (citing *Bagley*, 473 U.S. at 680; *United States v. Agurs,* 427 U.S. 97, 104 (1976)). A prosecutor's false representation to the jury similarly "involves prosecutorial misconduct and a corruption of the truth-seeking function as well, albeit through somewhat different means." *Id.*

*Third*, the Commonwealth's argument that the information Swain has now provided was not material for a *Napue* analysis is identical to the argument it made regarding the *Strickland* and *Brady* claims based on Swain, *see* ECF No. 90 at 43, and therefore fails for the same reasons, *see* pp. 43-47, *supra*. Indeed, as discussed above, Long's materiality burden in the context of a *Napue* due process claim is lower and more favorable to the defendant as compared to the *Brady* standard. *See Haskell*, 866 F.3d at 146-47. The Swain evidence certainly satisfies this lower standard as there is a reasonable likelihood that if the Commonwealth had not falsely asserted that Swain provided no information to help Long, all the while knowing that he did, the jury would have determined Long was not involved in the convenience store altercation and thus reached a different result.

### C.    Procedural Posture

The Commonwealth has waived exhaustion for this claim. *See* ECF No. 90 at 22-24. The Commonwealth's position is that the claims related to Swain are meritless such that a hearing is not required on them. However, counsel for the Commonwealth has represented that, if the Court believes a hearing is necessary, then the Commonwealth, having waived exhaustion, would not raise a § 2254(e)(2) bar to a hearing. Because *Shinn* did not treat § 2254(e)(2) as jurisdictional,

the Commonwealth may waive this affirmative defense. *See Shinn*, 596 U.S. at 375 n.1; *Stokes v. Stirling*, 64 F.4th 131, 139-40 (4th Cir. 2023).

## V.    DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, INTERVIEW, AND CALL DELISA GRIFFIN AS AN ALIBI WITNESS

This claim is addressed at ECF No. 20-2 at 22-23 and ECF No. 29 at 72-93.

### A.    Background

In his 2015 state PCRA petition, Long brought an ineffective assistance of counsel claim based on his trial attorney's failure to investigate and failure to present Delisa Griffin as an alibi witness. Several witnesses testified about this claim at a 2016 hearing.

Griffin testified that Long came to her house on November 10, 2011, between 5:15 and 5:45 pm, and stayed all evening so that he was with her during the time of the shooting, and she repeatedly stated that she remembered the day because it was her mother's birthday. N.T. 11/21/2016, 81, 84-85. She also testified that she told Mr. Tinari that she was with Long at the time of the incident, but he did not call her as a witness. *Id.* at 87-89.

Long similarly testified that he was with Griffin at the time of the shooting. *Id.* at 14. Long said that at the time of the incident Jazmine Cobb was his girlfriend, but he had a relationship with Griffin behind Cobb's back. *Id.* at 11-12. Long further testified that he only spoke to his attorney twice—the day he retained him and about thirty seconds before trial—and that Mr. Tinari never called him or wrote him. *Id.* at 19-20, 22-23. Long testified that he told Mr. Tinari he was with Griffin that night and wrote down her name and phone number and that Mr. Tinari told him that he would interview Griffin, but he never did. *Id.* at 20, 26. When Long was brought to court for trial, he asked Mr. Tinari if he had interviewed Griffin, and Mr. Tinari said it was too late, but Long noted that Griffin was in the courtroom throughout the trial. *Id.* at 29, 32.

Cobb corroborated Griffin's testimony. *Id.* at 212-13. Cobb testified that she and Griffin were in her car, on their way to a religious service, when she called Mr. Tinari to find out what was going on with Long's case. *Id.* Cobb handed the phone over to Griffin, and Mr. Tinari spoke to Griffin. *Id.* at 213. Cobb heard Griffin give defense counsel her name, phone number, and address. *Id.*

The Commonwealth called Mr. Tinari, who testified that he knew about Cobb, Long's girlfriend, but did not remember Griffin and did not recall having any conversations with Long about any witnesses. *Id.* at 114-16. On cross, Mr. Tinari testified he did not have any paperwork for Long's case, other than a single letter. *Id.* at 136. Regarding Griffin, PCRA counsel asked:

> Q.    Hypothetically speaking, if Delisa Griffin came in here and testified that she had a conversation with you, that's not true?
>
> A.    I don't know. I don't recall having a conversation with her.
>
> Q.    So you're saying it's possible you had a phone conversation with Delisa Griffin?
>
> A.    It could be. I don't know who she is or when the conversation was that you're talking about.

*Id.* at 182.

PCRA counsel continued to ask Mr. Tinari about his conversations with Griffin, who testified that the questions refreshed his recollection. *Id.* at 184. Mr. Tinari then testified that he did remember something about there being a love "triangle," *id.* at 185, presumably the one involving Griffin, Cobb, and Long. Mr. Tinari also testified that he did not interview witnesses or develop the defense case in any other way. *Id.* at 189. Mr. Tinari reiterated that when he said that he did not recall a discussion with Long about an alibi witness before trial, he could not say that the event did not occur; he simply did not remember. *Id.* at 190.

At the end of the hearing, the PCRA court indicated that it found Delisa Griffin to be credible. N.T. 11/21/2016, 234 ("The person that I did believe was telling the bulk of the truth is Ms. Griffin. But the question is how reliable of a witness is Ms. Griffin?"). However, in the PCRA court's ensuing Rule 1925(a) opinion, it found Griffin to be "unreliable" because Griffin was not sure about the night on which Long visited her and instead "appeared to describe a common practice of her and [Long's] instead of a specific recollection of events." *Commonwealth v. Long*, No. 3691 EDA 2016, 2018 WL 3015330, at *3 (Pa. Super. June 18, 2018) (quoting PCRA opinion). The PCRA court further found, contrary to trial counsel's testimony that he may have met Griffin and discussed an alibi but simply could not remember, *see* N.T. 11/21/16, 190, that defense counsel testified that he "never met [Griffin], and never discussed a potential alibi defense with her," ECF No. 29 at A9 (1/27/2017 PCRA Ct. Op.).

The Superior Court held that the PCRA court's credibility determinations were supported by the record. Specifically, the Superior Court held that it was dispositive to this claim that the PCRA court credited defense counsel's supposed testimony that he had never heard of Griffin over Griffin's testimony that she had spoken to defense counsel and told him that she was an alibi witness. *See Long*, 2018 WL 3015330, at *3.

**B.    Argument**

**1.    The State Courts' Factual Findings Regarding Griffin's and Trial Counsel's Testimony Were Unreasonable Determinations of Fact Under 28 U.S.C. § 2254(d)(2)**

The state courts made unreasonable determinations of fact both as to their finding that Griffin's testimony was not credible because she was not specific about the date she was with Long and as to their finding that Mr. Tinari did not know about Griffin.

As to the first issue, the Commonwealth acknowledges that the PCRA court's finding that Griffin could not conclusively establish that the events she described occurred at the time of

Butts-Sterns's murder is "arguably based on an unreasonable determination of the facts." ECF No. 90 at 45 n.9. As the Commonwealth correctly notes, Griffin provided specific testimony about the time that she was with Long and repeatedly asserted that she knew that this happened on November 10th, the night of the shooting, because it was her mother's birthday, and her mother left the house around 5:00 pm that day to celebrate. *Id*. Thus, it is clear that, contrary to the PCRA court's finding that the Superior Court adopted, Griffin provided specific testimony about the day of the events at issue and did not simply describe something that she and Long commonly did. Indeed, at the hearing, the PCRA court expressly stated that it believed "the bulk of the truth" of Griffin's testimony. *See* N.T. 11/21/2016, 234.[8]

As to the second point, no one, not even trial counsel, testified that he did not know about Griffin. As discussed above, Mr. Tinari's recollection was refreshed at the hearing. He admitted that Long told him about "another girl," that "this other girl called me," and that he may have spoken with Griffin. *See* N.T. 11/21/2016, 182, 184-85. He further testified that he was aware of a love triangle. *Id.* at 185. The PCRA court concluded that "nothing on the record indicates that [trial] counsel was being untruthful to the court." ECF No. 29 at A9. This finding should apply

---

[8] The Commonwealth's claim that Griffin's bias toward Long undercut her credibility, *see* ECF No. 90 at 45 n.9, is belied by the PCRA court's statement that it believed the bulk of what Griffin said. Moreover, as one of two women involved in a love triangle with Long, it is far from clear that Griffin would be biased toward Long as opposed to being upset with him. Indeed, the testimony from Griffin, Long, and Cobb at the PCRA hearing established that this was a difficult situation for all of them. Long testified that he "was like creeping with Delisa behind her [Cobb's] back. That was her best friend." N.T. 11/21/2016, 11. He further noted "[w]e had a secret relationship behind my girlfriend's back" *Id.* at 11-12. Griffin testified that she was hesitant to speak with anyone, stating: "Jazz is my friend and I went behind her back and *I was sleeping with her boyfriend*, you know. Don't nobody want to-- don't nobody want to-- I didn't want to hurt Jazz and I wanted to help Butchie at the same time. Q. Okay. A. (*witness crying*)." *Id.* at 96 (emphasis added). Cobb testified that she did not know about Long's relationship with Griffin and the fact that he was at her house until shortly before Long's trial, stating: "For a long time, he would not tell me that he was at her house, so I pretty much heard it from the neighborhood. And then when I asked him, he did tell me." *Id.* at 216.

with equal force to all of Mr. Tinari's testimony, including his admission that he may well have
spoken with Griffin.

Moreover, Mr. Tinari's admission is verified by neutral corroboration. Specifically, Cobb
(Long's girlfriend, who would have disapproved of him being with Griffin) testified she
personally handed the phone to Griffin, and defense counsel took Griffin's name, phone number,
and address. *Id.* at 212-13. The state courts, however, never addressed Cobb's testimony.
Ignoring a witness's central, internally consistent explanation is the kind of selective fact-finding
that § 2254(d)(2) forbids. *See Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005) (holding that,
where the state court omitted findings on evidence critical to the claims, without any explanation
and where the witnesses appeared credible, its decision was based on an unreasonable
determination of the facts in the state court record under § 2254(d)(2)).

These factual errors were material. A state court cannot rely on a finding that defense
counsel never knew about the witness where the record contains direct, corroborated admissions
to the contrary. Such findings are "objectively unreasonable." *Brumfield v. Cain*, 576 U.S. 305,
314 (2015).

### 2. Trial Counsel's Failure to Interview and Call Griffin Requires Relief Whether Reviewed *De Novo* or Under AEDPA Deference

Once § 2254(d)(2) is satisfied, the federal court must review the claim *de novo*. *See
Breakiron*, 642 F.3d at 131. However, even if this Court gives the state court determinations
deference under AEDPA, relief is required under § 2254(d)(1) because the state courts
unreasonably applied clearly established federal law regarding ineffective assistance of counsel
claims.

a.  **Trial Counsel's Failure to Conduct Any Pretrial Investigation Constitutes Deficient Performance**

As detailed above, Mr. Tinari met with Long only once before trial and failed to maintain any meaningful communication thereafter. He ignored Long's letters, arranged no confidential calls, and never discussed defense strategy. N.T. 11/21/2016, 22-23, 25, 189. By his own admission, counsel conducted no investigation beyond reading the discovery materials. *Id.* at 189. He could not recall ever asking Long where he was at the time of the homicide and interviewed no witnesses, neither those identified by the Commonwealth nor any potential defense witnesses. *Id.* at 169.

The Commonwealth reduces *Strickland* to a single question—whether counsel knew about the witness—while disregarding the Supreme Court's clear mandate that counsel must conduct a reasonable investigation when a defendant asserts his innocence. *Strickland*, 466 U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). It is worth noting that ultimately, counsel himself could not say whether or not he knew about the witness. The state courts never addressed counsel's failure to investigate and, as a result, failed to apply established federal law. This is the paradigmatic "complete failure to investigate" that courts consistently find constitutionally deficient. As the Third Circuit has put it, "the courts of appeals are in agreement that failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989).

Even assuming that defense counsel was never alerted to Griffin, an assumption that is not supported by the record, *Wiggins* holds that when "known evidence would lead a reasonable attorney to investigate further," failure to investigate is objectively unreasonable. 539 U.S. at 527. Defense counsel knew Long maintained his innocence and was "not present." N.T.

11/21/2016, 146. A competent attorney must follow up with the obvious question: "Where were you, and who were you with?" Counsel's testimony shows he did not do this. *Id.* at 167.

Counsel's "strategy" of presenting no witnesses and no defense evidence—despite a viable alibi witness who came to court prepared to testify—is not the result of informed professional judgment; it is the product of no investigation, which is per se unreasonable under *Strickland* and *Wiggins*. The state courts' failure to address this issue is a misapplication of law.

### b. Trial Counsel's Failure to Investigate Long's Alibi Prejudiced Long

This case turned entirely on credibility. The Commonwealth relied on one witness's out-of-court statement—a statement the witness recanted at trial. In that posture, credible alibi testimony—anchored to a fixed date, placing Long with Griffin before, during, and after the shooting—creates a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694. The PCRA judge herself found Griffin generally truthful. The failure to present *any* defense evidence in a one-witness case, where compelling evidence of innocence was there for the asking, is prejudicial under any application of *Strickland*'s standard.

### C. Procedural Posture

The Commonwealth has agreed that this claim was properly exhausted in state court. *See* ECF No. 90 at 25.

## VI. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND CALL ERIC GREEN, AND THE COMMONWEALTH VIOLATED DUE PROCESS BY SUPPRESSING GREEN'S EXCULPATORY STATEMENT

These claims are addressed at ECF No. 20-2 at 20-21, 24-25 and at ECF No. 29 at 93-109.

### A.    Background

In Long's 2015 state PCRA petition, he also brought an ineffective assistance of counsel claim, as well as a *Brady* claim, regarding Eric Green. Specifically, Long asserted that trial counsel failed to investigate or present Green as an eyewitness and that the Commonwealth failed to disclose that Green had told detectives Long was not the shooter.

At a 2016 hearing, Green testified that he met up with Gaffney, Butts-Sterns, and Benderick Sterns (Butts-Sterns's cousin) as they were being chased by two men in West Philadelphia on the day of the murder. N.T. 11/18/2016, 31-33. Green testified that he was with the group when a guy went toward them, "pointing a gun at us and shots went off." *Id.* at 33. Green then ran to 57th and Pentridge. *Id.* Green saw the gunman's face, and it was not Long. *Id.* at 34. Green knew it was not Long because he knew Long from school at Delaware Valley High School. *Id.*

After the shooting, detectives brought Green to Homicide. He told detectives the above narrative and when shown a photo of Long, Green told them that Long was not the shooter. *Id.* at 35. Green found out that Long had been arrested for the Butts-Sterns killing in June of 2012, when he was in county prison with him. *Id.* at 43. Green told Long that he knew he had not shot Butts-Sterns, and he volunteered to speak to Long's lawyer about it. *Id.* at 43-44. Green also testified that Benderick Sterns told him that Butts-Sterns's killer had died. *Id.* at 44-45.

The Commonwealth called Mr. Tinari, who said that all he remembered was "[s]omething along the line he [Green] was interviewed and he didn't make an ID." *Id.* at 121-22. Defense counsel testified that he did not recall Long telling him that Green had information helpful to the defense. *Id.* at 124. Mr. Tinari never tried to interview Green. *Id.* at 181. PCRA counsel asked if it raised any red flags for him that Gaffney's statement said that Green was present at the shooting, but the detective's activity sheet said otherwise. Mr. Tinari answered, "No." *Id.* at 177.

The PCRA court denied the claim, finding Green not credible, and the Superior Court affirmed. The Superior Court held that Long was not entitled to relief because the PCRA court determined that Green was not credible because: he did not corroborate other witnesses who said that the shooter stood over Butts-Sterns and shot him in the head; a statement from Lidell Brightman did not say Green was with the group on the day of the shooting; Green's testimony that he saw the shooter's face for five minutes was implausible; and he only gave his account after meeting up with Long in prison. *Long*, 2018 WL 3015330, at *3-4. The Superior Court affirmed based on that credibility judgment. *Id.* at *4. As discussed below, these findings are unreasonable.

**B.      Argument**

**1.      The State Courts' Factual Findings Related to Green Were Unreasonable Determinations of Fact Under 28 U.S.C. § 2254(d)(2)**

The state courts' finding that Green was not credible was an unreasonable determination of facts in light of the evidence presented in the state court proceedings.

As an initial matter, as discussed above, part of the PCRA court's credibility determination that was then adopted by the Superior Court hinged on the finding that Green did not corroborate other witness testimony that the shooter stood over Butts-Sterns and shot him in the head. The Commonwealth concedes that the record does not support this finding. ECF No. 90 at 49. Green's testimony was not that he saw Butts-Sterns's shooting but rather that he saw the gunman and ran away. Thus, as the Commonwealth correctly recognizes, "[n]aturally, Green would not have explained the execution-style shooting described by Gaffney, Matthias, and Hunter when he never alleged that he saw it." *Id.* at 50.

The Commonwealth nevertheless defends the PCRA court's credibility finding on the remaining three grounds identified above, namely that: (1) Brightman did not mention Green in

58

his statement; (2) Green supposedly could not have seen the shooter's face for five minutes; and (3) Green came forward after seeing Long in prison. But all of these findings are similarly unreasonable determinations of the facts.

*First*, the fact that Brightman's statement does not mention that Green was present for the shooting is of no consequence. The Commonwealth's star witness and the only witness that implicated Long—Rashan Gaffney—said Green was present at the outset of the shooting in both his statement to detectives. He maintained this in his trial testimony even though he recanted other aspects of his police statement. *See, e.g.*, N.T. 5/15/2013, 76 ("We met up with Eric Green on Malcolm and Frazier Street and the two guys were about two or three houses from us . . . They started chasing us . . . They were shooting at us the whole time.").[9] Unlike Gaffney's accusation against Long, Gaffney would have had no motive to confabulate an unimportant and collateral (at the time) data point like Green's presence. The PCRA court's analysis is irreconcilable with itself. It sustained a conviction that rested solely on Gaffney's identification, yet dismissed as unreliable Gaffney's account of who else was present during the shooting—a distinction for which the PCRA court offered no coherent justification.

*Second*, the PCRA court's finding that "Green's testimony that he looked at the shooter's face for five minutes immediately before the shooting is implausible," ECF No. 29 at A10, is immaterial to any credibility determination. It is, of course, correct that Green did not stare at the gunman's face for five uninterrupted minutes. But it is also clear that placed in proper context, Green did not say that he did so:

Commw.:    About how much time did you have to look at the gunman's face?

---

[9] The PCRA court stated that "Gaffney's statement can only confirm that Green was present prior to the shooting." ECF No. 29 at A10. But Gaffney's statement makes clear that Green was present when the shooting *began*, consistent with Green's statement to Detective Lucke before trial and his PCRA hearing testimony.

| Green: | About like five minutes. |
|---|---|
| Commw.: | Five minutes? What's going on during the period of five minutes that allowed you to look at the gunman's face? |
| Green: | Well, it was a crowd, and when Rashon was telling me somebody was behind me, I turned around and looked. And when I got a visual on the gunman's face, he was coming |
| . . . . | |
| Commw.: | And when he came between the cars, was he on the same block as you? |
| Green: | Yes. |
| . . . . | |
| Commw.: | And as soon as he got near you, is that when he fired the shot? |
| Green: | Well, he pointed the gun at us first. |

N.T. 11/18/2016, 32-33, 40-41. Green's "five-minute" remark plainly refers to how long the gunman followed the group *before* he opened fire, not that Green was staring at the gunman for five uninterrupted minutes. But the PCRA court contorted it to justify its finding that Green was not credible.

*Third*, the PCRA court's observation that "Green's testimony is further clouded by the fact that he only developed this story after meeting [Long] in prison. Prior to that meeting, Green denied having been present at the shooting," ECF No. 29 at A10, is also unreasonable. Once the court's primary reasons—each based on an unreasonable reading of the record as discussed above—are set aside, this single, insubstantial point is all that remains. This single point is also an incorrect interpretation of the facts because Green testified that he provided an exculpatory non-identification of Long before Long's trial (and *before* he was incarcerated together with Long) on December 30, 2011:

| Defense: | Do you recall ever speaking with detectives about -- |
|---|---|

. . . .

Green:        Yes. I was brought into Homicide and I was questioned about the murder. And they asked me my story on the murder and I told them what I just told you. And they showed me a photograph . . . of Butchie Long. And I stated there that . . . I don't remember this guy as being the shooter that night. And they said why. And I said that I know him . . . I told them I went to school with [Long].

N.T. 11/18/2016, 35-36.

Green's testimony alone refutes the PCRA court's conclusion that he was "incredible" because he supposedly never came forward before encountering Long in prison. Compounding the injustice, the Commonwealth never disclosed Green's exculpatory statement to detectives. The suppression of this evidence violated Long's due process rights at trial, and the PCRA court then relied on the very absence created by that suppression to deny relief. By this logic, the Commonwealth is rewarded for failing to turn over evidence.

Indeed, the Commonwealth appears to agree that Green is not entirely incredible, instead asserting that "reasonable minds could disagree about Green's credibility. . . ." ECF No. 90 at 50. The Commonwealth concedes that the PCRA court's primary motive for discrediting Green is wrong and offers nothing of substance to defend its conclusion that the remaining bases are reasonable. For the reasons set forth above, they are not. The PCRA court's finding that Green was not credible is not just something on which reasonable minds could disagree but instead was objectively unreasonable when viewed in light of the full state court record.

## 2. Trial Counsel's Failure to Investigate and Call Green Requires Relief Whether Reviewed *De Novo* or Under AEDPA Deference

As with Long's ineffective assistance claim regarding Griffin, once § 2254(d)(2) is satisfied, the federal court must review the claim *de novo*. *See Breakiron*, 642 F.3d at 131. *De novo* review is also appropriate here because the state court described the *Strickland* test but did not analyze whether its two prongs were met, instead denying the claim based on its credibility

determination as to Green. *See generally* ECF No. 90 at 51 (acknowledging this issue, noting that the claim was nevertheless arguably decided on the merits, but stating its position on this claim through the lens of *de novo* review). However, as with Long's Griffin claim, even if this Court gives the state court determinations deference under AEDPA, relief is required under § 2254(d)(1) because the state courts unreasonably applied clearly established federal law regarding ineffective assistance of counsel claims.

### a.   Trial Counsel's Failure to Investigate and Call Green Constituted Deficient Performance

Trial counsel's failure to investigate Green constituted deficient performance. The Commonwealth's only argument to the contrary boils down to the assertion that "it was a reasonable, strategic reason for counsel not to call an unbelievable witness. . . ." ECF No. 90 at 51. However, Green is credible for the reasons discussed above. Moreover, as discussed in the context of Long's Griffin claim, trial counsel admittedly performed *no* pretrial investigation. He thus had no basis for assessing Green's credibility. A decision not to call a witness to testify can only be a reasonable strategic decision if counsel has interviewed the witness. "If counsel does not speak to a witness, then counsel 'is ill-equipped to assess his credibility or persuasiveness as a witness.'" *Harrison v. Quarterman*, 496 F.3d 419, 426 (5th Cir. 2007) (quoting *Anderson v Johnson*, 338 F.3d 382, 392 (5th Cir. 2003)); *see also Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) (holding that counsel did not make a strategic choice not to call a witness when counsel did not talk to that witness).

Indeed, the cases the Commonwealth cites support the conclusion that trial counsel's performance here was deficient. For example, in *Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992), the court found that trial counsel's failure to even interview the only two eyewitnesses to a crime and subsequent failure to call them at trial constituted deficient performance because it

"was not a case where further investigation was unlikely to bear fruit" or "where the defendant gave counsel reason to believe that further investigation would be in vain." *Id.* at 1345.[10] The same is true here. Trial counsel knew that Gaffney, the Commonwealth's star witness, told police that Green was at the scene even though the police activity sheet said otherwise. This discrepancy alone would lead a competent lawyer to look further. Counsel also knew that Long maintained his innocence and that he was not present. In these circumstances, the failure to even attempt to interview Green is not the product of any reasonable strategic decision. Instead, as discussed above, it is the type of complete "failure to conduct any pretrial investigation" that "generally constitutes a clear instance of ineffectiveness." *Gray*, 878 F.2d at 711. It is patently unreasonable for counsel not to investigate a witness who was at the scene when the shooting began as that "known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

### b. Trial Counsel's Failure to Investigate and Call Green Prejudiced Long

Trial counsel's failure to investigate Green and consequent failure to call him to testify in Long's defense at trial also prejudiced Long. The Commonwealth's argument to the contrary rests on its assertion that Green's testimony had "limited evidentiary value" because he did not see the prior altercation at the convenience store and because Green testified that there were two men pursuing the group, one of whom was not Long and the other of whom he did not get a good look at. *See* ECF No. 90 at 52. In the Commonwealth's view, Long still could have been the

---

[10] The Commonwealth also cites *McAleese v. Mazurekiewicz*, 1 F.3d 159 (3d Cir. 1993). That case is inapposite because it involved trial counsel's failure to call an alibi witness at trial after trial counsel had investigated the witness in a case where trial counsel did present five disinterested alibi witnesses. *Id.* at 165. That situation is completely different from this one, where trial counsel did not investigate Green, or anyone else, and did not present any witnesses on Long's behalf.

second person and could still have shot Butts-Sterns. *Id.* at 52-53. These arguments do not defeat materiality under *Strickland*.

As an initial matter, in a case like this one, where there was virtually no evidence against Long, a witness whose testimony has even "limited evidentiary value" can still be critical and lead the jury to reach a different outcome. "It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) (denying relief where there was strong evidence of guilt). Here, the Commonwealth's case was extraordinarily weak, making any testimony favorable to Long all the more important and all the more likely to cause the jury to view the case differently.

Moreover, regarding the Commonwealth's argument that Green's testimony is not material because he was not at the convenience store altercation, it is notable that the Commonwealth here acknowledges the relevance of that prior altercation while previously arguing that it was not important in asking this Court to deny Long's claims based on Justin Swain. *Compare* ECF No. 90 at 41 *with id.* at 51. The reality is that both the convenience store altercation and the later pursuit and shooting of Butts-Sterns are important as they are both part of the chain of events leading to the murder, and Swain and Green both provide important information as to different parts of this chain.

Finally, the Commonwealth's argument that Green's testimony is of limited value because he saw only one of two shooters and did not see the final stage of the shooting amounts to an argument that Green's testimony is not material because it does not rule out *any possibility*

of Long's involvement.[11] But, this is not what *Strickland* prejudice requires. To establish prejudice, Long need not prove that "counsel's deficient conduct more likely than not altered the outcome." *Strickland*, 466 U.S. at 693. Instead, Long must demonstrate "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* They did. If a jury had heard evidence from Green that: (1) he was with the group when most of the shooting occurred; and (2) he knew Long and, during that time, Long was neither the shooter nor present, there is a reasonable probability it would have reached a different result.

### 3.    Green's Non-Identification of Long Is Material and the Commonwealth's Suppression of it Requires Relief Under *Brady*

The Commonwealth argues that Long's *Brady* claim related to the Commonwealth's concealment of Green's statement fails because the information Green provided was not material. *See* ECF No. 90 at 54. As discussed above and as the Commonwealth correctly recognizes, the *Strickland* prejudice and *Brady* materiality standards are the same, and the Commonwealth's argument that Green's non-identification of Long to the police is not material fails for the same reasons discussed above.

### C.    Procedural Posture

The Commonwealth has agreed that these claims were properly exhausted. *See* ECF No. 90 at 25.

---

[11] And while the Commonwealth's theory of events, *see* ECF No. 90 at 53, is theoretically possible, it is not plausible, was not argued at Long's trial, and is not supported by the evidence. The Commonwealth's theory of Long's involvement, changed from the trial theory to accommodate the new evidence from Swain and Green, would require the jury to believe that: (1) Long somehow quickly learned of the convenience store altercation for which he was not present; (2) Long somehow joined the group that was involved in the altercation; (3) someone other than Long shot Butts-Sterns; and (4) Long then appeared and fired the final shot.

## VII.  LONG IS ENTITLED TO HABEAS RELIEF BASED ON A STANDALONE CLAIM OF ACTUAL INNOCENCE

This Claim is addressed at ECF No. 73 at 43-48. The Commonwealth waived exhaustion for this claim. *See* ECF No. 90 at 22-24.

Whether a "freestanding" actual innocence claim that would recognize innocence itself as a basis for habeas relief (as opposed to operating as a gateway that allows review of claims with procedural issues) exists is a question that has repeatedly been left open by the Supreme Court and the Third Circuit. *See, e.g.*, *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming "for the sake of argument" that the claim exists); *District Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71-72 (2009) (recognizing the existence of the claim is an "open question" and noting that the Court had "struggled with it over the years"); *Albrecht v. Horn*, 485 F.3d 103, 121-22 (3d Cir. 2007) (assuming claim exists but denying relief); *Wright v. Superintendent Somerset SCI*, 601 F. App'x 115, 116-17 (3d Cir. 2015) (same). This is the appropriate case in which to recognize the claim pursuant to the Eighth and Fourteenth Amendments and to grant relief, as Long has established his innocence under any standard.

The Commonwealth's case relied on Gaffney's implication of Long in his police statement and preliminary hearing testimony. Gaffney's reliability was already in question, and with the disclosure of his true incentives and further impeachment evidence discussed here, it is now eviscerated. The Commonwealth's case against Long is thus reduced to his earlier presence at a mini-market wearing a commonly-worn and popular jacket. Substantial new evidence, however, now underscores the irrelevance of those facts and shows that Long did not commit the crime—Long's alibi that he was with Griffin at all times related to Butts-Sterns's murder; Green's eyewitness account identifying someone else as the shooter; and Swain's statement confirming Long was not at the precipitating altercation. Evidence of Gaffney's incentives and

undisclosed immunity further destroys the credibility of the only evidence the Commonwealth relied upon.

## VIII.    THE CUMULATIVE IMPACT OF DUE PROCESS VIOLATIONS, COUNSEL'S INEFFECTIVENESS, AND NEW EVIDENCE UNDERMINES CONFIDENCE IN THE VERDICT AND REQUIRES RELIEF

This claim is addressed at ECF No. 20-2 at 25-26, ECF No. 29 at 109-11, and ECF No. 73 at 48-49. The Commonwealth waived exhaustion for this claim. *See* ECF No. 90 at 22-24.

The cumulative effect of the Commonwealth's countless due process violations, compounded by trial counsel's deficient performance,[12] eviscerates the credibility of the Commonwealth's case against Long, particularly the credibility of its star witness, Gaffney. This requires relief. Indeed, the Commonwealth acknowledges that the cumulative prejudice analysis is a "closer call" than when the prejudice from each claim is considered individually and further acknowledges that, "the evidence, had it been disclosed, *may have shifted the jury's analysis to some extent. . . .*" ECF No. 90 at 60 (emphasis added). This is tantamount to agreeing that relief is necessary. If this new evidence might shift the jury's analysis, it follows that we cannot have confidence in a verdict reached by a jury that did not have this information. *See Kyles*, 514 U.S. at 1575 (finding cumulative prejudice where the government's case would be "a significantly weaker case" than the jury heard); *see also, e.g.*, *Wearry*, 577 U.S. at 392 n.6 (noting that, given the "undermine confidence in the verdict" standard, a habeas petitioner can prevail "even if . . . the undisclosed information may not have affected the jury's verdict").

Moreover, while the Commonwealth correctly recognizes that "[i]ndividual errors that do

---

[12] The Commonwealth does not include the evidence involved in Long's ineffective assistance of counsel claims in its cumulative prejudice analysis based on its view that those claims did not involve any underlying error. *See* ECF No. 90 at 60 n.11. That view, however, is incorrect for the reasons discussed above. *See* Sections V & VI, *supra*.

not entitle a petitioner to relief may do so when combined," it nonetheless analyzes each "category" of evidence in isolation without any meaningful consideration of the cumulative effect. ECF No. 90 at 58, 60-62. In doing so, the Commonwealth erroneously asserts that none of the evidence is truly new evidence, which is both incorrect and not by any means a dispositive factor for determining whether evidence is material. Contrary to the Commonwealth's argument, this is not a case where the suppressed evidence merely "expanded upon [what was] already introduced at trial." *Id.* at 60.  Rather, each item exposes a distinct and previously concealed flaw in the Commonwealth's case, specifically:

- Undisclosed transactional immunity for Gaffney, the only inculpatory witness;

- Undisclosed back-to-back homicide interrogations and notes labeling Gaffney "weak";

- Undisclosed evidence that Gaffney intimidated witnesses and was the suspect in a retaliatory shooting;

- Evidence undiscovered by trial counsel and undisclosed by the Commonwealth showing that Justin Swain told police that Long was not present during the altercation that the prosecution claimed set the entire chain of events in motion;

- Evidence undiscovered by trial counsel and undisclosed by police that Eric Green told police that Long was also not the person he saw shoot Butts-Sterns shortly before the fatal shot; and

- Evidence undiscovered by trial counsel that Long was with Delisa Griffin at all relevant times.

No reasonable juror could evaluate all of this information together and still credit Gaffney's disavowed identification.

The Commonwealth's reliance on *Rega* is misplaced. In *Rega*, the Third Circuit held that the cumulative effect of the Commonwealth's suppression of two pieces of evidence—an alleged promise by a prosecutor that one witness's cooperation might be considered in future plea negotiations and another witness's memory issues—did not require relief. *See* 115 F.4th at 243-44. However, the first witness "was one of *four* participating witnesses who knew Rega and who unequivocally testified that he was the shooter," and the second witness was not at the scene, such that "[f]urther impeaching her would thus not have undermined the most damning evidence against Rega." *Id.* at 242-44 (emphasis in original).

This case, by contrast, case involved a *single* witness, Gaffney, whose motive to curry favor was manifest, but the jury heard none of the evidence showing that Gaffney was: (1) immunized for firing an unlicensed firearm at someone; (2) interrogated in an unrelated homicide in which he was closely associated with the prime suspect minutes before he implicated Long; (3) considered "weak" by detectives; (4) the prime suspect in the shooting of two witnesses; or (5) actively intimidating witnesses in another murder prosecution. This evidence fundamentally alters the credibility calculus of the single witness on whom the Commonwealth's case entirely depended. *Rega* simply does not speak to a case where the prosecution's sole witness was never subjected to meaningful adversarial testing and where extensive impeachment was affirmatively suppressed.

Likewise, *Turner v. United States*, 582 U.S. 313 (2017), another case relied on by the Commonwealth, is wholly distinguishable because the withheld evidence there was minor and cumulative of impeachment the jury already heard, and the case was supported by multiple eyewitnesses and confessions. Here, the suppressed evidence is neither trivial nor cumulative; it strikes at the credibility of the Commonwealth's sole inculpatory witness in an otherwise one-

witness case, making the verdict far more vulnerable under *Brady* and *Kyles*. Indeed, in its recent

decision in *Glossip*, the Supreme Court highlighted the importance that any additional

impeachment evidence has in a one-witness case, even when that witness's credibility was

attacked at trial, finding that a revelation about the witness's willingness to lie "would be

significant in any case, and *was especially so here where [he] was already nobody's idea of a*

*strong witness*." *Glossip*, 604 U.S. at 248 (emphasis added; cleaned up).

Nor can the Commonwealth minimize the impact of Swain's statement by speculating

that Long could have appeared in "a different neighborhood half an hour later." ECF No. 90 at

61. The prosecution's entire theory at trial was linear and specific: Long was with the man in the

red hoodie during the altercation outside the store, followed the group, and participated in the

shooting. Swain directly refutes the starting point of that narrative by stating Long was not

present at the altercation at all. The Commonwealth's alternative theory—conjured only after

Swain surfaced—requires a sequence of improbable leaps that no reasonable juror would accept:

that Long somehow arrived in a different neighborhood, joined an entirely different group of

people already pursuing the victims, obtained a gun, and inserted himself into the shooting. The

prosecution argued none of this at trial, and materiality cannot be measured against a

hypothetical theory the jury never heard. As the Supreme Court has explained, "the question is

not whether the State would have had a case to go to the jury if it had disclosed the favorable

evidence, but whether we can be confident that the jury's verdict would have been the same."

*Kyles*, 514 U.S. at 453. A defendant "need not demonstrate that after discounting the inculpatory

evidence in light of the undisclosed evidence, there would not have been enough left to convict."

*Id.* at 434-35. Rather, a defendant need only show that the favorable evidence "could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

In a one-witness case—where the sole inculpatory evidence is a recanted statement— cumulative prejudice is not a close question. Each suppressed or undiscovered item independently weakens the reliability of the Commonwealth's case; together, they dismantle it. The evidence is not redundant and is not trivial; it is new, unheard evidence that strikes at the only link between Long and the crime. Under *Kyles*, *Wearry*, *Glossip*, and long-standing Third Circuit precedent including *Dennis*, the combined impact puts "the whole case in such a different light as to undermine confidence in the verdict." *Rega*, 115 F.4th at 241. That is the very definition of cumulative materiality.

## CONCLUSION

In sum, the Commonwealth's arguments largely boil down to an assertion that none of the additional evidence Long now presents is material because Gaffney recanted at trial and was impeached at trial. However, the Commonwealth asked the jury to disbelieve the recantation, and precedent demonstrates that, in a single witness case, the disclosure of impeachment evidence is all the more critical for the defense. Here, the Commonwealth's suppression of information about Gaffney in itself warrants relief. When that suppression is viewed cumulatively with the other constitutional violations that occurred at Long's trial, relief is required.

For all the above reasons, and based upon the full record of this matter, Petitioner, Butchie Long, requests that the Court grant the writ, and vacate Long's convictions and sentence.

Respectfully Submitted,

*/s/ Nilam A. Sanghvi*
Nilam A. Sanghvi
Clay Waterman
Pennsylvania Innocence Project
1515 Market Street, Ste. 300

71

Philadelphia, PA 19102
(215) 204-4255
nilam.sanghvi@painnocence.org
clayton.waterman@painnocence.org

*/s/ Karl Schwartz*
Wiseman, Schwartz, Cioschi & Trama, LLP
718 Arch Street, Suite 701 North
Philadelphia, PA 19106
(215) 360-3988
schwartz@wisemanschwartz.com

Counsel for Petitioner Butchie Long

Dated: February 2, 2026
Philadelphia, PA

**Certificate of Service**

I, Nilam A. Sanghvi, hereby certify that on this 2nd day of February 2026, I served the foregoing upon all counsel of record via the ECF system.

*/s/ Nilam A. Sanghvi*
Nilam A. Sanghvi

# **Exhibit 1**

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO: M11-285 |
|---|---|---|---|
| | | | INTERVIEWER: Det Buckley |
| NAME Hazel Matthias | | AGE ▮▮▮ | RACE ▮▮ | DOB ▮▮▮▮▮ |
| ADDRESS ▮▮▮▮▮▮▮▮▮ | | APARTMENT NO. | PHONE NO. ▮▮▮ |
| NAME OF EMPLOYMENT/SCHOOL | | | SOC. SEC. NO. ▮▮▮ |
| ADDRESS OF EMPLOYMENT/SCHOOL | | DEPARTMENT | PHONE NO. |
| DATES OF PLANNED VACATIONS | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | |
| NAME OF CLOSE RELATIVE ▮▮▮▮▮ | | | |
| ADDRESS ▮▮▮▮ | | | PHONE NO. |
| PLACE OF INTERVIEW Homicide Division Sgt Office | | DATE 11-10-11 | TIME 750PM |
| BROUGHT IN BY 12th District Police | | DATE 11-10-11 | TIME |
| WE ARE QUESTIONING YOU CONCERNING The shooting death of Ercel Sterns on 11-10-11 | | | |
| WARNINGS GIVEN BY | | DATE | TIME |

| ANSWERS | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|

Q. Hazel, my name is Detective Buckley and I would like to ask you some questions concerning the shooting death of Ercel Sterns that occurred on 11-10-11. Are you willing to answer those questions?

A. Yes

Q. Can you read, write and understand the english language?

A. Yes

Q. Are you presently under the influence of drugs or alcohol?

A. No

Q. Do you know the decedent?

A. No

Q. Go on in your own words and tell me what you know about this investigation?

A. I was driving my car down 57th Street and I was with my sister. We had just passed Malcom Street when I saw a group of males, maybe 4-5, run out of Hatfield Street, the 5600 block. They passed in front of my car and then went to the west side of 57th Street. I heard a shot and I saw one of the males fall. He fell of 57th Street right above Willows in the street. Then I saw one of the guys stand over him and shoot him again. Then the males ran back north on 57th Street and I do not know where they went from there.

11-... P. Matthias

INVESTIGATION INTERVIEW RECORD

CONTINUATION SHEET

CITY OF PHILADELPHIA

POLICE DEPARTMENT

M11-285

Interview of Hazel Matthias                    Page #2

CONTINUED

My sister called the police and we waited until the police arrived, I had parked on 57th Street just on the other side of Willows.

Q. When did you first see the male armed with a gun?

A. When I heard the shot is when I saw it, I don't know what kind of gun it was.

Q. As best that you can, could you describe the shooter?

A. He had a hoody on, the hood was up, and it was either blue or black, and it had a white stripe on the sleeve. He was average build, not heavy set or anything. I could not tell how old he was because I could not see his face.

Q. Can you describe any of the other males?

A. They all had on dark clothing.

Q. When the male did the shooting, where were the other guys he was with?

A. When I heard the shot the guy with the gun was by himself, I did not see where the other guys were at that point. I remember when the man with the gun went past my car after the shooting, there was one guy with him.

Q. Did you hear any of the male saying anything at any point?

A. No

Q. Is there anything else that you can add?

A. No

Q. Would you please read this interview over and if it is true and correct sign the bottom of each page?

A. Okay

Hazel P. Matthias

## **Exhibit 2**

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO: M11-285 INTERVIEWER: BASS |
|---|---|---|

| NAME | | | |
|---|---|---|---|
| Tracie J. Hunter | AGE ▓▓ | RACE ▓▓ | DOB ▓▓ |
| ADDRESS ▓▓▓▓▓ | APARTMENT NO. | | PHONE NO. ▓▓▓ |
| NAME OF EMPLOYMENT/SCHOOL ▓▓▓▓ | | | SOC. SEC. NO. ▓▓▓ |
| ADDRESS OF EMPLOYMENT ▓▓▓▓ | DEPARTMENT | | PHONE NO. |
| DATES OF PLANNED VACATIONS | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | |
| NAME OF CLOSE RELATIVE ▓▓▓ | | | |
| ADDRESS ▓▓▓▓ | | | PHONE NO. |
| PLACE OF INTERVIEW Homicide Unit | | | DATE 11-10-11 / TIME 8:00pm |
| BROUGHT IN BY 12th Dist. Police | | | DATE 11-10-11 / TIME 725pm |
| WE ARE QUESTIONING YOU CONCERNING The shooting death of a male at 57th & Willows St on 11-10-11 | | | |
| WARNINGS GIVEN BY | | | DATE / TIME |

| ANSWERS | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|

Q. Tracie, I am Detective Bass and I am going to ask you some questions about a shooting that took place tonight at 57th & Willows St. Is that okay with you?
A. Yes.

Q. Do you read, write and understand English?
A. Yes.

Q. How far did you go in school?
A. Degree from Philadelphia Community College.

Q. Are you known by any other names or nicknames?
A. Julie. It's not really a nickname. It is my middle name.

Q. Right now, are you under the influence of any drugs or alcohol?
A. No.

Q. Were you present tonight when a male was shot and killed at 57th and Willows Ave?
A. Yes. I was driving by. Well, I was the passenger in my sisters car. I wasn't driving.

Q. What kind of car were you in?
A. An Infinity I30. Brown.

*Tracie J. Hunter* (signature)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

Tracie Hunter           Pg#2           M11-285

Q. Can you please tell me what you saw tonight?
A. We were on our way down 57th St. We were heading southbound on 57th St. towards Hadfield. Just as we got to Hadfield St., I think I heard pops. Then I saw three or four boys running out of Hadfield, that would be 5600 Hadfield onto 57th St. There was one young boy in front and I could tell that he was definitely being chased by the other two or three. At first I thought it was a joke because I didn't see the young man fall and there was no screaming or anything like that. At this time the young men were on the east side of 57th St. Then the young man who was being shot crossed the street in front of my sisters car and the other three followed. When the young man who was shot got on the west side of 57th St, he fell to the ground. Then the one with the gun, he was by himself when he went over to the young man and shot him while the young man was on the ground.

Q. What happened after the shooting?
A. After he shot him, he ran past the car back towards Hadfield St. I don't really know where he went I was just happy they passed the car because they were running towards the car.

Q. Did you see the other males running away too?
A. They ran past the car first. The one with the gun ran past the car after them.

Q. What did you do after they ran away?
A. My sister pulled over by the Longstreth school. I was hysterical and I called 9-1-1.

Q. Did you go to where the young man was shot?
A. No.

Q. Did you see anyone go to where the young man was?
A. Yes. People went to where he was. I don't know where they came from.

Q. Did you recognize any of the young men you saw running?
A. No. I don't know anyone from around there.

Q. Do you remember what the shooting victim was wearing?
A. No. It was dark clothes because I don't remember anything light.

Q. What about the male you saw shooting?
A. He had on a blue hoody. I seem to remember white stripes somewhere on the hoody but I am not sure where they were. I just remember white.

Q. Do you know about how old the male with the gun was? How tall he was?
A. They all looked so young. Even the young man who was shot. They looked so young.

*Tracie J. Wade*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

Tracie Hunter                              Pg#3                              M11-285

Q. Do you remember seeing anyone else out there?
A. I remember there was a young lady and she had a baby. She was right there and it seemed like she didn't know what to do. I saw her run down Hadfield towards 58th St. I'm not sure if she ran all the way down Hadfield or went into the store for safety.

Q. When you first saw the young lady, how close was she to where the victim was?
A. She was on the sidewalk right there. The young man who was shot didn't make it to the sidewalk when he fell. I saw her running when they were coming over across the street.

Q. Were there any cars obstructing your view of what happened?
A. No. There were no cars coming at the time and there were no parked cars where the young man fell.

Q. Is there anything that you can add at this time?
A. No.

Q. Please read this 3 page interview. If everything is true and correct, sign each page. If there are any mistakes tell me and we will correct them, okay?
A. Okay.    *Tracie J. Hunter*

## Exhibit 3



20



21



14



15